# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION, )
800 K Street N.W., Suite 1000 )
Washington, D.C. 20001, )
  )
NATIONAL FEDERATION OF )    Case No. 1:25-cv-00420
FEDERAL EMPLOYEES, AFL-CIO, )
1225 New York Avenue N.W., Suite 450 )    MEMORANDUM OF
Washington, D.C. 20005, )    POINTS AND
  )    AUTHORITIES IN
INTERNATIONAL ASSOCIATION OF )    SUPPORT OF
MACHINISTS AND AEROSPACE WORKERS, )    PLAINTIFFS' MOTION
AFL-CIO, )    FOR A TEMPORARY
9000 Machinists Place )    RESTRAINING ORDER
Upper Marlboro, MD 20772, )    AND PRELIMINARY
  )    INJUNCTION
INTERNATIONAL FEDERATION OF )
PROFESSIONAL & TECHNICAL )
ENGINEERS, AFL-CIO, )
513 C Street N.E. )
Washington, D.C. 20002,  and )
  )
INTERNATIONAL UNION, UNITED )
AUTOMOBILE, AEROSPACE AND )
AGRICULTURAL IMPLEMENT WORKERS )
OF AMERICA, )
8000 East Jefferson Avenue )
Detroit, MI 48214 )
  )
               Plaintiffs, )
  )
               v. )
  )
DONALD J. TRUMP, )
President of the United States )
1600 Pennsylvania Avenue N.W. )
Washington, D.C. 20035, )

CHARLES EZELL,                                      )
Acting Director,                                    )
Office of Personnel Management                      )
1900 E Street N.W.                                  )
Washington, D.C. 20415,                             )
                                                    )
DOUGLAS O'DONNELL,                                  )
Acting Commissioner, Internal Revenue Service       )
U.S. Department of Treasury                         )
1500 Pennsylvania Avenue N.W.                       )
Washington, D.C. 20220,                             )
                                                    )
DOROTHY FINK, Acting Secretary                      )
U.S. Department of Health and                       )
Human Services                                      )
200 Independence Avenue S.W.                        )
Washington, D.C. 20201,                             )
                                                    )
RUSSELL VOUGHT, Acting Director,                    )
Consumer Financial Protection Bureau,               )
1700 G Street N.W.                                  )
Washington, D.C. 20552                              )
                                                    )
RANDY MOORE, Chief,                                 )
U.S. Forest Service                                 )
U.S. Department of Agriculture                      )
1400 Independence Avenue S.W.                       )
Washington, D.C. 20250,                             )
                                                    )
DOUG COLLINS, Secretary                             ),
Department of Veterans Affairs                      )
810 Vermont Avenue N.W.                             )
Washington, D.C. 20420,                             )
                                                    )
PETE HEGSETH, Secretary                             )
Department of Defense                               )
1000 Defense Pentagon                               )
Washington, D.C. 20301-100,                         )
                                                    )
MAKENZIE LYSTRUP, M.D., Director,                   )
Goddard Space Flight Center                         )
National Aeronautics and Space Administration       )
8800 Greenbelt Road                                 )
Greenbelt, MD 20771, and                            )

                                                          )
MATTHEW J. MEMOLI, Acting Director,                       )
National Institutes of Health                             )
9000 Rockville Pike                                       )
Bethesda, MD 20892                                        )
                                                          )
                                    Defendants.           )
_____           )


## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page:

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................ 3

I.  The Executive Order's Directive to Agencies to Fire Hundreds of Thousands of Employees............................................................................................... 3

II.  The OPM-Directed Mass Firing of Probationary Employees Across the Government.............................................................................................. 4

III.  OPM's "Fork in the Road" Threat to Federal Employees to Resign or Else ..... 6

ARGUMENT ...................................................................................................... 7

I.  The Unions' Claims Will Likely Succeed. ........................................................ 8

    A. The President and His Administration's Mass Firing of Nonessential Workers and Probationary Employees and the Deferred Resignation Plan Violate Separation of Powers Principles ...............................................8

        1.  Congress Has Plenary Authority Over the Existence, Mission, and Funding of Executive Agencies..............................................8

        2.  The Executive Branch's Actions Intrude on Congress's Powers..........9

    B. The Executive Order's and OPM's Mass Firing Directives Violate the Reduction-in-Force Statutory and Regulatory Construct ....................13

        1.  RIF Statute and Regulations.....................................................13

        2.  The Workforce Order and OPM's Instruction Direct Agencies to Violate the RIF Statute and Regulations.............................................14

    C. This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims ....... 18

        1. The Unions Will Suffer Irremediable Harm, Rendering Any Future Judicial Review Meaningless ...................................................... 19

            a. Financial Harm...............................................................20

b. Loss of Bargaining Power……………………………………………22

2. The Unions' Claims Are Wholly Collateral to the Administrative Scheme Because They Will Suffer Substantial Independent Harm if Forced to Proceed Through Administrative Proceedings…...………………..24

3. Agency Expertise is No Longer Entitled to Any Weight in a *Thunder Basin* Analysis…….....…………………………………………………………25

II.     The Unions Will Suffer Irreparable Harm Absent Immediate Injunctive Relief…………………………………………………………………………… 25

III.     The Balance of Equities Tips in the Unions' Favor, and the Public Interest Will Be Served by Immediate Injunctive Relief…………………………………… 28

CONCLUSION…………………………………………………………………… 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) ........................................................ 24

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ................................................................. 24

*Axon Ent. v. FTC*, 598 U.S. 175 (2023) ......................................................... 18, 19, 23

*Berkeley v. Mt. Valley Pipeline, LLC*, 896 F.3d 624 (4th Cir. 2018) ........................ 19

*Bowen v. City of New York*, 476 U.S. 467 (1986) ...................................................... 24

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................... 8-9

*Clinton v. City of New York*, 524 U.S. 417 (1998) .................................................. 9, 29

*Commerce v. FLRA*, 7 F.3d 243 (D.C. Cir. 1993) ...................................................... 16

*Cross v. DOT*, 127 F.3d 1443 (Fed. Cir. 1997) .......................................................... 15

*Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551 (D.C. Cir. 2023) .................... 19

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* 561 U.S. 477
  (2010) ....................................................................................................................... 9

*Grier v. HHS*, 750 F.2d 944 (Fed. Cir. 1984) ............................................................ 16

*In re AFGE*, 790 F.2d 116 (D.C. Cir. 1986) ............................................................... 23

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ...................................................... 11

*Int'l Union of Elec., Radio & Machine Workers v. NLRB*, 426 F.2d 1243
  (D.C. Cir. 1970) ..................................................................................................... 23

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015) ................................................. 19, 24, 25

*Loper Bright Ent. v. Raimondo*, 603 U.S. 369 (2024) ............................................... 25

