# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION, )
800 K Street N.W., Suite 1000 )
Washington, D.C. 20001, )
 )
NATIONAL FEDERATION OF )          Case No.  1:25-cv-420
FEDERAL EMPLOYEES, AFL-CIO, )
1225 New York Avenue N.W., Suite 450 )
Washington, D.C. 20005, )          **AMENDED**
 )          **COMPLAINT FOR**
INTERNATIONAL ASSOCIATION OF )          **DECLARATORY AND**
MACHINISTS AND AEROSPACE WORKERS, )          **INJUNCTIVE RELIEF**
AFL-CIO, )
9000 Machinists Place )
Upper Marlboro, MD 20772, )
 )
INTERNATIONAL FEDERATION OF )
PROFESSIONAL & TECHNICAL )
ENGINEERS, AFL-CIO, )
513 C Street N.E. )
Washington, D.C. 20002,  and )
 )
INTERNATIONAL UNION, UNITED )
AUTOMOBILE, AEROSPACE AND )
AGRICULTURAL IMPLEMENT WORKERS )
OF AMERICA, )
8000 East Jefferson Avenue )
Detroit, MI 48214 )
 )
           Plaintiffs, )
 )
           v. )
 )
DONALD J. TRUMP, )
President of the United States )
1600 Pennsylvania Avenue N.W. )
Washington, D.C. 20035, )

CHARLES EZELL,                                              )
Acting Director,                                           )
Office of Personnel Management                            )
1900 E Street N.W.                                        )
Washington, D.C. 20415,                                   )
                                                          )
DOUGLAS O'DONNELL,                                        )
Acting Commissioner, Internal Revenue Service             )
U.S. Department of Treasury                               )
1500 Pennsylvania Avenue N.W.                             )
Washington, D.C. 20220,                                   )
                                                          )
ROBERT F. KENNEDY, JR., Secretary                         )
U.S. Department of Health and                             )
Human Services                                            )
200 Independence Avenue S.W.                              )
Washington, D.C. 20201,                                   )
                                                          )
RUSSELL VOUGHT, Acting Director,                          )
Consumer Financial Protection Bureau,                     )
1700 G Street N.W.                                        )
Washington, D.C. 20552                                    )
                                                          )
RANDY MOORE, Chief,                                       )
U.S. Forest Service                                       )
U.S. Department of Agriculture                            )
1400 Independence Avenue S.W.                             )
Washington, D.C. 20250,                                   )
                                                          )
DOUG COLLINS, Secretary                                   ),
Department of Veterans Affairs                            )
810 Vermont Avenue N.W.                                   )
Washington, D.C. 20420,                                   )
                                                          )
PETE HEGSETH, Secretary                                   )
Department of Defense                                     )
1000 Defense Pentagon                                     )
Washington, D.C. 20301-1000,                              )
                                                          )
MAKENZIE LYSTRUP, Director,                               )
Goddard Space Flight Center                               )
National Aeronautics and Space Administration             )
8800 Greenbelt Road                                       )
Greenbelt, MD 20771, and                                  )

|                                              |   |
|----------------------------------------------|---|
| MATTHEW J. MEMOLI, Acting Director,          | ) |
| National Institutes of Health                | ) |
| 9000 Rockville Pike                          | ) |
| Bethesda, MD 20892                           | ) |
|                                              | ) |
|                                Defendants.   | ) |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs National Treasury Employees Union (NTEU), National Federation of Federal Employees (NFFE), International Association of Machinists and Aerospace Workers (IAM), International Federation of Professional and Technical Engineers (IFPTE), and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) (collectively, the Unions) represent hundreds of thousands of employees in dozens of federal agencies and departments across the nation.

The Unions bring this action to protect the workers they represent from the Executive Branch's attempts to dismantle the federal government through the mass firings of hundreds of thousands of employees (those who are considered "nonessential" for purposes of a government shutdown and those who are in probationary status) and a pressure campaign on federal workers to quit their jobs through a "deferred resignation program."

