## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, et al., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:25-cv-00420 |
| DONALD J. TRUMP, et al., | ) ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER

Upon his reelection to office, President Trump set to work to transform the federal work force. Among other things, he issued directives to require a return to in-person work, to restore accountability for federal workers who have policy-making authority and to senior career executives, and to reform the federal hiring process to focus on merit. Animating these and other critical reforms is the recognition that the federal workforce must be streamlined to be more efficient and to better serve the American people.

Several actions followed, three of which Plaintiffs challenge in this lawsuit. First, on January 20, 2025, the U.S. Office of Personnel Management ("OPM") issued a memorandum to the heads and acting heads of Executive Branch departments and agencies directing them to identify all employees on "probationary" periods—generally, those members of the Competitive Service with less than one year of federal service and those members of the Excepted Service with less than two years of federal service.  The OPM memorandum also directed each agency to "promptly determine whether those employees should be retained at the agency."

Second, on January 28, 2025, OPM announced a deferred resignation program whereby

eligible federal employees could voluntarily choose to resign their positions by February 6, 2025, and would, consistent with federal law, retain all pay and benefits through September 30, 2025 and be exempt from in-person work requirements. That deferred resignation program was challenged in the United States District Court for the District of Massachusetts; its announced deadline for deferred resignation requests was administratively stayed during temporary restraining order proceedings before the plaintiffs' motion was denied on February 12, 2025, after which OPM closed the program to new deferred resignation requests.

Third, on February 11, 2025, the President issued Executive Order No. 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," which announced plans addressing modified hiring practices and preparations for reductions in force ("RIFs") to be taken "consistent with applicable law[,]" among other directives to Executive Branch agencies.

Plaintiffs, five national labor unions that represent federal employees, disagree with those policy choices and allege that taken together, they "will soon lead to the loss of over a half-million federal employees[;]" they likewise allege that at least one of them (National Treasury Employees Union, or NTEU), "will imminently lose up to half of its revenue and around half of the workers that it represents[,]" and that each of them "will . . . lose critical revenue and heft at the bargaining table." On those allegations, they seek the extraordinary remedy of a temporary restraining order that would enjoin one portion of EO 14210, would enjoin the alleged "mass firing of probationary employees that is occurring across federal agencies," and would enjoin "further extension or iterations of OPM's deferred resignation program."

Plaintiffs' TRO request should be denied on multiple grounds. To begin with, they fail to establish irreparable harm absent the temporary relief they seek. Their alleged harms are not

legally cognizable in the first instance; they cannot seek injunctive relief on behalf of their federal employee members. What is more, any actual or potential harm to those members from loss of employment is remediable following the conclusion of litigation in the appropriate forum, should they prevail, and thus cannot constitute irreparable harm.

Nor can Plaintiffs establish a likelihood of success on the merits of their claims, which allege broadly that the President is impermissibly intruding on legislative prerogatives through his efforts to streamline and reshape the Executive Branch workforce, and that EO 14210 and OPM's agency instructions violate statutory and regulatory Reduction-in-Force requirements. That is so for at least two reasons. First, Plaintiffs base their assertion of Article III standing on a predicted loss of membership and dues, an inherently speculative basis for standing; moreover, they even seek relief on the basis of voluntary choices made by their members (and other federal employees) that opted to accept the deferred resignation offer extended by OPM, reflecting voluntary third-party decisions that cannot form the basis for injury-in-fact. Second, because Plaintiffs here are federal labor unions, district court review of their claims is foreclosed by the comprehensive, reticulated administrative-judicial review scheme set forth in the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101, *et seq*. ("FSL-MRS").

Likewise, the balance of equities and the public interest favor defendants, as Plaintiffs' requested TRO would interfere with the President's ability to manage, shape, and streamline the federal workforce to more closely reflect policy preferences and the needs of the American public.

Finally, if the Court is inclined to enter injunctive relief, it should be limited in scope to only these five Plaintiffs, rather than constitute the essentially nationwide injunction Plaintiffs seek.

