UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**NATIONAL TREASURY EMPLOYEES
UNION, et al.**,

             Plaintiffs,

             v.

**DONALD J. TRUMP, et al.**,

             Defendants.

Case No. 25-cv-420 (CRC)

## MEMORANDUM OPINION AND ORDER

The first month of President Trump's second administration has been defined by an onslaught of executive actions that have caused, some say by design, disruption and even chaos in widespread quarters of American society. Affected citizens and their advocates have challenged many of these actions on an emergency basis in this Court and others across the country. Certain of the President's actions have been temporarily halted; others have been permitted to proceed, at least for the time being. These mixed results should surprise no one. Federal district judges are duty-bound to decide legal issues based on even-handed application of law and precedent—no matter the identity of the litigants or, regrettably at times, the consequences of their rulings for average people.

This case presents challenges to three of President Trump's recent executive actions aimed at drastically reducing the size of the federal workforce. Plaintiffs National Treasury Employees Union ("NTEU") and four other unions that represent federal employees seek a temporary restraining order and a preliminary injunction to prevent: (1) the termination of their members who are probationary employees; (2) the anticipated implementation of large-scale reductions in force ("RIFs") throughout federal agencies; and (3) any renewal of the Trump

Administration's program to offer federal employees "deferred resignation" with pay and benefits until September 30 of this year.

For the reasons explained below, the Court will deny the unions the preliminary relief they seek because it likely lacks subject matter jurisdiction to hear their claims. The claims must instead be brought before the Federal Labor Relations Authority ("FLRA") under the Federal Service Labor-Management Relations Statute.

I.    **Background**

A.    Mass Firing of Probationary Employees

On January 20, 2025, the Office of Personnel Management ("OPM") issued a memorandum directing federal agencies to identify all employees serving probationary periods by January 24. Mem. from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, titled "Guidance on Probationary Periods, Administrative Leave and Details" (Jan. 20, 2025) ("OPM Mem."), available at https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20 Administrative%20Leave%20and%20Details%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%20FINAL.pdf. Probationary employees include those who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment. Id. Agency heads were further directed to send their lists of probationary employees to OPM and "promptly determine whether those employees should be retained at the agency." Id. OPM also requested a determination from each federal agency as to which probationary employees they wished to retain, along with a short justification, by February 5. Am. Compl. ¶ 55. The federal government employs an estimated 220,000 probationary employees. Id. ¶ 57.

NTEU[1] alleges that a "mass firing of probationary employees" is now underway.  Id. ¶ 60.  The allegation is not without evidence.  On February 11, the Consumer Financial Protection Bureau ("CFPB") sent pink slips to its probationary employees.  TRO Mot., Ex. 1 ("Kaspar Decl.") ¶ 14.  The Food and Drug Administration ("FDA") and the Department of Energy have cashiered "well over a majority" of their probationary employees.  Reply, Ex. 1 ("Kaspar Supp. Decl.") ¶ 4.  The Department of Health and Human Services, the Bureau of Land Management, the Environmental Protection Agency, the National Park Service, and the Food and Nutrition Service have likewise sacked many probationary employees.  Id. ¶ 5.  And the Federal Deposit Insurance Corporation and the Internal Revenue Service ("IRS") intend to terminate many probationary employees imminently, with the IRS apparently planning to fire "thousands of probationary employees as soon as this week."  Id. ¶ 6.

B.  Deferred Resignation Program

Meanwhile, on January 28, OPM sent an email to all federal employees presenting them with a deferred resignation offer known as the "Fork in the Road" directive.  Original Email to Employees, OPM, https://www.opm.gov/fork/original-email-to-employees (last visited Feb. 19, 2025).  Under the terms of the offer, employees who chose to resign would "retain all pay and benefits regardless of [their] daily workload and [would] be exempted from all applicable in-person work requirements until September 30, 2025."  Id.  To resign, employees needed only to respond from their government accounts with the word "Resign" in the body of an email.  Id. The Fork in the Road email further noted that OPM could not "give [] full assurance regarding the certainty of your position or agency" to those employees who chose to stay.  Id.

---

[1] For convenience, the Court will collectively refer to Plaintiffs as NTEU.

As originally announced, the opportunity to accept the offer was set to expire on

February 6.  Am. Fed'n of Gov' Emps., AFL-CIO v. Ezell, No. 25-cv-10276, 2025 WL 470459,

at *1 (D. Mass. Feb. 12, 2025).  Prior to the deadline, several labor unions representing federal

employees moved for a temporary restraining order to stay the directive's February 6 closing.

