**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, et al., et al., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00420 |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES.......................................................................................................... iii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

   I.    STATUTORY BACKGROUND..................................................................................... 2

      a.   The President's Authority to Manage the Federal Workforce........................................ 2

      b.   The Federal Service Labor-Management Relations Statute. .......................................... 3

   II.   FACTUAL BACKGROUND ........................................................................................... 4

      a.   OPM's Guidance Memorandum on Probationary Periods, Administrative Leave and

      Details. ........................................................................................................................... 4

      b.   OPM's Voluntary Resignation Program......................................................................... 5

      c.   Executive Order 14210. ................................................................................................. 7

   III.   PROCEDURAL HISTORY ............................................................................................. 8

LEGAL STANDARD .................................................................................................................... 8

ARGUMENT .................................................................................................................................. 9

   I.    THE COURT LACK SUBJECT-MATTER JURISDICTION OVER ALL OF

   PLAINTIFFS' CLAIMS. ................................................................................................. 9

a.    Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance. ...................................................................................................................... 10

b.    Plaintiffs Lack Organizational Standing Because They Have Not Proven Cognizable Injury to Their Professed Missions. ...................................................................................... 14

c.    The Union Plaintiffs Lack Associational Standing Because the Claims Asserted Necessitate Individualized Findings. ...................................................................................... 18

II.    DEFENDANTS' APA CLAIMS ARE UNREVIEWABLE. ............................................ 20

a.    Plaintiffs Do Not Allege Any Agency Action. ................................................................ 20

b.    Plaintiffs Do Not Allege Any Final Action. ................................................................... 22

c.    The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs. ........................................................................................ 23

III.    PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED A CONSTITUTIONAL VIOLATION. ....................................................................................................................... 24

CONCLUSION .................................................................................................................... 26

# TABLE OF AUTHORITIES

**CASES**

*AFGE v. Sec'y of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013)................................................12

*Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484 (5th Cir. 2014)......................25

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459 (D.
    Mass. Feb. 12, 2025)........................................................................................................15

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA,
    2025 WL 820782 (N.D. Cal. Mar. 14, 2025)...........................................................................16

*Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21,
    2025) ................................................................................................................................15

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023) ..................................25

*Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383 (D. Md. 2011)...............................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................10

*Axon Enterprise, Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 143 S.Ct. 890, 215 L.Ed.2d 151
    (2023)................................................................................................................................12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................10

*Bennett v. Spear*, 520 U.S. 154 (1997) ......................................................................................26

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002 ...................2

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)...........................................................................27

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 104 S. Ct. 439,
    441, 78 L. Ed. 2d 195 (1983) .............................................................................................3

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ............................................24

*Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192 (D.C. Cir. 2011).....................................22

*City of New York v. DOD*, 913 F.3d 423 (4th Cir. 2019)................................................................21

*Collins v. Yellen*, 594 U.S. 220 (2021) ........................................................................................19

*Ctr. for Biological Diversity v. Nishida*, No. CV 21-119 (RDM), 2021 WL 827189 (D.D.C. Mar.
   4, 2021) .................................................................................................................................22

*Dalton v. Specter*, 511 U.S. 462 (1994)........................................................................................28

*Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016) .......................................24

*Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012)...............................................................11

*Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016)
   ................................................................................................................................................27

*Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136 (D.C. Cir. 2011) ......................................17

*Fed. Lab. Rels. Auth. v. Aberdeen Proving Ground, Dep't of the Army*, 485 U.S. 409, 108 S. Ct.
   1261, 99 L. Ed. 2d 470 (1988) ...............................................................................................4

*Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ........17

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005)..........................................................................27

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) .........................................................................23

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006)................25

*Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009) .......................................................................27

*Gill v. Whitford*, 585 U.S. 48, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018) .................................19

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...............................................................17

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ..............................................21

*Lewis v. Casey*, 518 U.S. 343 (1996) ...........................................................................................19

*Loc. 1498, Am. Fed'n of Gov't Emp. v. Am. Fed'n of Gov't Emp., AFL/CIO*, 522 F.2d 486 (3d Cir.
   1975) .......................................................................................................................................2

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) 14

*Louisiana v. United States*, 948 F.3d 317 (5th Cir. 2020) .........................................................25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......................................................................16

*Mahorner v. Bush*, 224 F. Supp. 2d 48 (D.D.C. 2002)...............................................................20

*Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451 (D.C. Cir. 1965)..........................2

*Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, (4th Cir. Apr. 9,
    2025) ...................................................................................................................................16

*Maryland v. United States Dep't of Agric.*, No. CV JKB-25-0748, 2025 WL 800216 (D. Md.
    Mar. 13, 2025)......................................................................................................................15

*Moms Against Mercury v. FDA*, 483 F.3d 824 (D.C. Cir. 2007)................................................10

*Myers v. United States*, 272 U.S. 52 (1926)................................................................................2

*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995) ...........................17

*Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) ...................................20

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)...............................................................24

*OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025)........................................16

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017).....................................................27

*Pub. Citizen v. Trump*, 297 F. Supp. 3d 6 (D.D.C. 2018)..........................................................22

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................................................19

*Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000) .............................................................25

*Sorenson Commc'n, LLC v. FCC*, 897 F.3d 214 (D.C. Cir. 2018) .............................................22

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009).................................................................16

*Tanner-Brown v. Haaland*, 105 F.4th 437 (D.C. Cir. 2024)......................................................21

*Transp. Trades Dep't, AFL-CIO v. Nat'l Mediation Bd.*, 530 F. Supp. 3d 64 (D.D.C. 2021)......10

*Tulare Cnty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002)...................................................23

*Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18 (D.C. Cir. 2015)................17

*United States v. Fausto*, 484 U.S. 439, 445 (1988)...................................................12

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186 (4th Cir. 2013) .............25

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...................................29