*MSPB v. FLRA,* 913 F.2d 976 (D.C. Cir. 1990) .................................................... 16-18

*Myers v. United States*, 272 U.S. 52 (1926) ................................................................. 8

*NTEU and DHHS, Region X*, 25 F.L.R.A. 1041 (1987) ............................................... 16

*NTEU v. OPM*, 76 M.S.P.R. 244 (1997) .................................................................... 17

*New Mexico v. Richardson*,
    39 F. Supp. 2d 48 (D.D.C. 1999) ...................................................................... 8

*NRC v. FLRA*, 895 F.2d 152 (4th Cir. 1990)....................................................... 15, 16

*Rowland-Clum v. Department of the Army*, 1996 U.S. App. LEXIS
    29579 (Fed. Cir. Nov. 12, 1996) ..................................................................... 15

*Sierra Club v. United States Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ................................................................. 7, 25

*Singh v. Berger*, 46 F.4th 88 (D.C. Cir. 2022)......................................................... 28

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ................................. 18, 19, 25

*Tilton v. SEC*, 824 F.3d 276 (2d Cir. 2016) ............................................................ 19

*Train v. City of New York*, 420 U.S. 35 (1974) ........................................................ 11

*WMATA v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) ......................................................................... 8

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................... 9, 10

## Constitutional Provisions

Article I, Section 1 .......................................................................................... 8

## Statutes and Regulations

2 U.S.C. §§ 681-688............................................................................................ 9

5 U.S.C. § 3502................................................................................................ 13, 17

5 U.S.C. § 3502(a) ............................................................................................... 13

5 U.S.C. § 3502(d) ........................................................................................... 13, 14

5 U.S.C. § 3502(d)(2)............................................................................................ 14

5 U.S.C. § 3502(d)(2)(D)....................................................................................... 13

5 U.S.C. § 3502(e) ............................................................................................... 14

5 U.S.C. § 3502(e)(3) ............................................................ 14

5 U.S.C. § 7701 .................................................................. 18

31 U.S.C. § 1341.............................................................. 9, 10

31 U.S.C. § 1342................................................................ 10

42 U.S.C. § 10134(d) .......................................................... 11

Inflation Reduction Act, Pub. L. No. 117-169................................ 11

Inflation Reduction Act, Pub. L. No. 117-169, § 10301 ..................... 12

5 C.F.R. Part 351 ............................................................... 13

5 C.F.R. § 351.201(a)(2) .................................................. 13, 15

5 C.F.R. § 351.402(a) .......................................................... 15

5 C.F.R. § 351.402(b)........................................................... 15

5 C.F.R. § 351.501(a) .......................................................... 17

5 C.F.R. § 351.502(a)........................................................... 17

## Other Authorities

Congressional Research Service, *The Internal Revenue Service's
    Strategic Operating Plan* (June 2, 2023)................................ 12

Eric Katz, *See Who Would Get Furloughed in a Shutdown This Year*,
    GovExec.com (Sept. 22, 2023) ........................................... 3

Executive Order No. 14210, Implementing the President's
    "Department of Government Efficiency" Workforce Optimization
    Initiative (Feb. 11, 2025).........................................passim

Fork in the Road, OPM.gov (last visited Feb. 14, 2025) .................... 6

Garrett Haake and Megan Lebowitz, *White House Says About 75K
    Federal Workers Accepted 'Deferred Resignation' Offer*, nbc.com
    (Feb. 12, 2025) .................................................. 7, 22, 27

Holly Otterbein, *Musk Aims to Hobble Federal Workers Ahead of
    'Buyout' Deadline*," Politico.com (Feb. 6, 2025)....................... 7

Jason Miller, *OPM Asks Agencies to Justify Keeping Probationary Employees*, Federal News Network.com (Feb. 4, 2025) .......................................... 4

Laurel Wamsley, *Up to 100 More Workers Are Fired at CFPB as Staff Fear Mass Layoffs are Looming*, NPR.com (Feb. 13, 2025) ................................ 3-4

National Taxpayer Advocate, Annual Report to Congress 2022 .............................. 12

OPM, *Guidance on Probationary Periods, Administrative Leave and Details*, opm.gov ..................................................................... 4

OPM, *Workforce Reshaping Operations Handbook* (March 2017) ........................... 15

Rebecca Beitsch, *OPM Directs Agencies to Fire Government Workers Still on Probation*, The Hill.com (Feb. 13, 2025) ..................................................... 5

The Federalist No. 51 (J. Madison) .............................................................. 8

The Federalist No. 71 (A. Hamilton) ............................................................ 8

Tim Reid et al., *Thousands Fired in US Government as Trump, Musk Purge Federal Workers*, Reuters.com (Feb. 13, 2025) ............................................ 5

U.S. Department of Treasury, *Continuing Improvements to IRS Customer Service in Filing Season 2024* (June 7, 2024) ...................................... 12

## INTRODUCTION

Plaintiffs National Treasury Employees Union (NTEU), National Federation of Federal Employees (NFFE), International Association of Machinists and Aerospace Workers (IAM), International Federation of Professional and Technical Engineers (IFPTE), and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) (collectively, the Unions) represent hundreds of thousands of employees in dozens of federal agencies and departments across the nation.

This case centers on three Executive Branch actions that will soon lead to the loss of over a half-million federal employees. *First*, on February 11, 2025, Defendant Trump issued Executive Order No. 14210, Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative (Workforce Order). Among other categories of employees, the Workforce Order directs agencies to fire workers who would be deemed "nonessential" during a government shutdown—a figure that approximated 345,000 during the last major lapse in appropriations in 2018-19. Those firings have begun. *Second*, Defendant Office of Personnel Management (OPM) has directed federal agencies to fire their probationary employees, which number some 220,000 nationwide. Those firings have likewise begun. *Third*, Defendant OPM threatened the approximately 2.2 million federal civil employees, urging them to resign their positions through a "deferred resignation program" or face losing their jobs. At least 75,000 employees agreed to resign.

A mass reduction of roughly twenty-five percent of the federal civilian workforce is unprecedented. It raises the novel question of whether the Executive Branch may lawfully hobble the federal agencies that Congress creates, to which Congress assigns statutory missions, and which Congress funds so that they may accomplish those legislative directives. The Unions contend that these Executive Branch actions, collectively, violate separation of powers principles. They likewise violate federal statutes and regulations governing reductions-in-force (RIFs).

The Unions seek emergency relief to preserve the status quo and to protect the workers they represent from the Executive Branch's attempts to dismantle their agencies. The mass firings are underway and are proceeding a rapid pace. Absent prompt injunctive relief, Plaintiff NTEU will imminently lose up to half of its revenue and around half of the workers that it represents. Its bargaining power and influence with respect to its workers and at agencies where it represents workers will be diminished in a way that cannot be undone. The other union plaintiffs will likewise lose critical revenue and heft at the bargaining table.