Congress creates our federal agencies, assigns their missions, and funds their work, including their workforce. The Executive Branch's attempts to decimate that workforce through two targeted actions conflict with Congress's role in establishing that workforce and its respective portfolio of work and thus violate separation of

3

powers principles. The mass firing of employees will also violate Congress's

reduction-in-force (RIF) protocol.

## JURISDICTION

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

3.     Plaintiff NTEU is an unincorporated association with its principal

place of business at 800 K Street, N.W., Washington, D.C. 20001. NTEU is,

pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92

Stat. 1111, the exclusive bargaining representative of employees in thirty-seven

federal departments and agencies.

4.     Plaintiff NFFE is an affiliate of IAM and is an unincorporated

association with its principal place of business at 1225 New York Ave. N.W., Suite

450, Washington, D.C. 20005. It is the exclusive bargaining representative of

approximately 110,000 employees in agencies across the federal government.

5.     Plaintiff IAM is an unincorporated association with its principal place

of business at 9000 Machinists Place, Upper Marlboro, MD 20772. IAM is the

exclusive bargaining representative of approximately 600,000 members across

North America, with approximately 15,000 employees in agencies across the federal

government.

6.     Plaintiff IFPTE is an unincorporated association with its principal

place of business at 513 C St. N.E., Washington, D.C. 20002. IFPTE is the exclusive representative for approximately 34,000 professional and technical employees throughout the federal government.

7.     Plaintiff UAW is an unincorporated association with its principal place of business at 8000 East Jefferson Ave., Detroit, MI 48214. It represents hundreds of thousands of workers in the private and public sector, including in the federal government.

8.     The Unions negotiate collective bargaining agreements on behalf of the employees that they represent and enforce employees' collective and individual rights in grievances and in federal courts.

9.     Defendant Donald J. Trump is the President of the United States of America. On February 11, 2025, he issued an Executive Order that directs agencies to promptly undertake mass firings through RIFs. Executive Order No. 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 11, 2025).

10.     Defendant Charles Ezell is the Acting Director of the United States Office of Personnel Management (OPM). OPM, and thus Defendant Ezell, will implement and guide federal agencies' mass firing of employees and OPM's deferred resignation program.

11.     Defendant Douglas O'Donnell is the Acting Commissioner of the Internal Revenue Service (IRS). The IRS employs more dues-paying NTEU members than any other federal agency or department. As the head of the IRS,

Defendant O'Donnell is responsible for implementing the actions described in this complaint within that agency.

12.     Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services (HHS). HHS employs the third largest number of dues-paying NTEU members. As the head of HHS, Defendant Kennedy is responsible for implementing the actions described in this complaint within that agency.

13.     Defendant Russell Vought is the Acting Director of the Consumer Financial Protection Bureau (CFPB). The CFPB employs dues-paying NTEU members. As head of the CFPB, Defendant Vought is responsible for implementing the actions described in this complaint within that agency.

14.     Defendant Randy Moore is the Chief of the U.S. Forest Service within the U.S. Department of Agriculture. NFFE represents 18,080 employees within the Forest Service. As the head of the Forest Service, Defendant Moore is responsible for implementing the actions described in this complaint within that agency.

15.     Defendant Doug Collins is the Secretary of the Department of Veterans Affairs (VA). NFFE represents approximately 10,000 employees within the VA. As the head of the VA, Defendant Collins is responsible for implementing the actions described in this complaint within that agency.

16.     Defendant Pete Hegseth is the Secretary of the Department of Defense (DoD). NFFE and IAM together represent approximately 53,000 employees within the DoD. As the head of the DoD, Defendant Hegseth is responsible for

implementing the actions described in this complaint within that agency.

17. Defendant Makenzie Lystrup is the Director of Goddard Space Flight Center, National Aeronautics and Space Administration. IFPTE represents close to 2,000 employees at the Goddard Space Flight Center. Defendant Lystrup is responsible for implementing the actions described in this complaint within the Goddard Space Flight Center.