At bottom, Plaintiffs fail to establish any of the requirements entitling them to a temporary

restraining order, and Plaintiffs' motion should be denied; failing that, any injunctive relief should be narrowly tailored to encompass Plaintiffs only.

## I.     FACTUAL AND LEGAL BACKGROUND

### A.     OPM's Guidance Memorandum on Probationary Periods, Administrative Leave and Details

On January 20, 2025, OPM Acting Director Charles Ezell transmitted a guidance memo to Executive Branch agencies directing them, in pertinent part, "identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees[.]"  Mem. from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, titled "Guidance on Probationary Periods, Administrative Leave and Details" (Jan. 20, 2025) ("OPM Mem.").  Further, the OPM Memorandum directed agencies to "promptly determine whether those employees should be retained at the agency."  *Id*.

### B.     OPM's Voluntary Resignation Program

On January 28, 2025, OPM sent an email to federal employees informing them of a "deferred resignation program."  *www.opm.gov/fork*.  The email explained that President Trump issued several directives during the first week of his administration, including requiring that federal employees return to in-person work, restoring accountability for employees who have policy-making authority, restoring accountability for senior career executives, and reforming the federal hiring process to focus on merit. *Id.* The email explained that if federal employees choose to remain in their current positions, their service was appreciated, but "we cannot give you full assurance regarding the certainty of your position or agency but should your position be eliminated you will be treated with dignity and will be afforded the protections in place for such positions." *Id.* The

email further announced a deferred resignation program, effective January 28, that would be available to most federal employees[1] until February 6, 2025. *Id.* Under this program, employees who resign "will retain all pay and benefits regardless of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025 (or earlier if you choose to accelerate your resignation for any reason)." *Id.* The email explained that to take advantage of the program, an employee needed to respond to the email from their work computer with the word "Resign" in the body of the reply email. *Id.* The email included a deferred resignation letter, which, among other things, explained that OPM was authorized to send the email under "Executive Order 9830 and 5 U.S.C. §§ 301, 1103, 1104, 2951, 3301, 6504, 8347, and 8461," and further explained that OPM intended to use the responses to the email "to assist in workforce reorganization efforts in conjunction with employing agencies." *Id.* (citing 88 Fed. Reg. 56058; 80 Fed. Reg. 72455). Finally, the email noted that a response to the email was voluntary. *Id.*

In the days following OPM's January 28, 2025 email to the federal workforce, OPM provided a list of Frequently Asked Questions ("FAQs") concerning the deferred resignation program. *www.opm.gov/fork/faq*. Among other things, the FAQs explained that for those who are eligible for the deferred resignation program and accept, the employing agency could execute paperwork reflecting all the terms of the agreement. *Id.* The FAQs further explained that any government shutdown could potentially affect an employee's pay regardless of whether the employee accepted the deferred resignation letter, but that employees who accepted the deferred resignation offer would still be entitled to the backpay available under the Government Employee

---

[1] The email explained that the voluntary resignation program was not available for military personnel, employees of the Postal Service, and those in positions related to immigration enforcement and national security, and those in any other positions specifically excluded by the employee's employing agency.

Fair Treatment Act of 2019. *Id.* (citing 31 U.S.C. 1341(c)(2)).

On February 4, 2025, OPM provided a memorandum to all heads and acting heads of Departments and agencies regarding the legality of the deferred resignation program. Legality of Deferred Resignation Program, https://www.chcoc.gov/content/legality-deferred-resignation-program. OPM's February 4 memorandum explained that the deferred resignation offer "has generated considerable scrutiny and numerous questions from interested employees," and had been "subject to various legal critiques." *Id.* The February 4 memorandum explained "why concerns regarding the program's legality are misplaced and offers clarifying guidance on certain aspects of the plan." *Id.*

Among other things, the February 4 memorandum explained that Congressional approval of the deferred resignation program was unnecessary because employees would remain in duty status and entitled to their regular pay and benefits. *Id.* The memorandum further explained that the program does not promise employees any additional compensation that might require special congressional appropriations. *Id.*