Id.  On February 6, United States District Judge George A. O'Toole, Jr. entered a temporary

restraining order preventing the government from enforcing the deadline.  Id.  Then, on February

12, Judge O'Toole dissolved the temporary restraining order and denied any further preliminary

injunctive relief, holding that the unions did not have standing to challenge the program and that

the court lacked subject matter jurisdiction over their claims.  Id. at *1–3.  The program

subsequently closed on February 12, and resignations after 7:20 p.m. on that day were no longer

accepted.  Fork in the Road, OPM, https://www.opm.gov/fork (last visited Feb. 19, 2025).

According to the White House, approximately 75,000 employees—roughly 3% of the federal

civilian workforce—resigned.  Am. Compl. ¶ 66.

> C. Executive Order No. 14210

Continuing the general push to slash the federal workforce, President Trump issued

Executive Order No. 14210, titled "Implementing the President's 'Department of Government

Efficiency' Workforce Optimization Initiative," on February 11.  Executive Order No. 14210,

available at https://public-inspection.federalregister.gov/2025-02762.pdf (last visited Feb. 19,

2025).  The executive order included several directives to supposedly "elimat[e] waste, bloat,

and insularity" in the federal government.  Id. § 1.

Relevant here, Section 3(c) of the order directs agency heads to "promptly undertake

preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and

to separate from Federal service temporary employees and reemployed annuitants working in

areas that will likely be subject to the RIFs." Id. § 3(c).  Section 3(c) further orders that "offices

that perform functions not mandated by statute or other law" be prioritized in the RIFs, including

"all agency diversity, equity, and inclusion initiatives;" "agency initiatives, components, or

operations" that are suspended or closed; and "all components and employees performing

functions not mandated by statute or other law who are not typically designated as essential

during a lapse in appropriations[.]"  Id.

In reliance on this executive order, NTEU asserts that the CFPB "fired over 70 term

employees" on February 13, including dues paying NTEU members.  Kaspar Supp. Decl. ¶ 7.

D.  Procedural History

Plaintiffs in this case are NTEU and four other labor unions that represent federal

employees: the National Federation of Federal Employees ("NFFE"), the International

Association of Machinists and Aerospace Workers ("IAM"), the International Federation of

Professional and Technical Engineers ("IFPTE"), and the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America ("UAW").  On

February 12, the unions brought constitutional and statutory challenges to the firing of

probationary employees, the deferred resignation program, and Executive Order No. 14210.

They claim that these executive actions violate constitutional separation-of-powers principles

"because they undermine Congress's authority to set and fund the missions of federal agencies."

Am. Compl. ¶ 89.  They further claim that the challenged actions violate the statute and

regulations governing RIFs, including statutorily mandated notice requirements.  Am. Compl. ¶¶

90–99; see 5 U.S.C. § 3502; 5 C.F.R. § 351.501(a).  Each union has dues paying members

affected or likely to be affected by the President's actions.

To date, "approximately 1,250–1500 dues paying members" of NTEU have been terminated. Kaspar Supp. Decl. ¶ 8. That represents "more than a half a million dollars in revenue." Id. Ninety-four percent of NTEU members pay union dues via payroll deductions, so dues payments for NTEU members who have been terminated "stop with their final paycheck." Id. ¶ 9. The IRS, in particular, employs more dues paying NTEU members than any other federal agency or department; HHS also accounts for a large fraction of members. TRO Mot., Ex. 2 ("Gray Decl.") ¶¶ 5, 7. Thus, NTEU estimates that the termination of all nonessential employees at IRS and HHS would cause them to lose approximately $15 million, around 38% of its annual dues revenue. Id. ¶ 9.

NFFE, for its part, has thousands of dues paying members who are probationary employees at the U.S. Forest Service, where the termination of probationary employees has begun, and is unable to maintain membership of employees who leave federal service. TRO Mot., Ex. 4 ("Erwin Decl.") ¶¶ 4, 7, 8. IFPTE also has some dues paying members who are probationary or nonessential employees, id., Ex. 5 ("Biggs Decl.") ¶¶ 6–8, as do IAM, id., Ex. 6 ("Norman Decl.") ¶ 4, and UAW, id., Ex. 3 ("Smith Decl.") ¶¶ 5–6.