**STATUTES**

5 U.S.C. § 3301....................................................................................11

5 U.S.C. § 7101 .................................................................................. 10

5 U.S.C. § 7105 .................................................................................. 10

5 U.S.C. § 7116 .................................................................................. 10

5 U.S.C. § 7117 .................................................................................. 10

5 U.S.C. § 7118 .................................................................................. 10

5 U.S.C. § 7123 .................................................................................. 10

5 U.S.C. § 7301 ................................................................................9, 11

Pub. L. 95-454, § 804, 92 Stat. 111..............................................................11

**OTHER AUTHORITIES**

H.R. Rep. No. 95-1403 (1978)....................................................................11

*Jerome Stevens Pharms., Inc. v. FDA*,

   402 F.3d 1249 (D.C. Cir. 2005)............................................................... 16

*Khadr v. United States*,

   529 F.3d 1112 (D.C. Cir. 2008)............................................................... 16

*Steel Co. v. Citizens for a Better Env't,*

   523 U.S. 83 (1998) ................................................................................................ 16

**REGULATIONS**

Exec. Order No. 10,988, 3 C.F.R. 521 (1959-1963) ...................................................... 10

Exec. Order No. 11491, 3 C.F.R. 861 (1966-1970) ...................................................... 10

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Art. II, § 1 ................................................................................................ 9

## INTRODUCTION

On February 20, 2025, this Court denied temporary and preliminary injunctive relief to Plaintiffs, holding that their claims fall outside of district court jurisdiction. Plaintiffs—five federal employee unions—had sought a temporary restraining order broadly halting the government from moving forward with a set of personnel policies announced in the days and weeks following President Trump's inauguration. The temporary relief sought by Plaintiffs would have prevented: "(1) the termination of [plaintiff unions'] members who are probationary employees; (2) the anticipated implementation of large-scale reductions in force ('RIFs') throughout federal agencies; and (3) any renewal of the Trump Administration's program to offer federal employees 'deferred resignation' with pay and benefits until September 30 of this year." Mem. Op. & Order of Feb. 20, 2025 at 1-2 (ECF No. 28) ("Op."). But the Court held that it lacked jurisdiction over Plaintiffs' challenges to those policies, explaining that "[t]hey must pursue their challenges instead through the scheme established by Congress in the Federal Service Labor-Management Relations Statute ('FSLMRS'), which provides for administrative review by the Federal Labor Relations Authority ('FLRA') in the first instance, followed by judicial review in the courts of appeals." *Id*. at 7. Thus, the Court denied Plaintiffs' request for a temporary restraining order and a preliminary injunction. *Id*.

For the same reasons, the Court should dismiss Plaintiffs' Amended Complaint for lack of jurisdiction. The Court's jurisdictional holding at the temporary and preliminary relief stage compels dismissal of the Amended Complaint for the same reasons. Similarly, Plaintiffs cannot show that they have either associational or organizational standing to assert their claims, providing another jurisdictional basis for dismissal. And finally, Plaintiffs could not succeed on the merits of their claims even if they could establish jurisdiction, requiring dismissal for failure to state a claim as well.

## BACKGROUND

### I.    STATUTORY BACKGROUND

#### a.    The President's Authority to Manage the Federal Workforce.

Article II of the Constitution provides that "[the executive Power shall be vested in a President of the United States of America." U.S. Const., Art. II, § 1, cl. 1. This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), including the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Prior to Congress's enactment of the Statute, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees" by Executive Order. *See, e.g.*, *Loc. 1498, Am. Fed'n of Gov't Emp. v. Am. Fed'n of Gov't Emp., AFL/CIO*, 522 F.2d 486 (3d Cir. 1975). "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d at 452. Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988, in 1962. Exec. Order No. 10,988, 3 C.F.R. 521 (1959-1963); *see Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 91—92, 104 S. Ct. 439, 441, 78 L. Ed. 2d 195 (1983) ("*BATF*"). In doing so, he recognized that labor relations are closely linked to "the efficient administration of the Government" and the "effective conduct of public business." *See* Exec. Order No. 10,988. That Executive Order has been amended by multiple Presidents in the more than sixty years since. *See* Exec. Order No. 11491, 3 C.F.R. 861

(1966-1970), as amended by Exec. Orders Nos. 11616, 11636, and 11838, 3 C.F.R. 605, 634 (1971-1975) and 3 C.F.R. 957 (1971-1975).

### b. The Federal Service Labor-Management Relations Statute.

Against this backdrop, Congress in 1978 passed the Federal Service Labor-Management Relations Statute ("FSLMRS"), 5 U.S.C. § 7101 *et seq.* The Statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111, provides "a scheme of administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). Administrative review is provided by the Federal Labor Relations Authority (FLRA), a three-member agency charged with adjudicating federal labor disputes, including "negotiability" disputes and "unfair labor practice" disputes. *Id.* (citing 5 U.S.C. § 7105(a)). In negotiability disputes, the FLRA determines whether agencies and unions must bargain over certain subjects. *Id.* (citing 5 U.S.C. §§ 7105(a)(2)(E), 7117(c)(1)). In unfair labor practice proceedings, the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the FSLMRS. *Id.* (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118). The FLRA's decisions in such disputes are subject to direct review in the courts of appeals. *Id.* (citing 5 U.S.C. § 7123(a), (c)).