The Unions thus ask this Court to immediately enjoin Section 3(c) of the Workforce Order, which directs the firing of nonessential federal employees and other federal workers; the mass firing of probationary employees that is occurring across federal agencies; and further extensions or iterations of OPM's deferred resignation program.

## FACTUAL BACKGROUND

### I.    The Executive Order's Directive to Agencies to Fire Hundreds of Thousands of Employees

On February 11, the President issued the Workforce Order, the purpose of which is to "restore accountability" by "eliminating waste, bloat, and insularity[.]" Workforce Order, sec. 1. The Workforce Order directs agency heads to "promptly prepare to initiate large-scale reductions in force (RIFs)" and to prioritize:

> [a]ll offices that perform functions not mandated by statute or other law . . . including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations . . . .

Workforce Order, sec. 3(c).

Taking the last category alone, the RIFs that the President has directed will eliminate a substantial portion of the federal civilian workforce. During the last major shutdown, the 35-day shutdown in 2018-19, approximately 345,000 employees were not designated as essential. Eric Katz, *See Who Would Get Furloughed in a Shutdown This Year*, GovExec.com (Sept. 22, 2023), www.govexec.com/workforce/2023/09/see-who-would-get-furloughed-shutdown-year/390517/ (last accessed February 14, 2025).

Just two days after the President's Workforce Order, the CFPB began terminating employees in reliance on it. Laurel Wamsley, *Up to 100 More Workers Are Fired at CFPB as Staff Fear Mass Layoffs are Looming*, NPR.com (Feb. 13, 2025), https://www.npr.org/2025/02/13/nx-s1-5296929/cpfb-layoffs-staff-trump-doge

(last accessed February 14, 2025) (noting termination letters explicitly relying on the Workforce Order).

II.    **The OPM-Directed Mass Firing of Probationary Employees Across the Government**

On January 20, OPM directed all federal department and agencies to provide it with a list of all probationary employees within the next four days. OPM Guidance on Probationary Periods, Administrative Leave and Details, OPM.gov, https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C %20Administrative%20Leave%20and%20Details%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%20FINAL.pdf (last accessed February 14, 2025).[1] OPM further asked the heads of all federal departments and agencies to "promptly determine whether those employees should be retained." *Id.*

By February 5 at noon, each federal department and agency had to send OPM its determination of which probationary employees, if any, should be retained. Specifically, "OPM asked agencies to submit their lists and gave them a 200-character limit to explain why the employee should stay in government." Jason Miller, *OPM Asks Agencies to Justify Keeping Probationary Employees*, Federal News Network.com (Feb. 4, 2025), https://federalnewsnetwork.com/workforce/2025/02/opm-asks-agencies-to-justify-keeping-probationary-employees (last accessed February 14, 2025). According to a

---

[1] Competitive employees are generally considered probationary in their first year, and excepted service employees are generally considered to be in a trial period their first two years. Both categories are referred to herein as probationary employees

source, "while OPM didn't specifically say employees would be fired if agencies indicated they did not want to retain them, there was an underlying message that these employees were on their way out." *Id.*

There are an estimated 220,000 probationary employees in the federal government. *See id.* A mass firing of nearly all probationary employees would thus wipe out about 10% of the federal civilian workforce.

The mass firing of probationary employees is underway. OPM has "directed agencies to fire all probationary employees 'with some exceptions.'" Rebecca Beitsch, *OPM Directs Agencies to Fire Government Workers Still on Probation*, The Hill.com (Feb. 13, 2025), thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/ (last accessed February 14, 2025). Consistent with OPM's direction:

- On the night of February 11, the CFPB, where Plaintiff NTEU represents employees, sent its probationary employees notices of termination. Declaration of Dan Kaspar (Ex. 1) ¶ 14 (Feb. 14, 2025).

- "The Department of Veterans Affairs . . . let go of more than 1,000 employees who were in their probationary period, while the U.S. Forest Service was set to fire more than 3,000." Tim Reid et al., *Thousands Fired in US Government as Trump, Musk Purge Federal Workers*, Reuters.com (Feb. 13, 2025), https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/ (last accessed February 14, 2025).

- The Food and Drug Administration, where Plaintiff NTEU represents employees, is preparing to terminate nearly all its probationary employees. Declaration of Dan Kaspar (Ex. 1) ¶ 15 (Feb. 14, 2025).

- The Bureau of Engraving and Printing, another agency where Plaintiff NTEU represents employees, is preparing to fire probationary employees. Declaration of Dan Kaspar (Ex. 1) ¶ 16 (Feb. 14, 2025).

- The Department of Energy, where Plaintiff NTEU represents employees, expected to send termination notices to probationary employees yesterday. Declaration of Dan Kaspar (Ex. 1) ¶ 17 (Feb. 14, 2025).

### III.    OPM's "Fork in the Road" Threat to Federal Employees to Resign or Else

On January 28, OPM sent the approximately 2.2 million federal civil employees an email designed to threaten them into resigning their positions. OPM invited employees to opt into a deferred resignation program and terminate their federal employment on September 30. At the same time, OPM cautioned these employees that "the majority of federal agencies are likely to be downsized through restructurings, realignments, and reductions in force." Fork in the Road, OPM.gov, https://www.opm.gov/fork/original-email-to-employees/ (last accessed February 14, 2025).

After OPM's initial communication, the Executive Branch, including OPM, continued to ramp up the pressure on the federal civilian workforce to resign. For example, "[i]n an email to some federal employees . . . a commissioner at a department overseen by Musk's allies warned of the impending pain if they don't

leave." Holly Otterbein, *Musk Aims to Hobble Federal Workers Ahead of 'Buyout' Deadline*," Politico.com (Feb. 6, 2025), https://www.politico.com/news/2025/02/06/federal-workers-musk-buyout-fears-00202768 (last accessed February 14, 2025).

The White House has reported that about 75,000 employees—over 3% of the federal civilian workforce—opted into OPM's deferred resignation program. Garrett Haake and Megan Lebowitz, *White House Says About 75K Federal Workers Accepted 'Deferred Resignation' Offer*, nbc.com (Feb. 12, 2025), https://www.nbcnews.com/politics/white-house/white-house-says-75000-accepted-federal-buyout-trump-rcna191971.

## ARGUMENT

A party seeking a temporary restraining order or preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 24 (D.D.C. 2013) (quotation marks and alterations omitted). "In conducting an inquiry into these four factors, a district court must balance the strengths of the requesting party's arguments in each of the four required areas. If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* (quotation marks, alterations, and ellipsis omitted).