18. Defendant Matthew J. Memoli is Acting Director of the National Institutes of Health (NIH). UAW represents a bargaining unit consisting of approximately 5,000 research and clinical fellows within NIH. As the head of NIH, Defendant Memoli is responsible for implementing the actions described in this complaint within that agency.

## STATEMENT OF CLAIMS

### I. Congress's Significant Power to Shape the Executive Branch

#### A. Congress's Plenary Authority over the Existence, Mission, and Funding of Executive Agencies

19. The Framers intended for Congress to be the most powerful branch of the federal government. The legislative power that the Founders envisioned "necessarily predominates" (The Federalist No. 51 (J. Madison)) and has a "tendency . . . to absorb every other" (The Federalist No. 71 (A. Hamilton)).

20. Congress can create or destroy executive branch agencies and dictate their missions. "To Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). *Accord Buckley v. Valeo*, 424 U.S. 1, 138

7

(1976) (discussing Congress's ability to create or remove federal agencies through the Necessary & Proper Clause). Congress thus "control[s]" the very "existence of executive offices." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010).

21.     Congress, moreover, has the power to fund or defund executive branch agencies—and, in exercising that power, determines whether and how agencies may function. The Antideficiency Act, 31 U.S.C. § 1341, which generally prohibits the executive branch from incurring obligations that Congress has not authorized, and the Impoundment Control Act, 2 U.S.C. §§ 681-688, which prevents the Executive from refusing to postpone or withhold the use of appropriated funds, illustrate this. Thus, while the President is responsible for the enforcement of federal laws, Congress alone has the power of the purse with which to fund or defund agencies and their activities.

### B.     The Inflation Reduction Act as an Example of Congress Building Up an Executive Branch Agency to Facilitate its Statutory Mission

22.     The Inflation Reduction Act (IRA), Public Law 117-169, is a strong example of Congress consciously giving a federal agency a resource boost so that it could better meet its statutory mission. Congress passed the IRA in 2022 after the IRS workforce had shrunk to its smallest size since the 1970s.

23.     The IRA authorized approximately $80 billion to the IRS over ten years, although Congress later rescinded half of that amount. The IRA required that the funding go to designated purposes, namely improving tax law enforcement, operations support, business systems modernization, and taxpayer services.

24.    IRS has used this IRA funding to hire thousands of new employees, many of whom are in probationary status. IRS has an estimated 15,000 probationary employees today, many of whom were hired through IRA funds.

25.    For example, IRS has rapidly hired thousands of additional employees to carry out Congress's mandate to improve taxpayer service. *See* Congressional Research Service, *The Internal Revenue Service's Strategic Operating Plan* (June 2, 2023), available at https://crsreports.congress.gov/product/pdf/IF/IF12394 (agency responded to more taxpayer calls "thanks to the hiring of 5,000 customer service representatives using IRA funds"); U.S. Department of Treasury, *Continuing Improvements to IRS Customer Service in Filing Season 2024* (June 7, 2024), available at https://home.treasury.gov (IRA funding has made thousands of new hires possible).

26.    Without these thousands of employees, Congress's intent through the IRA to improve tax enforcement and taxpayer services, among other things, would be thwarted.

27.    The IRA is just one example. Each year, Congress appropriates funds for other executive branch agencies such as HHS, the Forest Service, the VA, DoD, Goddard Space Flight Center, and NIH and directs them to carry out their statutorily mandated responsibilities.

C.    Congress's Reduction-in-Force Procedures for the Workforce that It
<u>Created and that It Funds</u>

28.    Congress enacted a law with certain requirements that must be followed in the event agencies need to issue a RIF. 5 U.S.C. § 3502.

29.    Congress delegated to OPM the authority to prescribe regulations with additional requirements for agencies to follow when implementing RIFs. 5 U.S.C. § 3502(a).

30.    Regulations for implementing RIFs apply when "the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties[.]" 5 C.F.R. § 351.201(a)(2).

31.    The Order directs agencies to promptly engage in RIFs for none of the specified, allowable reasons, but instead for the purpose of "eliminating waste, bloat, and insularity." Order, sec. 1.