The February 4 memorandum also clarified that although employees who take advantage of the deferred resignation program may pursue a second job outside the federal government, employees had to comply with the Standards of Ethical Conduct for Employees of the Executive Branch at 5 C.F.R. Part 2635 and other applicable federal laws, as well as any agency-specific regulations. *Id.* Finally, the February 4 memorandum included as an appendix a template deferred resignation agreement that could be used by agencies. *Id.*

On February 4, 2025, several federal unions sued in the District of Massachusetts, asserting direct organizational standing and seeking a temporary restraining order that would suspend the deadline OPM had set for submission of deferred resignation requests.  Following

expedited litigation on the plaintiff unions' motion for temporary restraining order (during which the district court entered a brief temporary restraining order enjoining the submission deadline to allow for orderly submission of briefing and argument), the district court denied the plaintiff unions' motion, holding that they could not show standing to sue and that district court review of their claims as pleaded was statutorily precluded under the FSL-MRS.  *See AFGE, et al., v. Ezell, et al.*, No. 25-cv-10276, Slip Op. at 2-3 (standing), 3-5 (preclusion) (D. Mass. Feb. 12, 2025) (ECF No. 66) (copy attached as Ex. A).  OPM closed the submission period later on the evening of February 12, 2025.

### C.    Executive Order 14210

On February 11, 2025, the President issued EO 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative."  EO 14210.  *See* https://public-inspection.federalregister.gov/2025-02762.pdf.  The key substantive provisions of the EO are set forth in Section 3, titled "Reforming the Federal Workforce to Maximize Efficiency and Productivity."  *Id*.  In four subparts, that section identified directives under the headings "Hiring Ratio" (subpart a), "Hiring Approval" (subpart b), "Reductions in Force" (subpart c), and "Rulemaking" (subpart d).  *Id*.  The provision most pertinent to Plaintiffs' claims here is subpart c.  There, the EO directs that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."  *Id*.  Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions

7

not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id*. Finally, it directs that "[t]his subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement." *Id*.

EO 14210 further provides that agency heads "may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities[,]" *id*. Sec.4 (b), and that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id*. Sec. 5(b).

## II.    Standards for Emergency Relief

A temporary restraining order, like a preliminary injunction, is extraordinary relief granted only to preserve the status quo. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 1:25-cv-239, 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025). It is "an extraordinary and drastic remedy" and "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To establish entitlement, a movant must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors merge when the government is the opposing party. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020); *accord Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 20 (D.D.C. 2018). "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an

'extraordinary remedy.'" *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

## III.    Procedural History

Plaintiffs filed suit on February 12, 2025, raising two claims: Count I, alleging that Defendants are violating the Constitutional separation of powers by infringing on Congress's Article I authority to fund and shape Executive Branch agencies, and Count II, alleging that Defendants are violating the Administrative Procedure Act by carrying out RIFs in violation of statutory and regulatory requirements.  ECF No. 1. Plaintiffs moved for a temporary restraining order late in the day on February 14. ECF No. 11.   By minute order on February 15, the Court directed Defendants to respond to Plaintiffs' TRO motion by 5 p.m. this Monday, February 17, with Plaintiffs to submit any reply by noon on Tuesday, February 18.  The Court has set the matter for hearing at 3 p.m. Tuesday, February 18.  *See* Minute Order of Feb. 15, 2025.

## ARGUMENT

Plaintiffs ask the Court to enter a temporary restraining order on the theory that the combination of OPM's actions and EO 14210 is causing them irreparable harm by bleeding them of members and revenue from dues.  But that alleged injury does not constitute irreparable harm, and Plaintiffs cannot show that their claims fall within district court jurisdiction or that they would prevail even if so, and thus cannot establish the requisite likelihood of success to warrant should relief.  The Court should accordingly deny their motion.

## I.    Plaintiffs Cannot Show Irreparable Harm Absent a TRO.

Plaintiffs' theory of irreparable harm—that they will suffer a precipitous decline in membership and dues from the challenged actions, which in turn will lead to a loss of bargaining power—cannot suffice for at least two reasons.