The unions filed their complaint on February 12, 2025. Two days later, on February 14, they moved for a temporary restraining order and preliminary injunction to prevent: (1) implementation of Section 3(c) of Executive Order No. 14210; (2) the firing of probationary employees across all federal agencies; and (3) any further extension or implementation of the deferred resignation program. TRO Mot. at 4. The case was then reassigned to this Court on Saturday, February 15. The same day, the Court ordered expedited briefing and oral argument on the TRO and preliminary injunction motion. The unions then filed an amended complaint on February 17, alleging further terminations of probationary employees at HHS, the EPA, the

6

Department of Energy, the Department of Agriculture, and the Food and Nutrition Service, as

well as the firing of term employees at the CFPB.  Am. Compl. ¶¶ 52, 61, 62.  The Court held a

hearing on February 18.

The Court will now deny the motion because it likely lacks subject matter jurisdiction

over the unions' claims.  They must pursue their challenges instead through the scheme

established by Congress in the Federal Service Labor-Management Relations Statute

("FSLMRS"), which provides for administrative review by the Federal Labor Relations

Authority ("FLRA") in the first instance, followed by judicial review in the courts of appeals.

## II.    Legal Standards

A temporary restraining order, like a preliminary injunction, "is an extraordinary remedy

that should be granted only when the party seeking the relief, by a clear showing, carries the

burden of persuasion."  Postal Police Officers Ass'n v. United States Postal Serv., 502 F. Supp.

3d 411, 418 (D.D.C. 2020) (Cooper, J.) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir.

2004)).  When considering a motion for preliminary relief through either vehicle, the Court must

determine whether the movant has met its burden of demonstrating that: (1) that they are likely to

succeed on the merits of their claims; (2) that they are likely to suffer irreparable harm absent

preliminary relief; (3) that the balance of the equities tilts in their favor; and (4) that

consideration of the public interest favors preliminary relief.  Winter v. Nat. Res. Def. Council,

Inc., 555 U.S. 7, 20 (2008); Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C.

2001) ("The court considers the same factors in ruling on a motion for a temporary restraining

order." ).

### III.  Analysis

NTEU fails to establish that it is likely to succeed on the merits because this Court likely lacks subject matter jurisdiction over the claims it asserts.  The Court will therefore deny the unions' motion for a temporary restraining order and, for the same reasons, deny their request for a preliminary injunction.  Because it likely lacks jurisdiction, the Court need not address the other considerations for preliminary injunctive relief.

### A.  Statutory Background

To begin, some brief background on the relevant statutory schemes.  The Federal Service Labor-Management Relations Statute ("the Statute" or "FSLMRS"), set forth in Title VII of the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978) (codified at 5 U.S.C. §§ 7101-35), governs labor relations between the executive branch and its employees.  It "grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters." Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 752 (D.C. Cir. 2019).  The Statute further "establishes a scheme of administrative and judicial review." Id.  Under that scheme, the Federal Labor Relations Authority ("FLRA"), a three-member agency charged with adjudicating federal labor disputes, reviews matters including "negotiability" and "unfair labor practice" disputes.  See 5 U.S.C. § 7105(a).  When reviewing unfair labor practice complaints, "the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." Trump, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118)).

Direct review of the FLRA's decisions is available in the courts of appeals.  5 U.S.C. § 7123(a).  The D.C. Circuit has repeatedly held that this scheme "provides the exclusive

procedures by which federal employees and their bargaining representatives may assert federal

labor-management relations claims." Trump, 929 F.3d at 755 (quoting AFGE v. Sec'y of the Air

Force, 716 F.3d 633, 636 (D.C. Cir. 2013)).

Separately, the CSRA also "established a comprehensive system for reviewing personnel

action taken against federal employees." Elgin v. Dep't of Treasury, 567 U.S. 1, 5 (2012). If an

agency takes a final adverse action against an employee—removal, suspension for more than 14

days, reduction in grade or pay, or furlough for 30 days or less, 5 U.S.C. § 7512—the employee

may appeal to the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7513(d). The MSPB

may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees.

Id. §§ 1204(a)(2), 7701(g). Probationary employees, however, generally do not enjoy a right to

appeal to the MSPB. Id. § 7511(a)(1). Employees may appeal final MSPB decisions to the

Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9).

This statutory review scheme, too, is "exclusive, even for employees who bring constitutional

challenges to federal statutes." Elgin, 567 U.S. at 13.