These directives are subject to a variety of limitations, however. As the Supreme Court has noted, Congress "[r]ecogniz[ed] 'the special requirements and needs of the Government,'" and the Statute therefore "exempts certain matters from the duty to negotiate." *Fed. Lab. Rels. Auth. v. Aberdeen Proving Ground, Dep't of the Army*, 485 U.S. 409, 108 S. Ct. 1261, 99 L. Ed. 2d 470 (1988) (per curiam) (quoting 5 U.S.C. § 7101(b)). Section 7117(a)(1), for instance, precludes an agency from bargaining over proposals that are "inconsistent with any Federal law or any Government-wide rule or regulation," and over "matters which are the subject of . . . a Government-wide rule or regulation." 5 U.S.C. § 7117(a)(1). And the Statute does not disturb the

3

President's express statutory authority to prescribe such Government-wide rules for the conduct of employees in the Executive Branch, *id*. at § 7301, or for the admission of individuals into the civil service. *Id*. at § 3301.  Moreover, section 7106(a) provides that "nothing in this chapter shall affect the authority of any management official of any agency" with respect to certain enumerated "management rights."  *See* H.R. Rep. No. 95-1403 (1978), *reprinted in* U.S.C.C.A.N. 2723 (Section 7106 "place[s] limits on the number of subjects about which agency management may bargain with a labor organization.").  Finally, the Statute itself makes clear that "[e]xcept as otherwise expressly provided," none of its provisions should be construed to "limit, curtail, abolish, or terminate any function of, or authority available to, the President which the President had immediately before" the Statute's effective date.  Pub. L. 95-454, § 804, 92 Stat. 111.

## II.         FACTUAL BACKGROUND

### a.   OPM's Guidance Memorandum on Probationary Periods, Administrative Leave and Details.

On January 20, 2025, OPM Acting Director Charles Ezell transmitted a guidance memo to Executive Branch agencies directing them, in pertinent part, "identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees[.]"  Mem. from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, titled "Guidance on Probationary Periods, Administrative Leave and Details" (Jan. 20, 2025) ("OPM Mem.").  Further, the OPM Memorandum directed agencies to "promptly determine whether those employees should be retained at the agency."  *Id*.  OPM later revised this guidance to clarify that "Agencies have ultimate decision-making authority over, and responsibility for, such personnel actions." *Id*. at 2, *revised on*, Mar. 4, 2025.

**b.  OPM's Voluntary Resignation Program.**

On January 28, 2025, OPM sent an email to federal employees informing them of a "deferred resignation program," *www.opm.gov/fork*, effective between January 28 and February 6, 2025, under which most federal employees[1] would be eligible to resign yet "retain all pay and benefits regardless of your daily workload and [] be exempted from all applicable in-person work requirements until September 30, 2025 (or earlier if you choose to accelerate your resignation for any reason)." *Id.*  To take advantage of the program, employees were instructed to respond to the email from their work computer with the word "Resign" in the body of their response email.  *Id.* The email included a deferred resignation letter, which, among other things, explained that OPM was authorized to send the email under "Executive Order 9830 and 5 U.S.C. §§ 301, 1103, 1104, 2951, 3301, 6504, 8347, and 8461," and further explained that OPM intended to use the responses to the email "to assist in workforce reorganization efforts in conjunction with employing agencies." *Id.*  (citing 88 Fed. Reg. 56058; 80 Fed. Reg. 72455).  Decisions were voluntary. *Id.*

In the days following OPM's January 28, 2025 email to the federal workforce, OPM provided a list of Frequently Asked Questions ("FAQs") concerning the deferred resignation program.  *www.opm.gov/fork/faq*.  Among other things, the FAQs explained that for those who are eligible for the deferred resignation program and accept, the employing agency could execute paperwork reflecting all the terms of the agreement.  *Id.*  The FAQs further explained that any government shutdown could potentially affect an employee's pay regardless of whether the employee accepted the deferred resignation letter, but that employees who accepted the deferred resignation offer would still be entitled to the backpay available under the Government Employee

---

[1] The email explained that the voluntary resignation program was not available for military personnel, employees of the Postal Service, those in positions related to immigration enforcement and national security, and those in any other positions specifically excluded by employing agencies.

Fair Treatment Act of 2019. *Id.* (citing 31 U.S.C. 1341(c)(2)).

On February 4, 2025, OPM provided a memorandum to all heads and acting heads of Departments and agencies regarding the legality of the deferred resignation program. Legality of Deferred Resignation Program, https://www.chcoc.gov/content/legality-deferred-resignation-program. OPM's February 4 memorandum explained that the deferred resignation offer "has generated considerable scrutiny and numerous questions from interested employees," and had been "subject to various legal critiques." *Id.* The February 4 memorandum explained "why concerns regarding the program's legality are misplaced and offers clarifying guidance on certain aspects of the plan." *Id.*

Among other things, the February 4 memorandum explained that Congressional approval of the deferred resignation program was unnecessary because employees would remain in duty status and entitled to their regular pay and benefits. *Id.* The memorandum further explained that the program does not promise employees any additional compensation that might require special congressional appropriations. *Id.*

The February 4 memorandum also clarified that although employees who take advantage of the deferred resignation program may pursue a second job outside the federal government, employees had to comply with the Standards of Ethical Conduct for Employees of the Executive Branch at 5 C.F.R. Part 2635 and other applicable federal laws, as well as any agency-specific regulations. *Id.* Finally, the February 4 memorandum included as an appendix a template deferred resignation agreement that could be used by agencies. *Id.*

On February 4, 2025, several federal unions sued in the District of Massachusetts, asserting organizational standing and seeking a temporary restraining order that would suspend the deadline OPM had set for submission of deferred resignation requests. Following expedited

briefing and argument on the plaintiff unions' motion (during which the court briefly stayed the response deadline to allow for orderly submission of briefing and argument), the court denied the plaintiff unions' motion, holding that they could not show standing to sue and that district court review of their claims as pleaded was statutorily precluded under the FSL-MRS. *See AFGE, et al., v. Ezell, et al.*, No. 25-cv-10276, Slip Op. at 2-3 (standing), 3-5 (preclusion) (D. Mass. Feb. 12, 2025) (ECF No. 66). OPM closed the submission period later on the evening of February 12.