I.    <u>**The Unions' Claims Will Likely Succeed.**</u>

To establish a likelihood of success on the merits, the Unions must show that a "serious legal question" is at issue. *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, the court may grant an injunction even though its own approach may be contrary to movants' view of the merits." *New Mexico ex rel. v. Richardson*, 39 F. Supp. 2d 48, 50 (D.D.C. 1999) (alterations omitted).

A.    **The President and His Administration's Mass Firing of Nonessential Workers and Probationary Employees and the Deferred Resignation Plan Violate Separation of Powers Principles.**

1.    **Congress Has Plenary Authority Over the Existence, Mission, and Funding of Executive Agencies.**

The Framers intended for Congress to be the most powerful branch of the federal government. The legislative power that the Founders envisioned "necessarily predominates" (The Federalist No. 51 (J. Madison)) and has a "tendency . . . to absorb every other" (The Federalist No. 71 (A. Hamilton)). The Constitution enshrines this predominant legislative power in Article I, Section 1: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Congress's constitutional power entitles it to create or destroy executive agencies and dictate their missions. "To Congress under its legislative power is given the establishment of offices . . . [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). *Accord Buckley v.*

8

*Valeo*, 424 U.S. 1, 138 (1976) (discussing Congress's ability to create or remove federal agencies through the Necessary & Proper Clause). Congress thus "control[s]" the very "existence of executive offices." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010).

Congress, moreover, has the power to fund or defund executive branch agencies—and, in exercising that power, determines whether and how agencies may function. The Antideficiency Act, 31 U.S.C. § 1341, *et seq.,* which generally prohibits the executive branch from incurring obligations that Congress has not authorized, and the Impoundment Control Act, 2 U.S.C. §§ 681-688, which prevents the Executive from postponing or withholding the use of appropriated funds, illustrate this. Thus, while the President is responsible for the enforcement of federal laws, Congress alone has the power of the purse with which to fund or defund agencies and their activities.

### 2.    The Executive Branch's Actions Intrude on Congress's Powers.

a.    The President and his administration's mass firings and their resignation program—collectively, a project to eviscerate agencies that Congress created and funded—violates two bedrock principles of the separation of powers.

*First*, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). *See Clinton v. City of New York*, 524, U.S. 417, 449-453 (1998) (Kennedy, J., concurring) (expressing separation of powers concerns with the Line Item Veto Act, through which the President could cancel out

certain spending provisions in legislation unilaterally). If the President could not seize steel mills when he believed national defense was at stake (*Youngstown Sheet & Tube Co.*, 434 U.S. at 588), there it must follow that the President cannot decimate entire agencies because of alleged "bloat" in the federal government. Workforce Order, sec. 1.

There is no statute that expressly authorizes the President to slash roughly one-quarter of the federal workforce, imperiling the statutory missions that Congress has assigned to federal agencies. "Nor is there any act of Congress . . . from which such a power can be fairly implied." *Youngstown Sheet & Tube Co.*, 434 U.S. at 588. Indeed, the Antideficiency Act, 31 U.S.C. § 1341 *et seq.*, shows Congress's intent that the "ongoing, regular functions of government" continue so long as Congress has funded the federal agencies that it created. 31 U.S.C. § 1342. While employees performing these functions may not work during a lapse in appropriations, the opposite is true when Congress has provided funding: they are to work—and to do so in furtherance of the statutory missions that Congress has prescribed to their agencies. Yet, under the Workforce Order, employees engaging in the "ongoing, regular functions of government" (31 U.S.C. § 1342)—nonessential employees—will be prioritized for a RIF.

*Second*, the Executive *must act* when Congress directs it to do so. The D.C. Circuit relied on this principle when granting a petition for a writ of mandamus ordering the Nuclear Regulatory Commission to approve or disapprove the Department of Energy's license application to store nuclear waste at Yucca

Mountain. *In re Aiken Cnty.*, 725 F.3d 255, 266-267 (D.C. Cir. 2013). Congress, through the Nuclear Waste Policy Act, required the Commission to issue its decision within a certain time. 42 U.S.C. § 10134(d). But the statutory deadline passed, and the Commission admitted that it did not intend to comply with the law. *In re Aiken Cnty.*, 725 F.3d at 258.

Then-Judge Kavanaugh, writing for the Court, explained that "[u]nder Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *Id.* at 259. The President "may not," the Court continued, "decline to follow a statutory mandate . . . simply because of policy objections." *Id.* The President's discretion "does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to . . . implement or administer statutory projects or programs." *Id.* at 266. *See Train v. City of New York*, 420 U.S. 35, 44-45 (1974) (noting that if Congress did not authorize the Executive to withhold funds under the Federal Water Pollution Control Act from being allotted, or to only disburse certain funds, then the Executive did not have such discretion).

This principle has equal force here. An example of an act of Congress that the Executive Branch's actions undermine is the Inflation Reduction Act (IRA), Pub. L. No. 117-169. Congress passed the IRA in 2022 after the IRS workforce had shrunk

to its smallest size since the 1970s.[2] In the IRA, Congress appropriated billions of dollars for designated purposes, namely improving tax law enforcement, operations support, business systems modernization, and taxpayer services. IRA § 10301. IRS has used this IRA funding to hire thousands of new employees. For example, IRS has rapidly hired thousands of additional employees to carry out Congress's mandate to improve taxpayer service.[3]

Many new IRS employees hired under the IRA are in probationary status. IRS has an estimated 15,000 probationary employees today, many of whom were hired through IRA funds.[4] The administration's mass firing of probationary employees will therefore thwart Congress's legislated goal in the IRA of improving tax enforcement and taxpayer services.

In sum, the Executive Branch's attempt to hobble the federal agencies that Congress created and to which it assigned missions through mass firings and a pressure campaign for resignations violates separation of powers principles.

---

[2] National Taxpayer Advocate, Annual Report to Congress 2022 at 27, https://www.taxpayeradvocate.irs.gov/reports/2022-annual-report-to-congress/full-report/ (last accessed February 14, 2025).

[3] *See* Congressional Research Service, *The Internal Revenue Service's Strategic Operating Plan* (June 2, 2023), https://crsreports.congress.gov/product/pdf/IF/IF12394 (last accessed February 14, 2025) (agency responded to more taxpayer calls "thanks to the hiring of 5,000 customer service representatives using IRA funds"); U.S. Department of Treasury, *Continuing Improvements to IRS Customer Service in Filing Season 2024* (June 7, 2024), https://home.treasury.gov/news/featured-stories/continuing-improvements-to-irs-customer-service-in-filing-season-2024 (last accessed February 14, 2025) (IRA funding has made thousands of new hires possible).

[4] *See* Declaration of Daniel Kaspar (Ex. 1) at ¶ 18 (Feb. 14, 2025).

12

### B. The Executive Order's and OPM's Mass Firing Directives Violate the Reduction-in-Force Statutory and Regulatory Construct.