32.    Before any agency begins a RIF, agencies must establish "competitive areas in which employees compete for retention." 5 C.F.R. § 351.402(a).

33.    A competitive area must be "defined *solely* in terms of an agency's organization unit(s) and geographical location, and it *must* include all employees within the competitive area so defined.'" 5 C.F.R. § 351.402(b) (emphasis added).

34.    "The competitive area includes all employees within the organizational unit(s) and geographical location(s) that are included in the competitive area definition." OPM, *Workforce Reshaping Operations Handbook* (March 2017) at 29,

https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force/workforce_reshaping.pdf.

35.     Because a competitive area *must* be defined solely in terms of an agency's organizational unit and a geographic location and must include all employees within the designated competitive area, a competitive area cannot be defined as all employees within a component that the Administration might, in the future, suspend or close or be defined as all employees who are not "typically" designated as essential during a lapse in appropriations without regard to organizational units or geography. Neither can a competitive area be defined as all probationary employees regardless of organizational units or geographic locations across multiple different agencies.

36.     Congress also required that OPM prescribe regulations for the release of competing employees in a RIF which gives due effect to certain factors, such as tenure of employment, military preference, length of service, and efficiency of performance ratings. 5 U.S.C. § 3502.

37.     Consistent with the statute, regulations similarly require agencies to classify competing employees on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance in several different tenure groups. 5 C.F.R. § 351.501(a).

38.     The President's February 11, 2025, Executive Order directs agencies to promptly engage in RIFs without regard to these required factors. For example, it

tells agencies to prioritize employees who would be nonessential during a lapse of appropriations instead of factors such as tenure and performance. Order, sec. 3(c).

39.     The President's Order directs agencies, including IRS, HHS, the CFPB, the Forest Service, VA, DoD, Goddard Space Flight Center, and NIH, to violate these regulations because it directs them to commence RIFs for an improper purpose, without a legally cognizable competitive area, and without complying with employee retention requirements.

## II.     The Trump Administration's Attempts to Dismantle the Executive Branch Agencies that Congress Created, Assigned Duties, and Funded

40.     In a span of a few weeks, Executive actions have targeted the federal civilian workforce in a way that attempts to stymie the statutory mission of their federal agencies. These actions, collectively, usurp Congress's authority to create agencies and to empower those agencies to do the work that Congress has asked them to do.

41.     The Executive Branch acting as the "woodchipper for [the federal] bureaucracy" conflicts with Congress's role as the creator, funder, and mission-setter for the executive branch agencies. Holly Otterbein, "Musk aims to hobble federal workers ahead of 'buyout' deadline," Politico.com, https://www.politico.com/news/2025/02/06/federal-workers-musk-buyout-fears-00202768. The actions described below, cumulatively, violate separation of powers principles.

A. <u>The Mass Firing of Hundreds of Thousands of Federal Employees</u>

42.    The Order, sec. 3(c), directs agencies to "promptly undertake preparations to initiate large-scale reductions in force."

43.    The Order, sec. 3(c), directs agencies to separate temporary employees and reemployed annuitants "working in areas that will likely be subject to the RIFs."

44.    The Order, sec. 3(c), then directs agencies to prioritize in the RIFs "all agency diversity, equity and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations[.]"

45.    During the last major shutdown, approximately 345,000 employees were not designated as essential. Eric Katz, See Who Would Get Furloughed in a Shutdown This Year (Sept. 22, 2023), https://www.govexec.com/workforce/2023/09/see-who-would-get-furloughed-shutdown-year/390517/.

46.    It is unknown how many employees work in the Order's vaguely defined category of "initiatives, components or operations" that the Administration "suspends or closes."

47.    NTEU represents thousands of employees who were designated as nonessential during the last shutdown and who would be prioritized in a RIF under the Order.