9

First, insofar as Plaintiffs' prediction of harm stems from a potential loss of members who have accepted the deferred resignation option offered by OPM, that would be a loss attributable to free choices exercised by individual members, which does not represent cognizable harm. "It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the independent responses and choices of third parties." *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019) (Wilkinson, J.). Unions have no preexisting legal entitlement to members choosing to stay in their ranks; and when they choose to leave, that is not a redressable legal harm.

Second, Plaintiffs' loss-of-membership theory remains speculative, and rests almost entirely on their concern that they will lose "substantial dues revenue" from the removal of members "because they are nonessential or probationary." Pls.' Br. at 20. As an initial matter, Plaintiffs cite no case law for this argument. *See id*. at 19-24. Yet even assuming some legal support, it falls short as a factual matter. Taking probationary-member and RIF losses in turn, the loss of substantial numbers attributable to each category remains conjecture at this point. NTEU asserts that it has "close to 10,000 dues paying probationary employees" among its members. *Id*. But it is far from clear how many such NTEU members might be removed during their probationary periods, much less whether that number would be "substantial." Plaintiffs likewise assert that they anticipate losing many members who "would be considered nonessential during a lapse of appropriations within [the Internal Revenue Service] and [the Department of Health and Human Services] alone." *Id*. But that argument ignores that by its own terms, EO 14210 is neither prescriptive nor unequivocal when referencing "employees . . . who are not typically designated as essential during a lapse in appropriations[.]" EO 14210 sec. 3(c). Instead, the EO explains that preparations for large-scale RIFs shall be undertaken "consistent with applicable law," and

similarly cabins its guidance for RIF prioritization to offices "perform[ing] functions not mandated by statute or other law[.]" *Id.* So it remains speculative how many of Plaintiffs' members may ultimately be subject to RIFs on the grounds that they "are not typically designated as essential," and thus impossible for Plaintiffs to establish that they face "substantial" loss of members from potential probationary removals or RIFs.

The same holds true for Plaintiffs' assertions that they face a potential "loss of bargaining power" as a result of the challenged actions. Pls.' Mem. at 22-24. They simply offer nothing more than speculation that they face imminent loss of heft at the bargaining table, which falls far short of the required "clear" showing of irreparable harm, *Winter*, 555 U.S. at 22.

Finally, if Plaintiffs are concerned about members departing their rolls and taking their periodic dues with them after September 30, 2025—the date when deferred resignations become effective—or another date by which the number of their members who may be subject to RIFs, there remains ample time before then to litigate those concerns through the ordinary course prior to that date without the need for the kind of extraordinary injunctive relief Plaintiffs seek in their Motion.

## II.     Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims.

Likewise, Plaintiffs cannot establish likelihood of success on the merits for at least two reasons: their claims are statutorily channeled away from district court review; they are not yet (and may never become) ripe for review; and they would not prevail on the merits in any event.

### A.     The FSL-MRS Precludes District Court Jurisdiction Over Plaintiffs' Claims.

At the outset, Plaintiffs cannot show that their claims may be heard in district court. The D.C. Circuit's decision in *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*"), is on all fours with this case, and would

compel dismissal for lack of jurisdiction on jurisdictional channeling grounds. Likewise, in *AFGE v. Ezell*, the U.S. District Court for the District of Massachusetts denied the plaintiff unions' motion for a temporary restraining order, in a decision issued on February 12, on two grounds: first, that the unions could not satisfy Article III standing on the claims as pleaded, and second, that district court jurisdiction over such claims was precluded under the FSL-MRS. *See AFGE v. Ezell*, Slip Op. at 2-3 (standing), 3-5 (preclusion).

In *AFGE v. Trump*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three Executive Orders issued by President Trump during his first administration that would have enacted substantial changes to the way federal unions operated. On the government's appeal from a district court decision largely in the unions' favor, the D.C. Circuit reversed the underlying decision on jurisdictional grounds, holding that the comprehensive, reticulated administrative-judicial review scheme set forth by the FSL-MRS channeled jurisdiction entirely away from the federal district courts, requiring that federal labor disputes be heard through the Federal Labor Relations Administration ("FLRA") review scheme, with judicial review to be provided in a federal court of appeals following the conclusion of administrative proceedings before the FLRA. *AFGE v. Trump*, 929 F.3d at 754-61.