B. *Thunder Basin* Preclusion

The government argues that the FSLMRS precludes this Court's jurisdiction over

NTEU's claims. Opp'n at 12–16.[2] To consider this contention, the Court employs the

---

[2] At least as to permanent employees, the government also suggests that the claims of individual employees are channeled to the MSPB. Feb. 18, 2025 Hrg. Tr. ("Tr.") 23:2–3. At oral argument, NTEU equivocated as to whether any non-probationary employees have been terminated. See Tr. 10:11–16. At one point, NTEU indicated that none of its non-probationary member employees had been terminated; at another, NTEU suggested that some CFPB term employees have been fired, which is also reflected in NTEU's supplemental declaration. Kaspar Supp. Decl. ¶ 7. In any event, as most if not all union members terminated to date have been probationary, the Court focuses on the FSLMRS's scheme, which permits the unions to bring claims on their behalf. The Court stresses, however, that the claims of permanent employees may alternatively be channeled to the MSPB as they arise.

framework set forth in <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200 (1994).[3]  Under <u>Thunder Basin</u>, a claim will be found to fall outside of the scope of a special statutory administrative review scheme in only limited circumstances: when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim is wholly collateral to the statutory review provisions; and (3) the claim is beyond the expertise of the agency.  <u>Arch Coal, Inc. v. Acosta</u>, 888 F.3d 493, 500 (D.C. Cir. 2018) (first citing <u>Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.</u>, 561 U.S. 477 (2010); then citing <u>Thunder Basin</u>, 510 U.S. at 212–13).  These exceptions are not applied pursuant to any "strict mathematical formula."  <u>Arch Coal</u>, 888 F.3d at 500 (citation omitted).  Rather, the exceptions reflect "general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design."  <u>Id.</u> (citation omitted).

    C.  <u>Application</u>

NTEU does not dispute that the claims it asserts are of the type generally covered by the FSLMRS scheme.  Feb. 18, 2025 Hrg. Tr. ("Tr.") 45:15–20.  And with good reason.  The claims here are brought by a union representing federal employees against their federal employers—thus, they are "federal labor-management relations claims."  <u>Trump</u>, 929 F.3d at 756.[4]  And the Statute's scheme is "exclusive" with respect to such claims.  <u>Id.</u>

---

[3] In passing, NTEU asserts that <u>Thunder Basin</u> is "on shaky ground."  TRO Mot. at 19 n.7.  Although NTEU is correct that two Justices recently expressed criticism of <u>Thunder Basin</u>, <u>see</u> <u>Axon Enter., Inc. v. FTC</u>, 598 U.S. 175, 205 (2023) (Gorsuch, J., concurring); <u>id.</u> at 196 (Thomas, J., concurring), six other Justices joined Justice Kagan's application of the <u>Thunder Basin</u> factors in that case.  The Court therefore sees no obstacle to continuing to apply the <u>Thunder Basin</u> factors.

[4] The FSLMRS grants the FLRA the authority to resolve certain disputes, including issues "relating to the duty to bargain in good faith" and "complaints of unfair labor practices." 5 U.S.C. § 7105(a).  Neither party specifies, however, which of these provisions covers NTEU's claims.  Although NTEU's counsel stated at the hearing that NTEU is not alleging an unfair

NTEU instead argues that the "limited circumstances" under which a claim will be found to fall outside the statutory scheme are present here.  But as in American Federation of Government Employees v. Trump, the balance of considerations favors the government.  929 F.3d at 761.

### 1.  Meaningful Judicial Review

To begin with, "all meaningful judicial review" is not foreclosed by channeling the unions' claims to the FLRA.  See Arch Coal, 888 F.3d at 500.  NTEU acknowledges that it could bring its claims before the FLRA.  Tr. 48:21–22.  And any claims that the FLRA is unable to resolve could be addressed by the circuit courts on appeal.  See 5 U.S.C. § 7123(a), (c).  Nevertheless, it is on this factor that NTEU expends most of its effort.  It mounts three main lines of attack.