### c. Executive Order 14210.

On February 11, 2025, the President issued EO 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." EO 14210. *See* https://public-inspection.federalregister.gov/2025-02762.pdf/. The key substantive provisions of the EO are set forth in Section 3, titled "Reforming the Federal Workforce to Maximize Efficiency and Productivity." *Id.* In four subparts, that section identified directives under the headings "Hiring Ratio" (subpart a), "Hiring Approval" (subpart b), "Reductions in Force" (subpart c), and "Rulemaking" (subpart d). *Id.* The provision most pertinent to Plaintiffs' claims here is subpart c. There, the EO directs that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id.* Finally, it directs that "[t]his subsection shall not apply to functions related

to public safety, immigration enforcement, or law enforcement." *Id*.

EO 14210 further provides that agency heads "may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities[,]" *id*. Sec.4 (b), and that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id*. Sec. 5(b).

## III.    PROCEDURAL HISTORY

Plaintiffs filed suit on February 12, 2025, subsequently amending their complaint on February 17, 2025, in which they raised two claims. Count I alleges that Defendants have violated the Constitutional separation of powers by infringing on Congress's Article I authority to fund and shape Executive Branch agencies.   Count II alleges that Defendants have violated the Administrative Procedure Act by carrying out RIFs in violation of statutory and regulatory requirements.  Pls.' Compl., ECF No. 1.  Plaintiffs moved for a temporary restraining order late in the day on February 14.  Pls.' TRO Mot., ECF No. 11.  By minute order on February 15, the Court directed Defendants to respond to Plaintiffs' TRO motion by 5 p.m. on  February 17, with Plaintiffs to submit any reply by noon on Tuesday, February 18.  The Court held a hearing on February 18, *see* Minute Order of Feb. 15, 2025, and denied Plaintiffs' request for both a temporary restraining order and a preliminary injunction on February 20, 2025.  *See* Op. at  16.  Defendants requested, and Plaintiffs agreed, to a thirty-day extension of their existing deadline to respond to Plaintiffs' Amended Complaint.  Consent Mot., ECF No. 35.  The Court granted Defendants' request, setting May 15, 2025, as the deadline to answer. *See* Minute Order of April 14, 2024.

## LEGAL STANDARD

The plaintiff bears the burden of establishing the court's subject-matter jurisdiction.  *See, e.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  If the plaintiff is unable to do

so, the Court must dismiss the action. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Under Rule 12(b)(1), a court may consider material beyond the allegations in the complaint. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005); *Transp. Trades Dep't, AFL-CIO v. Nat'l Mediation Bd.*, 530 F. Supp. 3d 64, 69 (D.D.C. 2021) (Nichols, J.). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

## ARGUMENT

This Court should dismiss the Complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) for two reasons: Plaintiffs' claims are channeled away from district court review under the FSL-MRS, as the Court previously held, and they cannot show standing in any event. And even if Plaintiffs could establish jurisdiction, they fail to state a claim on which relief can be granted, and their Amended Complaint should be dismissed under Rule 12(b)(6).

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS.

The action should be dismissed for lack of subject-matter jurisdiction. *First*, Congress has precluded district court jurisdiction over Plaintiffs' challenges to Defendants' management of the federal workforce under the Federal Service Labor–Management Relations Statute. *Second,*

Plaintiffs lack organizational standing to remedy any alleged injury flowing from the challenged actions. *Third*, Plaintiffs lack associational standing to seek relief for intangible harms, including purported increased risks of certain harms, ultimately stemming from Plaintiffs' disagreements with the Executive Branch's employment policy choices.

### a. Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance.

Congress has "established a comprehensive system for reviewing personnel action[s] taken against federal employees" that provides the "exclusive means" for review. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (citation omitted). The FSL-MRS, 5 U.S.C. §§ 7101–35, along with the broader Civil Service Reform Act ("CSRA") it is part of, Pub. L. No. 95-454, 92 Stat. 1111 (1978), sets out an "integrated scheme of administrative and judicial review" for federal labor disputes and most challenges to personnel actions taken against members of the civil service. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("AFGE") (exclusivity of FSL-MRS); *United States v. Fausto*, 484 U.S. 439, 445 (1988) (exclusivity of CSRA). As this Court previously noted in denying Plaintiffs' request for temporary and preliminary injunctive relief, "[t]he D.C. Circuit has repeatedly held that this scheme 'provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims.'" Op. at 8 (citing *AFGE*, 929 F.3d at 752) (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013)).

Plaintiffs do "not dispute the claims [they] assert[] are of the type generally covered by the FSLMRS scheme." Op. at 10. Instead, they have argued that their claims arise from "limited circumstances" that fall outside of the statutory scheme, suggesting that their "irremediable harm" from lost revenue and loss of bargaining power would deprive them of meaningful judicial review.

*Id.*; *see also* Pls.' Reply in Opp., ECF No. 16, at 4-5.  Plaintiffs thus have asserted that their situation qualifies as a "here-and-now injury," under *Axon Enterprise, Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023), that would permit this Court to adjudicate their claims despite the FSL-MRS's otherwise comprehensive channeling of federal labor disputes.  *Id*.