#### 1. RIF Statute and Regulations.

Under Section 3(c) of the Workforce Order, "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs) . . . ."

Congress has statutorily prescribed criteria that must be followed for both tenured and competitive employees if agencies implement RIFs. 5 U.S.C. § 3502. That statute requires, for example, that OPM issue regulations for the release of competing employees in a RIF that give due effect to employees' tenure, length of service, performance ratings and more. *Id.* § 3502(a) It also requires that agencies give advance notice of any RIF to affected employees and to their exclusive representative for collective bargaining purposes. *Id.* § 3502(d). That notice must include certain information, such as the employee's ranking relative to other employees and how that ranking was determined. *Id.* § 3502(d)(2)(D).

As Congress directed, OPM has promulgated RIF regulations. 5 C.F.R. Part 351. Those regulations apply when agencies intend to terminate employees and "the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties[.]" 5 C.F.R. § 351.201(a)(2).

### 2. The Workforce Order and OPM's Instruction Direct Agencies to Violate the RIF Statute and Regulations.

The Workforce Order and OPM's instruction direct agencies to violate the RIF protocol in four separate ways.

**a.** The President's Order violates the RIF statute because it directs agencies to take actions which will violate the statute's mandatory notice requirements and agencies are, in fact, beginning to implement RIFs without the requisite notice. Such agency actions thus violate the Administrative Procedure Act.

The RIF statute requires that agencies give at least 60 days' notice to employees affected by a potential RIF, as well as to those employees' exclusive representative for collective bargaining agreements, before any employee is released. 5 U.S.C. § 3502(d). The statutorily required notice must include certain information, such as the employee's ranking relative to other competing employees and how that ranking was determined. 5 U.S.C. § 3502(d)(2). Congress's notice period may be shortened but only if an agency so requests because of "circumstances not reasonably foreseeable." 5 U.S.C. § 3502(e). The notice period, in any event, can never be shorter than 30 days. *Id.* § 3502(e)(3).

**b.** The Workforce Order impermissibly directs agencies to violate OPM's regulations and, thus, the Administrative Procedure Act. Section 1 of the Order commands that agencies must engage in RIFs for the purpose of "eliminating waste, bloat, and insularity" (Workforce Order, sec. 1)—but that is not an allowable basis for a RIF under OPM's regulations.

14

RIFs may be undertaken for certain specified reasons, namely "lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties[.]" 5 C.F.R. § 351.201(a)(2). *See Cross v. DOT*, 127 F.3d 1443, 1446 (Fed. Cir. 1997) (a RIF is legitimately conducted if done so for one of the reasons identified in the regulation); *Rowland-Clum v. Department of the Army*, 1996 U.S. App. LEXIS 29579 at *3 (Fed. Cir. Nov. 12, 1996) (RIFs must be conducted for one of the legitimate reasons listed in the regulation).

The Workforce Order ignores these regulatory limitations. It unlawfully directs agencies to prioritize RIF'ing employees in "offices that perform functions not mandated by statute" or "employees . . .who are not typically designated as essential during a lapse in appropriations[]," (Workforce Order, sec. 3(c)), without regard to whether there is a funding shortage or other allowable reason to RIF such employees.

c. The Workforce Order likewise violates OPM regulations defining "competitive areas" for purposes of a RIF.

Before agencies begin a RIF, they must establish "competitive areas in which employees compete for retention." 5 C.F.R. § 351.402(a). A competitive area must be "defined *solely* in terms of an agency's organization unit(s) and geographical location, and it *must* include all employees within the competitive area so

defined.'" 5 C.F.R. § 351.402(b) (emphasis added).[5] "Agencies, therefore, must accommodate two elements, administrative structure and geography, in determining competitive areas. *Grier v. HHS*, 750 F.2d 944, 946 (Fed. Cir. 1984). In addition, "a competitive area 'must include all employees within the competitive area so defined.'" *Commerce v. FLRA*, 7 F.3d 243, 244 (D.C. Cir. 1993). Any agency competitive area that includes some, but not all, employees within a competitive area is unlawful.

Courts have consistently found that competitive areas that do not meet the regulatory criteria are invalid. The D.C. Circuit has held, for example, that a competitive area cannot be defined solely as encompassing bargaining unit positions. *NRC*, 895 F.2d at 157. *See also MSPB v. FLRA,* 913 F.2d 976, 980 (D.C. Cir. 1990) (defining "the competitive area to include only bargaining unit employees … is clearly prohibited under OPM regulations"); *NTEU and DHHS, Region X*, 25 F.L.R.A. 1041, 1044 (1987) (competitive area cannot be defined as encompassing all bargaining unit positions).

Because a competitive area must be defined solely in terms of an agency's organizational unit and a geographic location and must include all employees

---

[5] *See also* OPM, *Workforce Reshaping Operations Hand*book (March 2017) at 29, https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force/workforce_reshaping.pdf (last accessed February 14, 2025) ("The competitive area includes all employees within the organizational unit(s) and geographical location(s) that are included in the competitive area definition"); *NRC v. FLRA,* 895 F.2d 152, 157 (4th Cir. 1990) ("a competitive area must be 'defined solely in terms of an agency's organization unit(s) and geographical location, and it must include all employees within the competitive area so defined.'").

within the designated area, a competitive area cannot be defined—as the Workforce Order does—as employees within a component that the Administration might, in the future, suspend or close. Nor can it be defined vaguely as all employees who are not "typically" designated as essential during a lapse in appropriations without regard to organizational units or geography. Nor can a competitive area be defined as all probationary employees across multiple different agencies. There is no precedent for such a broad, amorphous RIF without regard to any agency's organization or geography. For these reasons, the Workforce Order and OPM's instruction directs agencies to violate OPM regulations.

      **d.**    The Workforce Order directs agencies to violate the regulatory requirements on how to classify employees for purposes of a RIF.

      Congress required that OPM prescribe regulations for how competing employees would be released in a RIF which gives due effect to certain factors, such as tenure of employment, military preference, length of service, and efficiency of performance ratings. 5 U.S.C. § 3502. Consistent with the statute, regulations similarly require agencies to classify competing employees on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance in several different tenure groups. 5 C.F.R. § 351.501(a). *See NTEU v. OPM*, 76 M.S.P.R. 244, 247 (1997) ("[t]o effectuate this statutory mandate, OPM promulgated 5 C.F.R. §§ 351.501(a) and 502(a)" which state how competing employees are classified).

But the Workforce Order directs agencies to promptly engage in RIFs without regard to these required factors. For example, it tells agencies to prioritize separating employees who would "typically" be deemed nonessential during a lapse of appropriations instead of basing a RIF on factors such as tenure and performance. Workforce Order, sec. 3(c). *Cf. MSPB v. FLRA*, 913 F.2d 976, 977 (D.C. Cir. 1990) (in a RIF, "the agency must classify each employee within a given competitive level according to the employee's tenure, veteran preference, length of service, and job performance"). For these reasons, the Workforce Order—again—directs agencies to violate OPM regulations.