13

48.     The IRS FY2025 Lapsed Appropriations Contingency Plan designates different numbers of employees who would continue to work during a shutdown depending on whether the shutdown occurs during tax Filing Season (January 1 through April 30) or Non-Filing season. Internal Revenue Service, Fiscal Year 2025 Lapsed Appropriations Contingency Plan (July 22, 2024), https://home.treasury.gov/system/files/266/IRS-FY24LapsePlan.pdf.

49.     During Filing Season, 53,782 of the 96,952 IRS employees on board as of the date of the plan (55.5%) are considered nonessential. During Non-Filing season, that number rises to 67,428 (69.5%). *Id.*

50.     The FY 2025 HHS Contingency Staffing Plan designates 40,887 of the 91,649 total onboard staff (45%) as nonessential. U.S. Department of Health and Human Services, FY 2025 HHS Contingency Staffing Plan, https://www.hhs.gov/about/budget/fy-2025-hhs-contingency-staffing-plan/index.html.

51.     NFFE, IAM, IFPTE, and UAW also collectively represent thousands of employees who were not designated as essential during the last shutdown.

52.     On February 13, the CFPB began issuing termination notices to over seventy term employees, including dues-paying NTEU members. The termination notices rely on the President's Order, stating: "your employment will be terminated effective at the close of business on February 13, 2025, due to Executive Order Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative – The White House dated February 11, 2025."

53.     In addition to the mass firing of nonessential employees that the President has directed, federal agencies are engaging in a mass firing of probationary employees that OPM is coordinating and directing.

54.     On January 20, OPM directed all federal department and agencies to provide it with a list of all probationary employees within the next four days. OPM Guidance on Probationary Periods, Administrative Leave and Details, OPM.gov, https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C %20Administrative%20Leave%20and%20Details%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%20FINAL.pdf. OPM further asked the heads of all federal departments and agencies to "promptly determine whether those employees should be retained." *Id.*

55.     By February 5 at noon, each federal department and agency had to send OPM its determination of which probationary employees, if any, should be retained. Specifically, "OPM asked agencies to submit their lists and gave them a 200-character limit to explain why the employee should stay in government." Jason Miller, *OPM Asks Agencies to Justify Keeping Probationary Employees*, Federal News Network.com (Feb. 4, 2025, 6:34PM), https://federalnewsnetwork.com/workforce/2025/02/opm-asks-agencies-to-justify-keeping-probationary-employees.

56.     According to a source, "while OPM didn't specifically say employees would be fired if agencies indicated they did not want to retain them, there was an underlying message that these employees were on their way out." *Id.*

57.    There are an estimated 220,000 probationary employees in the federal government. *See id.* A mass firing of nearly all probationary employees would thus wipe out about 10% of the federal civilian workforce.

58.    NTEU represents an estimated 15,000 probationary employees at the IRS alone, which has ramped up its hiring under the IRA. NTEU estimates that it represents over 1,000 probationary employees at HHS.

59.    NFFE, IAM, IFPTE, and UAW also represent probationary employees. NFFE represents almost 6,000 probationary employees at the U.S. Forest Service, roughly 1,500 probationary employees at the VA, and about 900 probationary employees at the DoD. Roughly ten percent of the employees in IAM's bargaining units across DoD are probationary. IFPTE represents probationary employees at Goddard Space Flight Center and within the Naval Sea Systems Command. And roughly ten percent of the employees in UAW's bargaining unit at NIH are probationary or trial period employees.

60.    The mass firing of probationary employees is underway. OPM has contacted agencies to direct them to terminate their probationary employees. On the night of February 11, the CFPB sent its probationary employees a notice of termination that ended their federal employment.

61.    Other agencies have likewise terminated large numbers of probationary employees, consistent with OPM's direction. For example, NTEU-represented agencies like HHS, the Environmental Protection Agency, the

Department of Energy, and the Department of Agriculture, Food and Nutrition Service have fired probationary employees en masse.

62.    Many other federal agencies are expected to terminate their probationary employees imminently, including IRS. IRS intends to fire thousands of probationary employees who do not support tax filing season work as soon as this week.