The same jurisdictional outcome should obtain here. Similar to the plaintiff unions' broad challenge to the three labor EOs at issue in *AFGE v. Trump*, Plaintiffs here allege that the OPM actions and EO 14210 would combine to substantially undermine their financial health and bargaining power. Plaintiffs make no effort to distinguish *AFGE v. Trump* on its facts, *see* Pls.' Mem. at 18-25, which should amount to an effective concession that it controls the outcome here. In fact, Plaintiffs cite *AFGE v. Trump* only once, in glancing fashion. *See id*. at 24 (one discussion of *AFGE v. Trump*, offered for proposition of law).

Instead of trying to distinguish the facts of their case from those of *AFGE v. Trump*, Plaintiffs suggest that the jurisdictional doctrine underpinning the D.C. Circuit's decision there, first articulated by the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), has either been called into question by more recent Supreme Court decisions or does not apply at all to the sort of claims they bring here.  Both suggestions are incorrect.

Plaintiffs' first suggestion can be afforded short shrift.   In a footnote, Plaintiffs suggest that "*Thunder Basin* is on shaky ground, in any event[,]" Pls.' Mem. at 19, n.7, citing to two single-justice concurring opinions in *Axon Enterprise v. Federal Trade Commission*, 598 U.S. 175, at 196 (Thomas, J., concurring), 205 (Gorsuch, J., concurring) (2023).  The suggestion that *Thunder Basin* is now "on shaky ground" following *Axon* outside of collateral attacks on pending agency administrative proceedings raising certain structural constitutional challenges finds no support anywhere else.  *See, e.g.*, *Leachco v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 759 (10th Cir. 2024) (noting that *Axon* "only upheld district court jurisdiction to consider collateral constitutional challenges to administrative proceedings," and concluding that it is not "a broad ruling that creates an entitlement on the merits to a preliminary injunction in every case where such constitutional challenges are raised[.]").

Plaintiffs' second suggestion fares no better.  In arguing that their federal labor claims can be heard in district court notwithstanding the *Thunder Basin* doctrine—and the squarely on-point *AFGE v. Trump*—Plaintiffs try to analogize their claims to the sort of "structural" constitutional challenge the *Axon* Court held not to be channeled away from district court jurisdiction.  But that attempt fundamentally misses the mark; even post-*Axon*, the sort of claims that Plaintiffs raise remain properly channeled away from district court.

Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction." *Axon*, 598 U.S. at 185. Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). Where Congress has done so implicitly, courts determine whether it intended to preclude particular claims by assessing whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin*, 510 U.S. at 207, 212).

The first step under *Thunder Basin*—Congress's intent to preclude—is satisfied here: Congress established a detailed statutory scheme for adjudicating federal labor disputes. The FSL-MRS provides for "administrative and judicial review" regarding disputes between employees and their federal employers and disputes between unions representing those employees and the federal government. *AFGE*, 929 F.3d at 752. Congress decided, through the FSL-MRS, that federal labor disputes must first be administratively exhausted before the FLRA. Judicial review, if any, is available only in a court of appeals. *See AFGE v. Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *see also* 5 U.S.C. § 7703(b) (judicial review in Federal Circuit or other court of appeals). "Congress typically chooses . . . review in a court of appeals following the agency's own review process" when designing an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme includes. Accordingly, as the D.C. Circuit has repeatedly recognized, the FSL-MRS precludes jurisdiction in the district courts over federal union disputes. *See AFGE*, 929

F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 636 (D.C. Cir. 2013)).

Turning to the second *Thunder Basin* step—whether particular claims are of the type Congress intended to be reviewed in this scheme—the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* (internal quotation marks, citation, and alteration omitted). These "considerations" are ultimately merely guideposts to "best [] understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

All three *Thunder Basin* factors are satisfied here.  First, the scheme provides for meaningful judicial review over Plaintiffs' claims. This is so even if the statutory scheme Congress has established does not allow the unions "to obtain 'pre-implementation' review" "or immediate relief barring all agencies from implementing" deferred resignations, probationary removals, or RIFs. *See AFGE*, 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756. Here, as in *AFGE* itself, parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757.