First, NTEU contends that no meaningful judicial review is available to it because it will suffer irremediable financial harm and loss of bargaining power in the interim.  TRO Mot. at 21–24.  NTEU therefore claims that this "here-and-now injury" prevents the preclusion of its claims under Axon Enterprise, Inc. v. Federal Trade Comm'n, 598 U.S. 175 (2023).  But NTEU misconstrues the "here-and-now" injury at issue in Axon.  There, plaintiffs challenged enforcement actions by the FTC and SEC on the ground that the ALJs in each proceeding could not "constitutionally exercise governmental authority because of their dual-layer protection from removal."  Id. at 183.  Thus, the core of each plaintiff's claim was that it would be subjected to

---

labor practice, Tr. 14:9–14, the Court fails to see why its statutory claims, at least, do not allege just that, especially given that unfair labor practices include agency enforcement of policies that violate a collective bargaining agreement predating those policies.  Sec'y of Air Force, 716 F.3d at 637 (citing 5 U.S.C. §§ 7116(a)(7), 7118(a)(1)).  Presumably, NTEU's collective bargaining agreements require compliance with applicable law, and NTEU claims that the administration's actions violate the RIF statute and regulations.

an "an illegitimate proceeding, led by an illegitimate decisionmaker." Id. at 191.  Such a harm

qualified as a "here-and-now injury" that could not be remedied after the fact by a court of

appeals, because "[a] proceeding that has already happened cannot be undone." Id.  Plaintiffs'

injuries were thus like those recognized by the Court's "immunity doctrines," in which a party

has "certain rights not to stand trial or face other legal processes." Id. (quotation marks omitted).

        NTEU's alleged harms here do not resemble the injury in Axon.  NTEU does not argue

that the FLRA is unconstitutionally structured or that, in resolving these claims, the agency

would subject the unions to an illegitimate proceeding.  Rather, NTEU purports to have suffered

two irreparable injuries affecting its internal operations: the loss of union dues, as it cannot

recover back dues for periods during which employees were not represented by the union, and

reputational harm stemming from a loss of bargaining power.  TRO Mot. at 21–24.  NTEU's

reliance on these injuries overreads Axon.  That case does not stand for the proposition that *any*

irreparable injury suffices to defeat preclusion.  Indeed, the Supreme Court was careful to add

that parties will ordinarily still have to go through the agency process even when doing so would

"subject[] them to significant burdens" such as "the expense and disruption of protracted

adjudicatory proceedings[.]" Axon, 598 U.S. at 192 (quotation marks omitted).  Those routine

burdens, which differed in kind from those suffered by the Axon plaintiffs, resemble the injury

NTEU asserts here.  NTEU claims that the relief it seeks would be harder to get if it proceeds

first before the FLRA, not that it has a right to avoid proceeding before the FLRA at all.  As a

result, NTEU's claimed injuries fall outside the narrow class of structural constitutional claims

that Axon carved out from the Thunder Basin framework.

        NTEU's assertion that it cannot recover all the relief it seeks from the FLRA does not

change the Court's analysis.  That assertion may be true.  But NTEU will be able to seek

"meaningful review," as the D.C. Circuit has interpreted it, via the statutory scheme.  If the

FLRA finds an unfair labor practice, for instance, it may "require[e] reinstatement of an

employee with backpay."  5 U.S.C. § 7118(a)(7)(C).  And even though NTEU cannot obtain its

"preferred form of relief" through the statutory scheme, that does not mean its claims avoid

preclusion.  Trump, 929 F.3d 748.  In American Federation of Government Employees v.

Secretary of the Air Force, 716 F.3d 633 (D.C. Cir. 2013), unions brought Administrative

Procedure Act claims against an Air Force policy requiring mechanics to dress in military

uniform while performing civilian duties.  Id. at 635.  Even though plaintiffs were afforded only

"more modest 'administrative options' for challenging the uniform regulation" before the FLRA,

"followed by judicial review in the courts of appeals," their claims remained precluded.  Trump,

929 F.3d at 756 (citing Sec'y of Air Force, 716 F.3d at 636–38).  Here too, NTEU's inability to

recover its lost dues from the FLRA does not provide it with an escape hatch from the statutory

review scheme.

Second, NTEU appears to suggest that the constitutional challenges it brings are not of

the type appropriately resolved under the statutory scheme.  TRO Mot. at 18.  But absent any

challenge to the very FLRA procedures it wishes to circumvent, NTEU's constitutional claims

do not defeat preclusion.  In holding that an employee's constitutional challenge to the draft was

properly channeled to the MSPB, the Supreme Court explained that whether a claim is precluded

"does not turn on [its] constitutional nature . . . but rather on the type of the employee and the

challenged employment action."  Elgin, 567 U.S. at 15.  So too here.  And even if the FLRA

cannot decide NTEU's constitutional claims, "it is of no dispositive significance whether the

agency has the authority to rule on constitutional claims so long as the claims 'can eventually

reach 'an Article III court fully competent to adjudicate' them."  Trump, 929 F.3d at 758

13

(citation omitted).  Since the courts of appeals serve as a backstop to any FLRA decision, NTEU's constitutional claims pose no barrier to preclusion.