But this Court has carefully considered and correctly rejected that very argument.  *Id*. at 11.  While denying Plaintiffs' request for temporary and preliminary injunctive relief, the Court concluded that *Axon* did not "stand for the proposition that *any* irreparable injury suffices to defeat preclusion."  *Id*.  Rather, the Court explained, the injury in *Axon* was that the plaintiffs, who were challenging enforcement actions by the SEC and FTC on the grounds the Administrative Law Judges who would hear their claims were unconstitutionally appointed, "would be subjected to 'an illegitimate proceeding, led by an illegitimate decisionmaker.'"  *Id.* at 12 (quoting *Axon* at 183, 143 S. Ct. 890).  "Such a harm qualified as a 'here-and-now injury' that could not be remedied after the fact by a court of appeals, because '[a] proceeding that has already happened cannot be undone.'"  *Id.* (quoting *Axon* at 183, 143 S. Ct. 890).  Plaintiffs, by contrast, do not argue that the FLRA is unconstitutionally structured or that they would be subject to illegitimate proceedings. The Court thus stressed that Plaintiffs' alleged injuries were "routine burdens" which must go through agency processes even if doing so would subject plaintiffs to significant burdens.  *Id*. (citing *Axon*, 598 U.S. at 192, 143 S. Ct. 890). Plaintiffs accordingly could not avoid the FSLMRS based on their alleged harms alone.  *Id*.

Plaintiffs have also attempted to avoid the FSL-MRS by painting their claims as constitutional separation-of-powers challenges.  Pls.' TRO Mot. at 18.  But this Court has rejected that contention as well, explaining "that whether a claim is precluded 'does not turn on [its]

constitutional nature . . . but rather on the type of the employee and the challenged employment action.'" Op. at 13 (quoting *Elgin*, 567 U.S. at 15, 132 S.Ct. 2126). Thus, the Court determined the FLRA could properly review Plaintiffs' constitutional claims and possibly even "moot the need to resolve the [claims]" by finding the challenged actions violated RIF statues. *Id*. at 15 (quoting *Trump*, 929 F.3d at 761) (internal citations omitted). Even if the FLRA did not have authority to decide Plaintiffs' constitutional claims, the Court determined "it is of no dispositive significance . . . so long as the claims can eventually reach 'an Article III court fully competent to adjudicate' them." *Id*. at 13 (quoting *Trump*, 929 F.3d at 758). With these facts in mind, the Court, decided Plaintiffs' constitutional claims were precluded by the FSL-MRS. *Id*.

Plaintiffs have also argued the probationary removals at issue at the time of their Amended Complaint were so numerous that they would overwhelm the FLRA, thereby foreclosing any meaningful review without the district court interceding to enjoin those personnel actions. *Id*. at 13. Again, though, the Court has rejected this argument, noting Plaintiffs could seek relief from the FLRA on behalf of a class of union members and that, if a constitutional holding by a court of appeals was necessary, such a holding would likely be broadly applicable to other plaintiffs challenging the same set of actions. *Id*. The Court went further in denying Plaintiffs' request for temporary and preliminary injunctive relief, emphasizing that the D.C. Circuit has previously rejected this same efficiency argument, explaining instead that plaintiffs "may not avoid the statutory review scheme[s] 'because it provides only an 'inconvenient' remedy.' *Id*. (quoting *Sec'y of Air Force*, 716 F.3d at 639).

Plaintiffs' final attempt to evade jurisdictional channeling at the preliminary relief stage was to argue that the FLRA's expertise regarding federal employment claims is no longer a relevant consideration in determining statutory claim preclusion following *Loper Bright*

*Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L.Ed.2d 832 (2024). But the Court rejected this argument too, noting that the Supreme Court has never suggested agency expertise was no longer a part of the statutory claim preclusion analysis, Op. at 15. The Court also considered that an agency's interpretation of a statute may be especially informative "'to the extent it rests on factual findings within [the agency's] expertise.'" *Id*. (citing *Loper Bright*, 603 U.S. at 402, 144 S.Ct. 2244). For these reasons, the Court held Plaintiffs' claims were precluded by the FSL-MRS. *Id*. at *4.

There is no reason the Court should reach a different conclusion at this stage. Notably, multiple courts in recent months have similarly held the FSL-MRS and the CSRA preclude district court jurisdiction over challenges to agencies' implementation of EO 14210, probationary employee removals, and the deferred resignation program. *See, e.g., Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) (finding the district court lacked jurisdiction over unions challenge to the deferred resignation program because they lacked standing and because the unions' claims fell within the FSLMRS scheme); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762, at *11 (D.D.C. Feb. 21, 2025) (agreeing the FSL-MRS divests district courts of jurisdiction to hear employment-based challenges involving USAID); *and Maryland v. United States Dep't of Agric.*, No. CV JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) (stayed by appeal) *Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, (4th Cir. Apr. 9, 2025) (holding that district court likely lacked jurisdiction to hear states' challenge to agencies' alleged failure to follow RIF requirements).[2]

---

[2] Two district courts in the Northern District of California have disagreed with the Government's statutory channeling arguments at the temporary or preliminary relief stage of litigation in cases challenging personnel actions or policies; the Government has appealed the district court's PI or

**b. Plaintiffs Lack Organizational Standing Because They Have Not Proven Cognizable Injury to Their Professed Missions.**

Statutory channeling aside, Plaintiffs cannot show that they have organizational standing to sue on behalf of themselves. Plaintiffs here are not agency employees, so they are not themselves "the object of the government action or inaction" they "challenge," meaning that although "standing is not precluded . . . it is ordinarily 'substantially more difficult' to establish." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). And organizations, like all plaintiffs, must prove an injury-in-fact that is fairly traceable to the challenged actions. For an organization such as the union Plaintiffs here, that showing requires "more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Each organization must establish that the challenged conduct "'perceptibly impaired' the organization's *ability to provide* services." *Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)) (emphasis added).

---

TRO decision in each case. In *American Federation of Government Employees, AFL-CIO, et al. v. Ezell, et al.*, the district court initially held that union plaintiffs' claims challenging several agencies' removal of probationary or trial period employees fell outside of its jurisdiction under the FSLMRS, but held that certain non-profit organizations could assert such claims in district court. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025) (stayed by appeal) *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025). The Government appealed that preliminary injunction and obtained a stay from the United States Supreme Court. *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025). The district court later revisited its initial jurisdictional decision as to the union plaintiffs and issued a new preliminary injunction requiring certain actions, but not requiring reinstatement of removed probationary or trial period employees. *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 1150698 (N.D. Cal. Apr. 18, 2025). On May 9, another court in the same district issued a temporary restraining order against RIFs underway at several agencies; the Government has appealed that decision. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-CV-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025), *appeal filed*, Case No. 25-3030 (9th Cir. May 9, 2025).