### C. This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims.

Defendants may argue that this Court lacks jurisdiction to consider the Unions' claims under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) and its progeny. *Thunder Basin* held that federal district courts lack jurisdiction if Congress meant to channel review of a particular claim through an administrative process. As explained below, that is not the case here.

While discrete federal personnel actions do process through an administrative scheme, such as an employee appealing a firing to the Merit Systems Protection Board (MSPB),[6] that bears no resemblance to what the Unions are challenging here. The Unions are arguing that three broad Executive Branch actions, taken together, violate the separation of powers doctrines. The Unions' APA

---

[6] *See* 5 U.S.C. § 7701.

claim that the Executive Order directs agencies to violate the RIF statute and regulations—hundreds of thousands of times over—is similarly not a discrete challenge that the MSPB might be able to resolve or enjoin.[7]

*Thunder Basin* does not divest this Court of its jurisdiction to resolve the Unions' claim. Under *Thunder Basin*, this court should consider (1) whether "a finding of preclusion could foreclose all meaningful judicial review;" (2) whether the claims are "wholly collateral" to the relevant statutory review provisions; and (3) whether the claims are beyond the expertise of the agency. *Id.* at 212–13. These factors "are not 'three distinct inputs into a strict mathematical formula.'" *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 560 (D.C. Cir. 2023) (quoting *Jarkesy v. SEC*, 803 F.3d 9, 17 (D.C. Cir. 2015)). Instead, they are "guideposts for a holistic analysis." *Jarkesy*, 803 F.3d at 22. In this case, each of these guideposts weighs against preclusion.

### 1. The Unions Will Suffer Irremediable harm, Rendering Any Future Judicial Review Meaningless.

The first *Thunder Basin* prong is whether preclusion might foreclose all meaningful judicial review. The Supreme Court has explained that future judicial

---

[7] *Thunder Basin* is on shaky ground, in any event. One Justice has referred to the *Thunder Basin* test "as a test we have fabricated"—to ascertain Congress's "intent" when enacting an administrative scheme. *Axon Ent. v. FTC*, 598 U.S. 175, 205 (2023) (Gorsuch, J.) (concurring). It is, in the view of that Justice, "a judge-made, multi-factor balancing test" characterized by its "sheer incoherence." *Id.* at 206. *See also id.* at 196 (Thomas, J.) (concurring) (questioning *Thunder Basin* because it is constitutionally questionable for Congress to vest "administrative agencies with primary authority to adjudicate core private rights . . .").

review is decidedly *not* meaningful when a plaintiff alleges a "here-and-now injury" that is "impossible to remedy" after the fact. *Axon Enter.*, 598 U.S. at 178. In such cases, judicial review "would come too late to be meaningful." *Id.*[8] Here, any judicial review would be rendered meaningless by the significant harm that the Unions will suffer during the delays associated with channeling—harm that cannot be remedied after the fact.

### a.    Financial Harm

The Unions will be financially harmed because they will immediately and irrevocably lose substantial dues revenue from members who are fired because they are nonessential or probationary. Plaintiff NTEU alone, for example, has tens of thousands of dues-paying members who would be considered nonessential during a lapse of appropriations within IRS and HHS alone.[9] The Unions also have thousands of dues-paying members who are probationary employees. NTEU alone has close to 10,000 dues-paying probationary employees.[10]

---

[8] Other federal courts of appeals have endorsed this interpretation of *Thunder Basin*'s judicial-review prong. *See Berkeley v. Mt. Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th Cir. 2018) (finding no meaningful judicial review when plaintiffs "are subject to some additional and irremediable harm beyond the burdens associated with the dispute resolutions process"); *Tilton v. SEC*, 824 F.3d 276, 286 (2d Cir. 2016) (same).

[9] *See* Declaration of Daniel Kaspar (Ex. 1) at ¶ 9 (Feb. 14, 2025) (NTEU has more than 30,000 dues-paying members at the IRS would be considered nonessential); *id.* at ¶ 12 (several thousand dues-paying members at HHS would be deemed nonessential).

[10] *See* Declaration of Daniel Kaspar (Ex. 1) at ¶¶ 18-19 (Feb. 14, 2025) (NTEU has 9,675 dues paying probationary members at IRS and approximately 270 at HHS).

For NTEU, dues from members constitute the majority of NTEU's annual budget.[11] If all employees previously designated as nonessential during the lapse in appropriations were terminated, along with an unknown number of employees who work in agency components that might be suspended or closed at some point, NTEU will immediately lose millions of dollars of revenue.[12] The loss of these dues will adversely affect NTEU's ability to carry out its mission in many ways. For example, NTEU will have less money available for staff to assist employees with grievances; to file litigation on employees' behalf; to advocate for employees on Capitol Hill; and to negotiate collective bargaining agreements. The other Unions will suffer the same harm.[13]

This harm is irrevocable. Even if the Unions were to prevail in this litigation and terminated employees were rehired at some later point, there is no mechanism

---

[11] *See* Declaration of Mark Gray (Ex. 2) at ¶ 4 (Feb. 14, 2025) (dues constitute almost 85% of NTEU's annual receipts).

[12] *See* Declaration of Mark Gray (Ex. 2) at ¶¶ 9, 11, 12 (Feb. 14, 2025) (NTEU would lose approximately $ 20 million just from the loss of IRS and HHS members deemed nonessential or who are probationary).

[13] *See* Declaration of Timothy Smith (Ex. 3) at ¶ 10 (Feb. 13, 2025) (termination of nonessential employees would substantially deprive the UAW and NIH Fellows United of dues revenue that is necessary to carry out its legally required representational work). *See* Declaration of Randy Erwin (Ex. 4) ¶ 11 (Feb. 13, 2025); *See* Declaration of Matthew S. Biggs (Ex. 5) ¶¶ 5-8 (Feb. 13, 2025) (IFPTE will be financially harmed if nonessential employees, including over one thousand of its dues-paying members, are terminated); Declaration of Craig Normal (Ex. 6) (Feb. 14, 2025) (termination of nonessential and probationary employees could reduce the level of servicing IAM could provide).

to force them to pay back dues for a period in which they did not have union representation.[14]

OPM's deferred resignation program adds to the Unions' financial harm. More than three percent of the workforce has opted into the deferred resignation program.[15] The Unions are substantially likely to suffer from the early retirement of dues-paying members.

<b>b.    Loss of Bargaining Power</b>

The Unions' bargaining power will also be substantially and irrevocably diminished through their loss of bargaining unit employees as a result of the Executive actions described above.