**B.    The Bullying of Federal Workers to Quit Their Jobs Through OPM's "Deferred Resignation Program"**

63.    On January 28, OPM sent the approximately 2.2 million federal civil employees an email designed to threaten them into resigning their positions. OPM invited employees to opt into a deferred resignation program and terminate their federal employment on September 30. At the same time, OPM cautioned these employees that "the majority of federal agencies are likely to be downsized through restructurings, realignments, and reductions in force." Fork in the Road, OPM.gov, https://www.opm.gov/fork.

64.    After OPM's initial communication to the federal civilian workforce, the Executive Branch, including OPM, has continued to ramp up the pressure on the federal civilian workforce to resign.

65.    For example, "[i]n an email to some federal employees . . . a commissioner at a department overseen by Musk's allies warned of the impending pain if they don't leave." Holly Otterbein, *Musk Aims to Hobble Federal Workers Ahead of 'Buyout' Deadline*," Politico.com (Feb. 6, 2025, 5:00AM), https://www.politico.com/news/2025/02/06/federal-workers-musk-buyout-fears-

00202768. That manager told employees "that 'we won't need staff in certain areas of the country' and 'will be cutting redundant business functions and associated staffing.' He said 'we're also considering how we can utilize AI in our portfolios.'" *Id.*

66.    According to the White House, at least 75,000 employees—roughly 3% of the federal civilian workforce—opted into OPM's deferred resignation program. Garrett Haake and Megan Lebowitz, *White House Says About 75K Federal Workers Accepted 'Deferred Resignation' Offer*, nbc.com (Feb. 12, 2025), https://www.nbcnews.com/politics/white-house/white-house-says-75000-accepted-federal-buyout-trump-rcna191971. The administration had hoped that 5-10% of the federal civilian workforce would resign through OPM's program. *Id.*

67.    OPM, in a social media post, confirmed that its deferred resignation program is just one-part of its "major restructuring" of the "federal workforce."

68.    NTEU members at IRS and HHS have signed up for OPM's deferred resignation program. NFFE, IAM and IFPTE have also had employees in their bargaining units sign up for the deferred resignation program. It is substantially likely that the overall percentage of the Unions' members who sign up for the program will match the percentage of the federal civilian workforce that signs up.

### III.    The Effect of the Attempts to Dismantle Federal Agencies on NTEU and the Other Unions

69.    The Unions bring this action on behalf of themselves because the Executive actions described above will end the federal employment of tens of thousands of their members. That will hurt the Unions financially and in terms of their influence at the bargaining table.

70.     Employees within the Unions' bargaining units can choose to voluntarily join and pay dues. Most of those members have elected to have their dues withheld from their pay and automatically paid to the Unions, as provided for under 5 U.S.C. § 7115(a).

71.     Congress has required federal sector unions to represent the interests of all employees in its bargaining units, not just the employees who choose to pay dues and become members. 5 U.S.C. § 7114(a)(1).

## A.     Financial Harm

72.     NTEU will be financially harmed because it will immediately lose dues revenue from members who are fired because they are nonessential or probationary. Even if these individuals remain NTEU members as former federal employees after they are fired, NTEU will lose money because their dues rates will be significantly reduced.

73.     NTEU has thousands of dues-paying members who would be considered nonessential during a lapse of appropriations within IRS and HHS alone. IRS has approximately 31,220 dues-paying members who would be considered nonessential during tax filing season (January 1 through April 30) and 39,141 dues-paying members who would be considered nonessential outside of tax filing season. HHS has approximately 2,578 dues-paying members who would be considered nonessential. It has many more dues-paying members in the other thirty-five agencies where NTEU is the exclusive representative.

74.    NTEU has thousands of dues-paying members who are probationary employees at IRS, HHS, and the CFPB. It has many more dues-paying members who are probationary employees in the other thirty-four agencies where NTEU is the exclusive representative.

75.    Dues from members constitute the majority of NTEU's annual budget. If all employees previously designated as nonessential during the lapse in appropriations were terminated, along with an unknown number of employees who work in agency components that might be suspended or closed at some point, NTEU will immediately lose millions of dollars of revenue.