Similarly, if any Plaintiff thinks that the deferred resignations, probationary removals, or RIFs conflict with any federal rule, guidance, or statute, it may assert that within the administrative scheme. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an

erroneous statutory interpretation); *Lyons v. VA*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja* ("*FLEOA*"), 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system).

Second, the asserted claims are not wholly collateral. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Plaintiffs challenge the deferred resignation program, certain probationary removals, and (future) RIFs. But those are all the kinds of federal labor issues that lie at the heart of the FSL-MRS.

Third, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. Indeed, *Elgin* directly addresses the point in the adjacent CSRA context. As the Court noted: "preliminary questions unique to the employment context" include fact questions about a "resignation" (there whether it "amounted to a constructive discharge") as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the FLRA, these "threshold questions" may "alleviate [the other] concerns." *See id.*

16

### B.    Plaintiffs' Claims Are Not Ripe.

In any event, Plaintiffs' claims would not be ripe even if they could be heard in district court.  Plaintiffs allege numerous violations of statutory and regulatory requirements governing RIFs.  Pls.' Mem. at 13-18.  But it is far from clear that any of the alleged violations will ever come to pass, as Plaintiffs cite no examples of agencies having initiated RIFs yet.  Indeed, the text of EO 14210 itself offers no support for Plaintiffs' assertions of statutory and regulatory RIF violations, as the EO states that agencies "shall promptly undertake preparations to initiate large-scale [RIFs], consistent with applicable law[.]"  EO 14210 sec. 3(c).  And even if the EO's language conditioning the implementation of future RIFs on compliance "with applicable law" is disregarded, it seems substantially too early to challenge RIFs implemented in accordance with the EO, as the President only issued it on February 11, 2025—less than one week prior to the filing of this brief.

### C.    Plaintiffs' Claims Are Unlikely to Succeed on the Merits.

Finally, even if the Court were to find jurisdiction over Plaintiffs' claims, they are unlikely to succeed on the merits.  Count I contends that Section 3(c) of EO 14210 violates separation-of-powers principles by intruding on Congress' authority to establish and fund federal agencies.  TRO Mem. at 8-12.  And Count II contends that the challenged actions violate the APA by implementing RIFs contrary to statutory and regulatory provisions.  But both claims are unlikely to succeed for the same reasons.

Cast as a separation-of-powers challenge, Plaintiffs' claims are not likely to succeed because "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).  The petitioners in *Dalton* sought to enjoing executive branch officials from implementing an allegedly unconstitutional

presidential decision to close certain military bases under the Defense Base Closure and Realignment Act of 1990. 511 U.S. at 471. Relying primarily on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the court of appeals reversed entry of dismissal, reasoning "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine" and "[t]hus, judicial review must be available to determine whether the President has statutory authority 'for whatever action' he takes." *Dalton*, 511 U.S. at 471 (citation omitted). The Supreme Court reversed, rejecting the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id*. Not "every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases). It explained that the Constitution is implicated only if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute. *Id*. at 473 & n.5.

Because neither situation applies here, Plaintiffs' separation-of-powers claim is not likely to succeed; nor is their largely parallel APA claim. Defendants are not executing Section 3(c) pursuant to independent Article II authority. Rather, they are implementing its directive to "initiate . . . reductions in force . . . consistent with applicable law," Exec. Order No. 14210, § 3. This applicable law includes OPM's regulations regarding federal agency governing RIFs, *see* 5 C.F.R. part 351, which in turn were properly issued under congressional authority, *see* 5 U.S.C. §§ 1302, 3502, 3503; *see also Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (stating that when the President "directs his subordinates how to proceed in

administering federally funded projects, but only 'to the extent permitted by law,"' the consequence is that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law.").