Lastly, NTEU argues that the firings at issue are so numerous that they will overwhelm the FLRA, thereby foreclosing, or at least forestalling, any meaningful review.  Tr. 15:16–19. The Court acknowledges that district court review of these sweeping executive actions may be more expedient.  But NTEU provides no reason why it could not seek relief from the FLRA on behalf of a class of plaintiffs and admits that it would ask other agencies to follow an administrative judge's ruling in its favor.  Tr. 48:21–23.  And a constitutional or statutory holding by a reviewing court of appeals would likely be broadly applicable to other plaintiffs challenging the same set of actions.

At bottom, NTEU's argument sounds in practicality and efficiency.  But the D.C. Circuit was unpersuaded by nearly identical reasoning in American Federation of Government Employees v. Secretary of the Air Force.  There, the union asserted that "the district court has jurisdiction because it can more efficiently adjudicate AFGE's claim that the Air Force instructions are contrary to statute on a nationwide, rather than local-by-local, basis."  Sec'y of Air Force, 716 F.3d at 639.  The D.C. Circuit rejected this argument, observing that statutory channeling requirements apply to "systemwide challenge[s]" to agency actions as well as to cases raising individual claims.  Id.  The court stressed, as well, that a plaintiff may not avoid the statutory review scheme "because it provides only an 'inconvenient' remedy."  Id.  Here too, although district court review may appear more efficient or convenient to NTEU, its preference does not insulate its claims from the FSLMRS review scheme.

14

2.   Collateral Claims and Agency Expertise

Moving to the final two Thunder Basin considerations, NTEU merely reprises its claim of

irremediable harm to argue that its claims are "wholly collateral" to the statutory review scheme.

TRO Mot. at 24–25.  The Court will therefore dispose of this argument in short order, for the

reasons already explained.

As to agency expertise, the third Thunder Basin factor, NTEU argues that it is no longer a

relevant consideration following Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024).

TRO Mot. at 25.  The Court does not agree with this sweeping statement.  Loper Bright did not

foreclose all reliance on agency expertise.  See Loper Bright, 603 U.S. at 402 (noting that

although an agency's interpretation of a statute is not binding, it may be especially informative

"to the extent it rests on factual premises within [the agency's] expertise.").  Nor did the

Supreme Court suggest that this factor is no longer part of the Thunder Basin analysis.

That said, as compared with the claims in American Federation of Government

Employees v. Trump, the Court is less certain that NTEU's claims "lie at the core of the FLRA's

'specialized expertise in the field of federal labor relations.'"  929 F.3d at 760.  But the statutory

claims do not appear that far afield from the agency's usual review.  The government represents

that whether the firing of probationary employees qualifies as a RIF, for instance, "are the types

of claims that the FLRA hears all the time."  Tr. 40:12–13.  And although the FLRA may lack

expertise on the constitutional claims, the agency could "moot the need to resolve the unions'

constitutional claims" by finding that the President's actions violated the RIF statute.  Trump,

929 F.3d at 761 (citation omitted).[5]

---

[5] And as to the alternative channeling scheme for permanent employees, the MSPB has
extensive expertise at least as to the statutory claims, as the Board appears to routinely handle

The first two <u>Thunder Basin</u> considerations demonstrate that the union's claims fall within the exclusive statutory scheme, and the third does not displace that conclusion. The Court therefore concludes that it likely lacks subject matter jurisdiction over NTEU's claims. <u>See</u> <u>Ezell</u>, 2025 WL 470459, at *2 (holding likewise as to unions' claims challenging the deferred resignation program).

The Court will, accordingly, deny Plaintiffs' request for a temporary restraining order and for a preliminary injunction.

## IV.  Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 11] Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is DENIED.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: <u>February 20, 2025</u>

---

such claims. <u>See</u> <u>Jenson v. Merit Sys. Prot. Bd.</u>, 47 F.3d 1183 (Fed. Cir. 1995) (reviewing claim that agency violated RIF notice requirements); <u>Ezell</u>, 2025 WL 470459, at *1 (relying on Federal Circuit case reviewing an MSPB decision on an allegedly involuntary resignation).