The limited scope of organizational standing under *Havens* is clarified in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The *Alliance* plaintiffs, four pro-life medical associations and several individual doctors, challenged FDA actions regarding the regulation of mifepristone, a pregnancy-termination drug, making it easier for doctors to prescribe and for pregnant women to obtain the drug. *Id.* at 376. Plaintiffs did not prescribe or use mifepristone, and FDA did not impose any requirements on plaintiffs. The *Alliance* Court observed that organizations may "sue *on their own behalf* for injuries they have sustained," *id.* at 393 (citing *Havens*, 455 U.S. at 379 n.19) (emphasis added), but made clear that an organization must show a genuine injury: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might only have a general legal, moral, ideological, or policy objection to a particular government action," *id.* at 381.

The *Alliance* Court explicitly rejected the organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Alliance*, 602 U.S. at 395. The *Alliance* Court noted that the organization plaintiff in *Havens*, HOME, "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* The false information provided by the realty defendant about apartment availability "perceptibly impaired" HOME's counseling and referral services, meaning that the defendant's "actions directly affected and interfered with" the organization's "core business activities" distinct from its advocacy activities— "not dissimilar," the *Alliance* Court added, "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* By contrast, FDA's relaxation of the regulation of mifepristone in *Alliance* did not present any similar impediment to the medical associations' business. *Id.* A plaintiff "cannot spend its way into standing simply by expending money to gather information

and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id.* at 394. Indeed, if diversion of resources could confer standing on an organization, that "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies," which take the Article III courts far outside their properly limited role. *Id.* at 395.

Like the plaintiffs in *Alliance*, Plaintiffs here are unable to identify direct harms to them. Plaintiffs claim they have "tens of thousands of dues-paying members" who will be terminated under EO 14210. *See* Pls.' TRO Mot. ¶¶ 21-22. And Plaintiffs allege that terminations will cause them to "immediately lose millions of dollars of revenue." *Id.* ¶ 21. This, in turn, will diminish their "influence in negotiating agreements. . . or lobbying Congress," and that "loss of status will likewise affect how any federal agency management perceive and deal with [the Unions] going forward. *Id.* ¶ 23. Here, what is at issue is, at most, each Plaintiffs' "pocketbook injury" from individual instrument-specific agency decisions, *Collins v. Yellen*, 594 U.S. 220, 243 (2021), and no more than that. Although Plaintiffs have sought broad relief against an array of agency decisions regarding employment, in Article III courts, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Gill v. Whitford*, 585 U.S. 48, 72, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

Going further than those pocketbook injuries would flout the principle that the "standing inquiry [must be] especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997). In that regard,

no Plaintiff can be allowed to maintain Article III standing based on anything less than "concrete" injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs' broad fears about employment outcomes or loss of bargaining power lack the requisite concreteness. *See, e.g.,* Kaspar Decl. ¶ 21 ("My colleague Mark Gray *estimates* that the mass firings of NTEU members who are nonessential and probationary employees, plus the resignation of others under OPM's deferred resignation program, will wipe out as much as half of NTEU's revenue.") (emphasis added); Smith Decl. ¶¶ 9-10 ("NIH . . . *expects* to collect somewhere between $10,000 and $40,000 dollars a month in membership dues to fund its activities once it is fully established. The termination of all non-essential employees . . . would substantially deprive the UAW and NIH Fellows United of all the dues revenue that is necessary . . .") (emphasis added). And Plaintiffs' forecasts of harms to the powers of Congress "amount[] to nothing more than speculation about future events that may or may not occur[.]" *See Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd*, 2003 WL 349713 (D.C. Cir. 2003).

Plaintiffs' reliance on *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) is also misplaced. There, the unions were contesting a final rule which would allow the Department of Homeland Security (DHS) to "unilaterally abrogate lawfully negotiated and executed collective bargaining agreements." *Id*. at 848. The unions argued that the final rule would hurt their bargaining power because they could not "effectively formulate strategies. . . to secure concessions from DHS because DHS. . . could later neutralize any concession [it] made[.]" *Id*. at 853. Thus, the final rule meant the unions would "enter collective bargaining with little to bargain over. . . fac[ing] an ever-present threat that DHS will abrogate any agreement that they

reach with management." *Id*. The D.C. Circuit found this injury, the effective nullification of collective bargaining, was "certainly a real injury" sufficient to give the unions standing. *Id*.

Contrast *Chertoff* with the current situation. Here, by Plaintiffs' admission, the only alleged harm is the expectation of lower dues, which Plaintiffs in turn allege will lead to a loss in bargaining power. Pls.' Compl. ¶¶ 72-86. True, NTEU claims "approximately 1,250-1,500 dues paying members" were terminated through the EO's implementation, Kaspar Suppl. Decl., ECF No. 16-1 ¶ 8, but it does not explain how those terminations have resulted in injury to the union's bargaining power. *Id*. This speculative chain of possibilities fails to establish cognizable injury; and Plaintiffs do nothing to further explain their position except to allege in conclusory fashion that they will "lose status" with federal agencies and members. Pls. TRO Mot., ECF No. 11, at 23. Furthermore, Plaintiffs' prediction as to members taking the deferred resignation program would be a loss attributable to free choices exercised by individual members, and "[i]t is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the independent responses and choices of third parties." *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019) (Wilkinson, J.). And so, while Plaintiffs may have standing to litigate their "pocket-book injury" over lost dues, they have not demonstrated standing to seek relief against the vast array of challenged actions.