The strength and influence of any union correlate directly with the size of its membership. NTEU, for example, is the nation's largest independent federal sector union and the second largest federal sector union overall. [16] NTEU regularly tells its employees, agencies, Congress, and the public that it represents approximately 150,000 employees in thirty-seven agencies across the government.[17]

---

[14] *See* Declaration of Randy Erwin (Ex. 4) ¶ 11 (Feb. 13, 2025) (there is no mechanism to recoup dues from any period in which employees are not in the federal service).

[15] *See* Garrett Haake and Megan Lebowitz, "White House says about 75K federal workers accepted 'deferred resignation' offer," nbc.com (Feb. 12, 2025), https://www.nbcnews.com/politics/white-house/white-house-says-75000-accepted-federal-buyout-trump-rcna191971

[16] Declaration of Daniel Kaspar (Ex. 1) at ¶ 23 (Feb. 14, 2025).

[17] Declaration of Daniel Kaspar (Ex. 1) at ¶ 23 (Feb. 14, 2025).

The mass firing of nonessential, probationary, and other employees will substantially reduce the number of employees that NTEU represents.[18] This will diminish NTEU's influence in negotiating agreements with other agencies or lobbying Congress for benefits that help federal employees. The bargaining unit employees that NTEU represents will see that NTEU has a more limited capacity to advocate for them.[19] That loss of status will likewise affect how any federal agency management perceive and deal with NTEU going forward.[20]

OPM's deferred resignation program compounds the Unions' loss of bargaining power. Union members who have opted into the program will become, on September 30, former federal employees who will no longer be part of any of the bargaining units that the Unions represent.

"Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining." *Int'l Union of Elec., Radio & Machine Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). If the Unions' membership losses arguably make then less effective in the eyes of their members, the members that the Unions keep in the wake of the Executive Order will question whether they should remain in any union in its weakened form. This

---

[18] *See* Declaration of Daniel Kaspar (Ex. 1) at ¶¶ 5-19 (Feb. 14, 2025).

[19] Declaration of Daniel Kaspar (Ex. 1) at ¶ 25 (Feb. 14, 2025).

[20] Declaration of Daniel Kaspar (Ex. 1) at ¶ 25 (Feb. 14, 2025); Declaration of Craig Norman (Ex. 6) at ¶ 8 (Feb. 14, 2025) (describing the impact of a cumulative loss of members on IAM's bargaining strength).

is why, in the federal labor context, "relief, if it is to be effective, must come quickly." *In re AFGE*, 790 F.2d 116, 117–18 (D.C. Cir. 1986) (R. Ginsburg, J.).

*    *    *

For these reasons, the Unions are suffering irremediable harm due to the Executive Branch actions challenged here. Each of these injuries is "impossible to remedy after the fact." *Axon*, 598 U.S. at 178. Accordingly, there would be no meaningful judicial review for the Unions' claims if they were forced to go through piecemeal and time-consuming administrative proceedings.

> 2.    **The Unions' Claims Are Wholly Collateral to the Administrative Scheme Because They Will Suffer Substantial Independent Harm if Forced to Proceed Through Administrative Proceedings.**

Whether a claim is "wholly collateral" to the relevant administrative review scheme is closely related to whether meaningful judicial review is available. Indeed, these considerations are so connected that they are often "analyzed together." *See AFGE v. Trump*, 929 F.3d 748, 759 (D.C. Cir. 2019).

Just as the irremediable injuries listed above negate the possibility of meaningful judicial review through the administrative scheme, they also render the the Unions' claims wholly collateral to that scheme. As the D.C. Circuit has explained, preclusion is inappropriate where the plaintiff demonstrates "independent harm caused by the delay[s]" associated with the administrative process. *Jarkesy*, 803 F.3d at 27. *See also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (claim is collateral and need not be exhausted "when a party would be

24

'irreparably injured'" if exhaustion is required); *Aguilar v. ICE*, 510 F.3d 1, 12 (1st Cir. 2007) (*citing Bowen*, 476 U.S. at 483 (1976)).

Here, as discussed above, the Unions stand to suffer "independent harm caused by the delay" that will remain even if it eventually succeeds in a later judicial proceeding. *See Jarkesy*, 803 F.3d at 27.

### 3. Agency Expertise is No Longer Entitled to Any Weight in a *Thunder Basin* Analysis.

*Thunder Basin*'s third prong—the degree to which administrative bodies such as the MSPB has any expertise that bears on this analysis—is effectively nullified in the new post-*Chevron* world. Courts must conduct their own statutory analysis without deference to agency interpretations. *See Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 374 (2024) ("[E]ven when an ambiguity happens to implicate a technical matter, it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts . . . .").

Even if the third prong were entitled to some weight, the Unions' showing of irremediable harm under the first two factors must overcome any countervailing influence from the third factor: potential expertise from the MSPB or other federal personnel agencies. *See Jarkesy*, 803 F.3d at 22 (*Thunder Basin* factors are "guideposts for a holistic analysis").

In sum, this Court has jurisdiction over the Unions' claims.

## II. The Unions Will Suffer Irreparable Harm Absent Immediate Injunctive Relief.

A party seeking immediate injunctive relief must show that, without it, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Sierra Club*, 990 F. Supp. 2d at 38 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 2013)). That prerequisite is satisfied here for the same reasons described in the subject matter jurisdiction analysis above.

As explained above, the Unions will immediately and irrevocably lose substantial dues revenue from members who are fired because they are nonessential or probationary. Plaintiff NTEU alone has tens of thousands of dues-paying members who would be considered nonessential during a lapse of appropriations within IRS and HHS alone.[21] And NTEU alone has close to 10,000 dues-paying members who are probationary employees.[22]

---

[21] *See* Declaration of Daniel Kaspar (Ex. 1) at ¶ 9 (Feb. 14, 2025) (NTEU has more than 30,000 dues-paying members at the IRS would be considered nonessential); *id.* at ¶ 12 (several thousand dues-paying members at HHS would be deemed nonessential); Declaration of Randy Erwin (Ex. 4) ¶ 7 (Feb. 14, 2025) (NFFE has thousands of dues paying members who would be deemed nonessential); Declaration of Matthew S. Biggs (Ex. 5) ¶ 6 (Feb. 14, 2025) (more than one thousand of IFPTE's 7,000 dues-paying members would be considered nonessential).

[22] *See* Declaration of Daniel Kaspar (Ex. 1) at ¶¶ 18-19 (Feb. 14, 2025) (NTEU has 9,675 dues paying members at IRS and approximately 270 at HHS who are probationary); Declaration of Randy Erwin (Ex. 4) ¶ 8 (Feb. 14, 2025) (NFFE has thousands of probationary dues paying members); Declaration of Matthew S. Biggs (Ex. 5) ¶ 7 (Feb. 14, 2025) (IFPTE knows of around 100 probationers who are dues-paying members and expects to learn of more).