76.    The loss of these dues will adversely affect NTEU's ability to carry out its mission in many ways. For example, NTEU will have less money available for staff to assist employees with grievances; to file litigation on employees' behalf; to advocate for employees on Capitol Hill; and to negotiate collective bargaining agreements.

77.    Even if NTEU prevails in this litigation and employees terminated under a RIF were rehired at some later point, there is no mechanism to force them to pay back dues for a period in which they did not have union representation.

78.    NFFE, IAM, IFPTE, and UAW will face the same types of financial harm—lost dues revenue—when their dues paying members who are nonessential or probationary are fired.

79.    OPM's deferred resignation program adds to NTEU's financial harm. NTEU members, including those at IRS and HHS, have opted into the program.

Even if these employees remain NTEU members after their resignations are effective on September 30, NTEU will lose money because retiree dues rates are significantly reduced.

80.    OPM's deferred resignation program similarly adds to the financial harm that NFFE, IFPTE and UAW are substantially likely to suffer from the early retirement of dues-paying members.

### B.    Loss of Bargaining Power

81.    The Unions' bargaining power will be diminished through their loss of bargaining unit employees and their loss of members as a result of the Executive actions described above.

82.    The strength and influence of any union correlate directly with the size of its membership. NTEU, for example, is the nation's largest independent federal sector union and the second largest federal sector union overall. NTEU regularly tells its employees, agencies, Congress, and the public that it represents approximately 150,000 employees in thirty-seven agencies across the government.

83.    Because the mass firing of nonessential, probationary, and other employees will substantially reduce the number of employees that NTEU represents, the union's influence in negotiating agreements with other agencies or lobbying Congress for benefits that help federal employees will be diminished.

84.    The bargaining unit employees that NTEU represents will see that NTEU has a more limited capacity to advocate for them. That loss of status will

likewise affect how federal agency management at IRS, HHS, the CFPB, and other agencies perceive and deal with NTEU going forward.

85.    OPM's deferred resignation program compounds NTEU's loss of bargaining power. NTEU members, including those at IRS and HHS, who have opted into the program will become, on September 30, former federal employees who will no longer be part of the bargaining units that NTEU represents.

86.    NFFE, IAM, IFPTE and UAW will similarly suffer a loss of status and influence from having fewer employees in their bargaining units as a result of the mass firing of employees and OPM's deferred resignation program.

## CAUSE OF ACTION

**Count I:  The mass firing of employees and the attempt to force resignations across the federal civilian workforce violate separation of powers principles.**

87.    Plaintiffs reassert the allegations contained in paragraphs 1 through 86 of this complaint as though contained herein.

88.    The mass firing of hundreds of thousands of employees and the coercive effort to get a similar number of federal employees to resign, collectively, were aimed at decimating the federal civilian workforce.

89.    These Executive Branch actions, including those of Defendants, thus violate separation of powers principles because they undermine Congress's authority to set and fund the missions of federal agencies.

**Count II**: **Defendants Ezell, O'Donnell, Vought, Kennedy, Moore, Collins, Hegseth, Lystrup, and Memoli are violating the Administrative Procedure Act by implementing RIFs contrary to regulations.**

90.    Plaintiffs reassert the allegations contained in paragraphs 1 through 89 of this complaint as though contained herein.

91.    Regulations for implementing RIFs apply when "the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties[.]" 5 C.F.R. § 351.201(a)(2).

92.    The Order directs agencies to promptly engage in RIFs for none of the specified, allowable reasons, but instead for the purpose of "eliminating waste, bloat, and insularity." Order, sec. 1.

93.    Regulations also require agencies to establish a "competitive area[] in which employees compete for retention." 5 C.F.R. § 351.402(a).

94.    Regulations require that a competitive area must be "defined *solely* in terms of an agency's organization unit(s) and geographical location and . . . it *must* include all employees within the competitive area so defined.'" 5 C.F.R. § 351.402(b) (emphasis added).