This case thus sharply contrasts with *Youngstown Sheet & Tube Co.*, in which the President had directed the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," and conceded the absence of statutory authority. 343 U.S. at 585-87. Plaintiffs have not suggested that either OPM's regulations or its statutory authority from promulgating these regulations are themselves unconstitutional. *Dalton*'s reasoning thus applies here and refutes Plaintiffs' argument that they are likely to succeed on their separation-of-powers claim. *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d  11, 51-54 (2020) (rejecting separation-of-powers claim based on Appropriations Clause constitutional claims based on *Dalton* because "[a]t bottom, this is just an allegation that [executive officials] exceeded their statutory authority"). This case concerns "simply" whether Defendants have "exceeded [their] statutory authority" and "no constitutional question whatever is raised"—"only issues of statutory interpretation." *Dalton*, 511 U.S. at 473-74 & n.6 (citation omitted).

In contending that the challenged actions violate the separation of powers, Plaintiffs are advancing the same argument the Supreme Court rejected in *Dalton*. Plaintiffs assert first, that Defendants acted in excess of statutory authority, *see* TRO Memo. at 9-10, and second, that Section 3(c) is inconsistent with existing statutes (*e.g.*, the Inflation Reduction Act, Pub. L. No. 117-169), TRO Mem. at 10-12. But these alleged separation-of-powers claims hinge entirely on, respectively, whether Defendants acted in accordance with OPM regulations regarding agency reductions in force (and their concomitant statutory authorization), and whether Section 3(c) on its

face is inconsistent with existing statutes.  The outcome of these questions depends on resolution of statutory and regulatory claims rather than any unique separation-of-powers principles.  If Plaintiffs' argument were accepted, then every garden-variety action by a federal agency alleged to be in violation of a statutory provision could also for the same reason be alleged to violate the constitutional separation of powers.  "Under *Dalton*, [Plaintiffs] cannot recast these types of claims as constitutional." *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 53; *see Dalton*, 511 U.S. at 474 (stating that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration.").

*******

Ultimately, because Plaintiffs' claims fall outside of district court jurisdiction and because they are unlikely to succeed on their merits, Plaintiffs cannot establish the likelihood of success on their claims necessary to obtain temporary injunctive relief.

### III. The Balance of the Equities and the Public Interest Weights Against Imposition of a Temporary Restraining Order.

The balance of equities and public interest also weigh heavily against Plaintiffs. These final two factors of the preliminary injunction analysis merge where relief is sought from the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009)Wint. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

Plaintiffs contend that there is "a clear public interest in maintaining the constitutionally prescribed balance of power between the legislative and executive branches," suggesting that a predicted 20 percent diminution of the federal civilian workforce would alter that balance of

power.  Pls.' Mem. at 29.  The balance of equities and the public interest point in the opposite direction, however: the President is charged with directing the Executive Branch workforce, and he has determined that the politically accountable heads of his agencies should take steps to streamline and modernize the workforce through measures including voluntary deferred resignations, removal of certain probationary employees, and RIFs.

## IV.    Any Injunctive Relief Should be Limited to Plaintiffs.

Finally, even if Plaintiffs could make the showing required for extraordinary preliminary relief, the essentially nationwide injunction they seek would be inappropriate. Despite only representing certain federal employees in certain agencies, Plaintiffs improperly seek a temporary restraining order that would broadly apply to all federal employees—including those who are not represented by these unions and including those who may not want any relief.

Both constitutional and equitable principles require that injunctive relief be limited to redressing Plaintiffs' own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey,* 518 U.S. 343. 357 (1996). "The actual-injury requirement would hardly serve [its] purpose . . . of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc..*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. V. Gerston Seed Farms*, 561 U.S. 139, 163

(2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin an order on the ground that it might cause harm to other parties"). Accordingly, any preliminary injunctive relief in this case should be limited to only addressing the claimed harms of the Plaintiffs and go no further.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a temporary restraining order.

Dated: February 17, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

LESLEY FARBY
Deputy Director, Federal Programs Branch

*/s/ Christopher R. Hall*
CHRISTOPHER R. HALL
Assistant Director
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 514-4778
E-mail: Christopher.Hall@usdoj.gov