### c. The Union Plaintiffs Lack Associational Standing Because the Claims Asserted Necessitate Individualized Findings.

Nor can Plaintiffs show associational standing. Associational standing requires each Plaintiff to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt v. Wash.*

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  Plaintiffs fail on the first prong because they neglect to identify even one member who has individual standing.

Plaintiffs' standing allegations focus on the challenged actions' purported impact on their members.  Compl. ¶¶ 42–62.  It is well established that an organization asserting standing on behalf of its members must, as threshold matter, "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  "[I]t is not enough to aver that unidentified members have been injured." *Sorenson Commc'n, LLC v. FCC*, 897 F.3d 214, 224 (D.C. Cir. 2018).  "Instead, at the very least, the identity of the party suffering an injury in fact," and who would thus have standing to bring suit individually, "must be firmly established."  *Pub. Citizen v. Trump*, 297 F. Supp. 3d 6, 19 (D.D.C. 2018) (internal alterations and quotation marks omitted);  *see also Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011).

Yet Plaintiffs fail to identify any specific member that has standing.  *See generally* Compl. Instead, Plaintiffs state in conclusory fashion that their members are "prioritized in a RIF under the [Executive] Order[,]" Compl. ¶ 47; that Plaintiffs represent thousands of probationary employees whose "mass firing. . . is underway[,]" Compl. ¶¶ 58–60; and that several of their members "have signed up for OPM's deferred resignation program," Compl. ¶ 68.  But "the questions of who specifically will suffer harm—and when, how, or why they will suffer it—remain unanswered.  The associational-standing doctrine demands more." *Ctr. for Biological Diversity v. Nishida*, No. CV 21-119 (RDM), 2021 WL 827189, at *1–2 (D.D.C. Mar. 4, 2021);  *see also Pub. Citizen*, 297 F. Supp. 3d at 18 (finding no associational standing where the plaintiffs "made no effort—either in their complaint or in the multiple declarations they have submitted—to identify a specific member who has suffered, or who is likely to suffer, an injury in fact").  Plaintiffs' failure

19

to provide the details of even a single member injured by the rule—even after amending their complaint—compels dismissal of their suit.

## II.    DEFENDANTS' APA CLAIMS ARE UNREVIEWABLE.

Even if Plaintiffs could show subject-matter jurisdiction, they have failed to state a claim under the APA for at least four reasons:  (1) Plaintiffs do not allege any *agency* action, (2) they do not allege any *final* agency action, and (3) an adequate alternative remedy is available.

### a.  Plaintiffs Do Not Allege Any Agency Action.

Review under the APA is available only for "agency action."  5 U.S.C. § 704.  Presidential actions are not agency actions reviewable under the APA.  It is "well-settled" that Presidential action is not subject to review under the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).  Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action."  *Franklin*, 505 U.S. at 796; *Tulare Cnty.*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001).

Because an executive order is a presidential rather than agency action, Plaintiffs' challenges to EO 14210 under the APA are not reviewable, irrespective of whether they bring those claims against the President, as a technicality.  *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (finding a cause of action under the APA is not available to challenge an executive order because the APA applies only to a "person suffering legal wrong because of *agency* action.").  Thus, Plaintiffs' claim that that the EO is contrary to law, or that the EO commands action, are all non-cognizable under the APA.  *See id.*

Plaintiffs' challenge to the implementation of the EO likewise fails.  First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA.  *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the

20

Department of State was acting on behalf of the President, their actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018).

Even more fundamentally, Plaintiffs do not identify a discrete action that either of the defendant agencies here have taken that is subject to APA review. A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *see Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 62 (2004). The agency actions that can properly be challenged under the APA are those that are "circumscribed [and] discrete." *SUWA*, 542 U.S. at 62. By contrast, the APA does not provide for "general judicial review of" agency conduct, *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (cited approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 n.13 (5th Cir. 2020)), or making a budget request, *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the

plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed to carry out the . . . Act's general directives").

Here, Plaintiffs' complaint does not challenge a discrete agency action but seeks a "wholesale improvement" of Defendants' employment policies.  Though Plaintiffs cite several individual employment actions, such as asserting CFPB "fired over 70 term employees," Kaspar Supp. Decl. ¶ 7, their claims in fact constitute a programmatic challenge opposing the "attempts to dismantle the federal government through the mass firings of hundreds of thousands of employees. . ." Pls.' Am. Compl., ECF No. 13 at 3.  Plaintiffs underscore their programmatic challenges by asking the Court to enjoin an "unprecedented" "mass reduction of. . . the federal civilian workforce," simultaneously questioning "whether the Executive Branch may lawfully hobble the federal agencies that Congress creates[.]" Pls. Mot. for TRO at 2.  These are the exact types of broad programmatic challenges which seek a "wholesale improvement" of an agency's general processes by court decree.  *Alabama-Coushatta Tribe of Tex.* 757 F.3d at 490.  Courts are simply not "empowered to enter [such] general orders compelling compliance with broad statutory mandates," under the APA.  *Lujan*, 497 U.S. at 66-67.

### b.  Plaintiffs Do Not Allege Any Final Action.

Agency action must be "final" to be reviewable under the APA.  5 U.S.C. § 704.  Agency action is final only if two requirements are met: the action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

Any alleged removals, threatened removals, or other personnel actions taken as to any of Plaintiffs' members are not actions involving the determination of rights or obligations belonging

to Plaintiffs as federal employee unions.[3]  As explained above in describing Plaintiff's lack of

Article III standing, there is no plaintiff before the Court who has been removed or otherwise

suffered an unwelcome personnel action; thus, Plaintiffs cannot obtain APA review of any such

personnel actions.[4]  Plainly, there is no final agency action here so far as the Plaintiffs are

concerned.  And with respect to their members, as discussed above, the only rights or obligations

that have been determined plainly relate to their employment, and those claims are subject to the

exclusive channeling provisions of the CSRA or the FSL-MRS.