If all employees previously designated as nonessential during the lapse in appropriations were terminated, along with an unknown number of employees who work in agency components that might be suspended or closed at some point, Plaintiff NTEU alone will immediately lose millions of dollars of revenue.[23] This revenue is *forever lost*. There is no mechanism to force employees to pay dues for a period in which they did not have union representation.[24]

The loss of these dues will immediately affect NTEU's ability to carry out its mission in many ways. For example, NTEU will have less money available for staff to assist employees with grievances; to file litigation on employees' behalf; to advocate for employees on Capitol Hill; and to negotiate collective bargaining agreements.[25] The other Unions will suffer the same harm.[26]

OPM's deferred resignation program adds to the Unions' financial harm. More than three percent of the workforce has opted into the deferred resignation

---

[23] *See* Declaration of Mark Gray (Ex. 2) at ¶¶ 9, 11, 12 (Feb. 13, 2025) (NTEU would lose approximately $ 20 million just at IRS and HHS from the loss of members deemed nonessential or who are probationary).

[24] Declaration of Randy Erwin (Ex. 4) ¶ 11.

[25] *See* Declaration of Daniel Kaspar (Ex. 1) at ¶¶ 21-22 (Feb. 14, 2025); Declaration of Mark Gray (Ex. 2) at ¶ 13 (Feb. 14, 2025).

[26] *See* Declaration of Randy Erwin (Ex. 4) ¶ 10 (Feb. 14, 2025) (NFFE's ability to carry out its mission would be severely curtailed if it were to lose dues-paying probationary and/or nonessential employees); Declaration of Matthew S. Biggs (Ex. 5) ¶ 9 (Feb. 14, 2025) (IFPTE would be unable to maintain current staff levels and thus levels of service to its membership).

program.[27] The Unions are substantially likely to suffer from the early retirement of dues-paying members.[28]

The Unions' bargaining power will also be substantially and irrevocably diminished through their loss of bargaining unit employees as a result of the Executive actions described above.  The strength and influence of any union correlate directly with the size of its membership. The mass firing of nonessential, probationary, and other employees slashes the number of employees that the Unions represent. Fewer employees will diminish the Unions' influence in negotiating agreements with other agencies or lobbying Congress for benefits that help federal employees. Employees will see that the Unions have less capacity to advocate for them. That loss of status will likewise affect how any federal agency management perceive and deal with the plaintiffs going forward.[29]

OPM's deferred resignation program compounds the Unions' loss of bargaining power. Union members who have opted into the program will become, on September 30, former federal employees who will no longer be part of any of the bargaining units that the Unions represent.

---

[27] *See* Garrett Haake and Megan Lebowitz, *White House Says About 75K Federal Workers Accepted "Deferred Resignation" Offer*, nbc.com (Feb. 12, 2025, 10:00PM), https://www.nbcnews.com/politics/white-house/white-house-says-75000-accepted-federal-buyout-trump-rcna191971.

[28] *See* Declaration of Randy Erwin (Ex. 4) ¶ 12 (Feb. 14, 2025) (NFFE members have opted into the deferred resignation program); Declaration of Matthew S. Biggs (Ex. 5) ¶ 11` (Feb. 14, 2025) (IFPTE members have opted into the deferred resignation program); Declaration of Craig Norman (Ex. 6) ¶ 7 (Feb. 13, 2025) (IAM members have opted into the deferred resignation program).
[29] *See* discussion *infra* at I.C.1.b.

III.    **The Balance of Equities Tips in NTEU's Favor, and the**
        **Public Interest Will Be Served by Immediate Injunctive Relief.**

The last two emergency relief requirements "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). The balance of equities and the public interest support a grant of immediate injunctive relief.

Immediate injunctive relief would maintain the status quo. It would enjoin the mass firings of federal workers and the extension or replication of the deferred resignation program until this Court resolves the Unions' constitutional and statutory claims against the government defendants. That relief would keep NTEU and the other unions from the drastic and irremediable harm to their bargaining power and influence and to their revenue streams that is described above.

There is, moreover, a clear public interest in maintaining the constitutionally prescribed balance of power between the legislative and executive branches. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 421 (Kennedy, J., concurring). Absent emergency relief, the Executive branch will be permitted to eradicate some twenty percent of the entire federal civilian workforce, preventing it from doing the critical work that Congress has assigned to it. An order granting the Unions' request for immediate injunctive relief is in the public interest and should issue.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court grant the temporary and preliminary injunctive relief set out in its proposed order.

Respectfully submitted,

/s/ Julie M. Wilson

_____

JULIE M. WILSON
General Counsel
D.C. Bar No. 482946

/s/ Paras N. Shah

_____

PARAS N. SHAH
Deputy General Counsel
D.C. Bar No. 983881

/s/ William Li

_____

WILLIAM LI
Associate General Counsel
D.C. Bar No. 1006366

/s/ Allison C. Giles

_____

ALLISON C. GILES
Assistant Counsel
D.C. Bar No. 439705

/s/ Jessica Horne

_____

JESSICA HORNE
Assistant Counsel
D.C. Bar No. 1029732

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street, N.W., Suite 1000
Washington, D.C. 20001
Tel: (202) 572-5500
Fax: (202) 572-5645
julie.wilson@nteu.org
paras.shah@nteu.org
william.li@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

Attorneys for Plaintiff NTEU

/s/ Yvette M. Piacsek
_____

YVETTE M. PIACSEK
General Counsel
D.C. Bar No. 980302

NATIONAL FEDERATION OF FEDERAL
EMPLOYEES, IAM, AFL-CIO
1225 New York Avenue N.W., Suite 450
Washington, D.C. 20005
Tel: 202-216-4428
ypiacsek@nffe.org

Attorney for Plaintiff NFFE


/s/ Carla M. Siegel
_____

CARLA M. SIEGEL
General Counsel
D.C. Bar No. 449953

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772
Tel: 301-967-4510
csiegel@iamaw.org

Attorney for Plaintiff IAM

/s/ Teresa Ellis

_____

TERESA ELLIS (admission pending)
General Counsel
D.C. Bar No. 495855

INTERNATIONAL FEDERATION OF
PROFESSIONAL & TECHNICAL
ENGINEERS, AFL-CIO
513 C Street N.E.
Washington, D.C. 20002
Tel: (202) 239-4880
tellis@ifpte.org

Attorney for Plaintiff IFPTE


/s/ Joshua B. Shiffrin

_____

Joshua B. Shiffrin
D.C. Bar No. 501008
Bredhoff & Kaiser P.L.L.C.
805 15th Street N.W.
Suite 1000
Washington D.C. 20005
Tel: (202) 842-2600
jshiffrin@bredhoff.com

February 14, 2025        Attorney for Plaintiff UAW