95.    Because a competitive area must be defined solely in terms of an agency's organizational unit and a geographic location and must include all employees within the designated competitive area, a competitive area cannot be defined as all agency components that might be suspended or closed in the future,

or be defined as all employees who are not "typically" designated as essential during a lapse of appropriations.

96.    Congress also required that OPM prescribe regulations for the release of competing employees in a RIF which gives due effect to certain factors, such as tenure of employment, military preference, length of service, and efficiency of performance ratings. 5 U.S.C. § 3502.

97.    Consistent with the statute, regulations similarly require agencies to classify competing employees on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance in several different tenure groups. 5 C.F.R. § 351.501(a).

98.    The Order directs agencies to promptly engage in RIFs without regard to these required factors. For example, it tells agencies to prioritize employees who would be nonessential during a lapse of appropriations instead of factors such as tenure and performance. Order, sec. 3(c).

99.    Agencies, including IRS, HHS, the CFPB, Forest Service, VA, DoD, Goddard Space Flight Center, and NIH, will violate the APA because they will commence RIFs for an improper purpose, without a legally cognizable competitive area, and without complying with employee retention requirements.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs request judgment against Defendants:

A.    Declaring that the mass firing of nonessential, probationary, and other employees and OPM's deferred resignation program, collectively, are unlawful;

B.    Enjoining the implementation of Section 3(c) of Executive Order No.

14210, Implementing the President's "Department of Government Efficiency"

Workforce Optimization Initiative;

     C.     Enjoining the implementation of OPM's directive to terminate

probationary employees;

     D.     Enjoining OPM from extending, expanding, or replicating its deferred

resignation program;

     E.     Enjoining violations of the RIF statute and regulations, including

requirements related to the establishment of the competitive areas, notice, the

allowable purposes for a RIF, and how competing employees would be released in a

RIF;

     F.     Ordering Defendants to pay reasonable attorneys' fees and costs; and

     G.     Ordering such other and further relief as the Court deems just and

proper.

Respectfully submitted,

/s/ Julie M. Wilson

_____

JULIE M. WILSON
General Counsel
D.C. Bar No. 482946

/s/ Paras N. Shah

_____

PARAS N. SHAH
Deputy General Counsel
D.C. Bar No. 983881

/s/ Allison C. Giles

_____

ALLISON C. GILES
Assistant Counsel
D.C. Bar No. 439705

/s/ Jessica Horne

_____

JESSICA HORNE
Assistant Counsel
D.C. Bar No. 1029732

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street, N.W., Suite 1000
Washington, D.C. 20001
Tel: (202) 572-5500
Fax: (202) 572-5645
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

Attorneys for Plaintiff NTEU

/s/ Yvette M. Piacsek
_____

YVETTE M. PIACSEK
General Counsel
D.C. Bar No. 980302

NATIONAL FEDERATION OF FEDERAL
EMPLOYEES, IAM, AFL-CIO
1225 New York Avenue N.W., Suite 450
Washington, D.C. 20005
Tel: 202-216-4428
ypiacsek@nffe.org

Attorney for Plaintiff NFFE


/s/ Carla M. Siegel
_____

CARLA M. SIEGEL
General Counsel
D.C. Bar No. 449953

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772
Tel: 301-967-4510
csiegel@iamaw.org

Attorney for Plaintiff IAM


/s/ Teresa Ellis
_____

TERESA ELLIS (admission pending)
General Counsel
D.C. Bar No. 495855

INTERNATIONAL FEDERATION OF
PROFESSIONAL & TECHNICAL
ENGINEERS, AFL-CIO
513 C Street N.E.
Washington, D.C. 20002

Tel: (202) 239-4880
tellis@ifpte.org

Attorney for Plaintiff IFPTE


/s/ Joshua B. Shiffrin

Joshua B. Shiffrin
D.C. Bar No. 501008
Bredhoff & Kaiser P.L.L.C.
805 15th Street N.W.
Suite 1000
Washington D.C. 20005
Tel: (202) 842-2600
jshiffrin@bredhoff.com

February 17, 2025                Attorney for Plaintiff UAW

28