### c. The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs.

Review under the APA is available only where "there is no other adequate remedy in a

court." 5 U.S.C. § 704.  The requirement that a plaintiff have "no other adequate remedy in court,"

*id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate

existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903

(1988).  "[T]he alternative remedy need not provide relief identical to relief under the APA, so

long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)

(citation omitted).  A remedy may be adequate even if "the arguments that can be raised [in the

alternative proceeding] are not identical to those available in an APA suit." *Elm 3DS Innovations*

---

[3] Even if, arguendo, Plaintiffs had standing to challenge these alleged actions (which they do not), Plaintiffs have failed to allege a prima facie final agency action.  *See* Complaint ¶ 99 (alleging that Defendants "*will* violate" the APA in the future because they "*will* commence RIFs") (emphasis added).

[4] There can be no APA review in any event, since the CSRA displaces the broader APA in the federal personnel context. *See United States v. Fausto*, 484 U.S. 439, 444, 108 S. Ct. 668, 672, 98 L. Ed. 2d 830 (1988) (CSRA precludes review of adverse federal employment actions in district court); *Fornaro v. James*, 416 F.3d 63, 68 (D.C. Cir. 2005) (APA review precluded by more specific CSRA review scheme, even where CSRA provides no rights or remedies for particular plaintiffs or types of claims).  As then-Judge Roberts explained for the D.C. Circuit in holding that the CSRA displaces remedies under the APA, "what you get under the CSRA is what you get." *Fornaro*, 416 F.3d at 67.

*LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016). A plaintiff lacks

a cause of action under the APA if an alternative adequate judicial remedy exists. *See Perry Cap.*

*LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F.

Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim because decision at issue was

not a final agency action and an alternative adequate remedy existed by way of appeal to the

Federal Circuit). As already described above in Section I, the instant suit is, in essence, an attempt

to obtain mass adjudication of employment claims, and there is an FSLMRS remedy available to

adjudicate the legality of federal employment actions that is an adequate alternative. Plaintiffs are

therefore barred from bringing this suit in this Court in the first instance. After all, as this Court

has already ruled, "it likely lacks subject matter jurisdiction over NTEU's claims[]" because "the

union's claims fall within the exclusive statutory scheme[.]" *Nat'l Treasury Emps. Union v. Trump*,

No. 25-CV-420 (CRC), 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025) (citing *Am. Fed'n of Gov't*

*Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025))

(holding likewise as to unions' claims challenging the deferred resignation program).

## III.   PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED A CONSTITUTIONAL VIOLATION.

Plaintiffs also cannot succeed on their claims that Defendants violated the Constitution. As

noted above, *see supra* Section I(b), Plaintiffs have not established standing to sue. Moreover,

Plaintiff's claims are statutory, not constitutional. Plaintiffs have argued that Defendants' actions

violate "Congress's constitutional prerogative to create federal agencies, legislate their missions,

and fund their work." Pls. TRO Mot. at 4. But even if Plaintiff were correct (they are not), that

claim alleges only a statutory violation. The Supreme Court has rejected the argument, asserted

by Plaintiffs here, "that whenever the President acts in excess of his statutory authority, he also

violates the constitutional separation-of-powers doctrine." *Dalton v. Specter*, 511 U.S. 462, 471

(1994).  Plaintiffs' "claims simply alleging that the President has exceeded his statutory authority" under RIF regulations or any other statute "are not 'constitutional' claims."  *Id.* at 473.

This case thus sharply contrasts with *Youngstown Sheet & Tube Co. v. Sawyer*, in which the President had directed the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," and conceded the absence of statutory authority.  343 U.S. 579, 585-87 (1952).  Plaintiffs have not suggested that either Defendants' regulations or their statutory authority for promulgating these regulations are themselves unconstitutional.  *Dalton*'s reasoning thus applies here and refutes Plaintiffs' argument that they are likely to succeed on their separation-of-powers claim.  *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51-54 (D.D.C. 2020) (rejecting separation-of-powers claim based on Appropriations Clause under *Dalton* because "[a]t bottom, this is just an allegation that [executive officials] exceeded their statutory authority").  This case concerns "simply" whether Defendants have "exceeded [their] statutory authority" and "no constitutional question whatever is raised"— "only issues of statutory interpretation."  *Dalton*, 511 U.S. at 473-74 & n.6 (citation omitted).

In contending that the challenged actions violate the separation of powers, Plaintiffs are advancing the same argument the Supreme Court rejected in *Dalton*.  Plaintiffs' alleged separation-of-powers claims hinge entirely on, respectively, whether Defendants acted in accordance with regulations regarding agency reductions in force (and their concomitant statutory authorization), and whether Section 3(c) of the EO is, on its face, inconsistent with existing statutes.  *See* Pls. TRO Mot. at 13–14.  The outcome of these questions depends on the resolution of statutory and regulatory claims rather than any unique separation-of-powers principles.  If Plaintiffs' argument were accepted, then every garden-variety action by a federal agency alleged to be in violation of a statutory provision could also for the same reason be alleged to violate the constitutional separation

of powers. "Under *Dalton*, [Plaintiffs] cannot recast these types of claims as constitutional." *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 53; *see Dalton*, 511 U.S. at 474 (stating that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration."). Plaintiffs have thus failed to allege a constitutional violation.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss and dismiss this case in its entirety.

Dated: May 15, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

Christopher Hall
Assistant Branch Director
Federal Programs Branch

*/s/ Richard C. Giles*
RICHARD C. GILES
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 598-7598
Email: Richard.C.Giles@usdoj.gov

*Counsel for Defendants*