## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, et al., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:25-cv-00420 |
| DONALD J. TRUMP, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'

## MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES.......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

   I.     STATUTORY BACKGROUND........................................................................ 2

      a.    The President's Authority to Manage the Federal Workforce........................................ 2

      b.    Historic Authority to Engage in RIFs. ........................................................ 3

      c.    The Federal Service Labor-Management Relations Statute. ......................................... 7

   II.    FACTUAL BACKGROUND ........................................................................... 9

      a.    OPM's Guidance Memorandum on Probationary Periods, Administrative Leave and

      Details. ........................................................................................... 9

      b.    The Deferred Resignation Programs............................................................ 9

      c.    Executive Order 14210. ........................................................................11

      d.    February 26, 2025 Memorandum ............................................................. 13

   III.   PROCEDURAL HISTORY .......................................................................... 16

LEGAL STANDARD ................................................................................................. 17

ARGUMENT .............................................................................................................. 18

   I.     THE COURT LACK SUBJECT-MATTER JURISDICTION OVER ALL OF

      PLAINTIFFS' CLAIMS. .......................................................................... 18

a.    Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance. .................................................................................................................. 19

b.    Plaintiffs Lack Organizational Standing Because They Have Not Pleaded Cognizable Injury to Their Professed Missions. ...................................................................... 28

c.    The Union Plaintiffs Lack Associational Standing Because the Claims Asserted Necessitate Individualized Findings. ...................................................................... 33

II.    COUNTS III, IV, AND V ARE UNREVIEWABLE UNDER THE APA. ........................ 34

a.    Plaintiffs Do Not Allege Any Agency Action. ................................................. 35

b.    Plaintiffs Do Not Allege Any Final Action. ..................................................... 37

c.    The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs. ...................................................................... 41

III.    THE EO AND WORKFORCE MEMORANDUM SATISFY THE APA. ................... 42

IV.    COUNTS I AND II PLEAD NO CONSTITUTIONAL VIOLATION. ...................... 46

CONCLUSION ................................................................................................................ 49

**TABLE OF AUTHORITIES**

**CASES**

*AFGE v. Sec'y of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013)                                      25

*AFGE v. Trump*, No. 25-cv-03698-SI, 2025 U.S. Dist. LEXIS 89344, at *43 (N.D. Cal. May 9, 2025)                                                                                                                29

*AFGE v. United States OPM*, No. C 25-01780 WHA, 2025 U.S. Dist. LEXIS 54382, at *16

    (N.D. Cal. Mar. 24, 2025) ............................................................................................ 29

*Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484 (5th Cir. 2014) .............. 44

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459 (D.

    Mass. Feb. 12, 2025) ................................................................................................... 28

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA,

    2025 WL 820782 (N.D. Cal. Mar. 14, 2025) ............................................................... 29

*Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21,

    2025) ............................................................................................................................. 28

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023) ........................... 44

*Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383 (D. Md. 2011) ....................... 43

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ 23

*Axon Enterprise, Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 143 S.Ct. 890, 215 L.Ed.2d 151

    (2023) ........................................................................................................................... 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 23

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................ 46

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002 .............. 2

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .................................................................... 50

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 91—92, 104 S. Ct.

    439, 441, 78 L. Ed. 2d 195 (1983) ............................................................................... 3

C.F.R. § 351 ........................................................................................................................ 4

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ..................................... 42

*Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) .............................. 41

*City and County of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)    52

*City of New York v. DOD*, 913 F.3d 423 (4th Cir. 2019)    40

*Collins v. Yellen*, 594 U.S. 220 (2021)    37

*Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. Nov. 25, 2020)    51

*Ctr. for Biological Diversity v. Nishida*, No. CV 21-119 (RDM), 2021 WL 827189 (D.D.C. Mar.
   4, 2021)    41

*Dalton v. Specter*, 511 U.S. 462 (1994)    55

*Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016)    43

*Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012)    24

*Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016)
   50

*Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136 (D.C. Cir. 2011)    36

*Fed. Lab. Rels. Auth. v. Aberdeen Proving Ground, Dep't of the Army*, 485 U.S. 409, 108 S. Ct.
   1261, 99 L. Ed. 2d 470 (1988)    10

*Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)    36

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005)    46

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)    42

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006)    44

*Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009)    50

*Gill v. Whitford*, 585 U.S. 48, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018)    37

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)    35

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021)    52

*Hilton v. Sullivan*, 334 U.S. 323, 336-39 (1948)    3

iv

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) — 40

*Keim v. United States*, 177 U.S. 290, 295 (1900) — 4

*Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) — 22

*Lewis v. Casey*, 518 U.S. 343 (1996) — 37

*Liuksila v. Turner*, 351 F. Supp. 3d 166, 184 (D.D.C. 2018) — 30

*Loc. 1498, Am. Fed'n of Gov't Emp. v. Am. Fed'n of Gov't Emp., AFL/CIO*, 522 F.2d 486 (3d Cir. 1975) — 3

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) — 27

*Louisiana v. United States*, 948 F.3d 317 (5th Cir. 2020) — 44

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) — 35

*Mahorner v. Bush*, 224 F. Supp. 2d 48 (D.D.C. 2002) — 38

*Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451 (D.C. Cir. 1965) — 2

*Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, (4th Cir. Apr. 9, 2025) — 29

*Maryland v. United States Dep't of Agric.*, No. CV JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) — 28

*Medkirk v. United States*, 45 Ct. Cl. 395, 401 (Ct. Cl. 1910) — 4

*Moms Against Mercury v. FDA*, 483 F.3d 824 (D.C. Cir. 2007) — 23

*Myers v. United States*, 272 U.S. 52 (1926) — 2

*NARA v. Favish*, 541 U.S. 157, 174 (2004) — 51

*Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) — 47

*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995) — 35

*Nat'l Treasury Emps. Union v. Donald J. Trump*, No. 25-5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025) ................................................................................................ 24

*Nat'l Treasury Emps. Union v. Trump*, No. CV 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025) ........................................................................................................................ 24

*Nat'l Ass'n of Immigr. Judges v. Owen*, No. 23-2235, 2025 WL 1560373 (4th Cir. June 3, 2025) .. 32

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ........................................................ 43

*OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ...................................... 29

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) .................................................. 50

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) .. 47

*Pub. Citizen v. Trump*, 297 F. Supp. 3d 6 (D.D.C. 2018) ...................................................... 41

*Raines v. Byrd*, 521 U.S. 811 (1997) .................................................................................... 38

*Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000) ........................................................ 44

*Sorenson Commc'n, LLC v. FCC*, 897 F.3d 214 (D.C. Cir. 2018) .......................................... 41

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) .......................................... 22

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................................................ 35

*Tanner-Brown v. Haaland*, 105 F.4th 437 (D.C. Cir. 2024) .................................................. 40

*Transp. Trades Dep't, AFL-CIO v. Nat'l Mediation Bd.*, 530 F. Supp. 3d 64 (D.D.C. 2021) ...... 22

*Tulare Cnty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002) .......................................................... 42

*Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18 (D.C. Cir. 2015) .............. 35

*U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) ........................ 46

*United States v. Fausto*, 484 U.S. 439, 445 (1988) .............................................................. 25

*Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) ................................ 50

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186 (4th Cir. 2013) ........ 44

*Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at * 18, (D.D.C. Apr. 22,

  2025) .......................................................................................................................... 31

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ........ 31

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ........ 32

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...................................... 55

**STATUTES**

19 Stat. 169 (Aug. 15, 1876).............................................................................................. 3

28 U.S.C. § 1295(a)(9)........................................................................................................ 9

5 C.F.R. § 351.801 ............................................................................................................. 20

5 U.S.C. § 3301 ..................................................................................................................11

5 U.S.C. § 551 ................................................................................................................... 45

5 U.S.C. § 7101 ................................................................................................................. 10

5 U.S.C. § 7105 ................................................................................................................. 10

5 U.S.C. § 7116 ................................................................................................................. 10

5 U.S.C. § 7117 ................................................................................................................. 10

5 U.S.C. § 7118 ................................................................................................................. 10

5 U.S.C. § 7123 ................................................................................................................. 10

5 U.S.C. § 7301 ..............................................................................................................2, 11

Civil Service Reform Act of 1978 (CSRA).  Pub. L. No. 95-454, 92 Stat. 1111............................ 9

Pub. L. 95-454, § 804, 92 Stat. 111................................................................................11

**OTHER AUTHORITIES**

. Legality of Deferred Resignation Program, https://www.chcoc.gov/content/legality-deferred-resignation-program ................................................................................................ 13

"deferred resignation program," www.opm.gov/fork, ................................................................ 12

64 Ann. Rep. U.S. Civil Service Comm'n 10 (1946-1947) .......................................... 5

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*,

    502 U.S. 32 (1991)................................................................................................ 58

*Changji Esquel Textile Co. v. Raimondo*,

    40 F.4th 716 (D.C. Cir. 2022) ............................................................................. 57

*Department of Education v. California*,

    *145 S. Ct. 966 (2025)* ......................................................................................... 58

*DOJ v. FLRA*,

    981 F.2d 1339 (D.C. Cir. 1993)........................................................................... 57

*DRP 2.0 & VERA – Current Offers, Agencies, & Key Deadlines*, MyFedBenefits (Apr. 2, 2025),

    https://myfedbenefitshelp.com/deferred-resignation-program-2-0-and-vera-updates/#:~:text=Several%20federal%20agencies%20have%20reopened,Specialists%20%E2%80%93%20there's%20really%20no%20substitute................................................. 14

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2316 (2001)...................... 54

*Fed. Express Corp. v. U.S. Dep't of Com.*,

    39 F.4th 756 (D.C. Cir. 2022) ......................................................................... 57, 58

Frequently Asked Questions ("FAQs") concerning the deferred resignation program.

    *www.opm.gov/fork/faq* ......................................................................................... 13

H.R. Rep. No. 95-1403 (1978)................................................................................11

Harry S. Truman, Statement by the President on Federal Employees Displaced by the Reduction-
    in-Force (Sept. 3, 1949) .................................................................................. 5

*Jerome Stevens Pharms., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005)...................................................................... 22

Mem. from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and
    Acting Heads of Departments and Agencies, titled "Guidance on Probationary Periods,
    Administrative Leave and Details" (Jan. 20, 2025)..................................... 12

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009)....................................................................... 57

Reuters, *Trump Tells Cabinet Secretaries They, Not Musk, are in Charge of Staff Cuts* (March 7,
    2025), available at https://www.reuters.com/world/us/trump-tells-cabinetsecretaries- they-not-
    musk-are-charge-staff-cuts-2025-03-06/ .................................................... 16

Ronald Reagan, Radio Address to the Nation on Federal Civilian Employment (Aug. 20, 1983). 6

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ...................................................................... 59

William J. Clinton, Memorandum on Career Transition Assistance for Federal Employees, (Sept.
    12, 1995) ....................................................................................................... 8

William J. Clinton, Memorandum on Implementing Management Reform in the Executive
    Branch (Oct. 1, 1993)................................................................................... 8

William J. Clinton, Memorandum on Streamlining the Bureaucracy (Sept. 11, 1993)................. 8

**REGULATIONS**

Exec. Order No. 10,988, 3 C.F.R. 521 (1959-1963) ....................................................... 3

Exec. Order No. 11491, 3 C.F.R. 861 (1966-1970) ....................................................... 3

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Art. II, § 1 ................................................................................................................ 2

## INTRODUCTION

On February 20, 2025, this Court denied temporary and preliminary injunctive relief to Plaintiffs, holding that their claims fall outside of district court jurisdiction.  Plaintiffs—five federal employee unions—had sought a temporary restraining order broadly halting the government from moving forward with a set of personnel policies announced in the days and weeks following President Trump's inauguration.  The temporary relief sought by Plaintiffs would have prevented: "(1) the termination of [plaintiff unions'] members who are probationary employees; (2) the anticipated implementation of large-scale reductions in force ('RIFs') throughout federal agencies; and (3) any renewal of the Trump Administration's program to offer federal employees 'deferred resignation' with pay and benefits until September 30 of this year." Mem. Op. & Order of Feb. 20, 2025 at 1-2 (ECF No. 28) ("Op.").  But the Court held that it lacked jurisdiction over Plaintiffs' challenges to those policies, explaining that "[t]hey must pursue their challenges instead through the scheme established by Congress in the Federal Service Labor-Management Relations Statute ('FSLMRS'), which provides for administrative review by the Federal Labor Relations Authority ('FLRA') in the first instance, followed by judicial review in the courts of appeals." *Id*. at 7.  Thus, the Court denied Plaintiffs' request for a temporary restraining order and a preliminary injunction. *Id*.

Plaintiffs now bring a Second Amended Complaint seeking much the same relief, though phrased differently.  The Court should dismiss their Second Amended Complaint for the same reasons it denied them preliminary relief.  Further, Plaintiffs cannot show that they have either associational or organizational standing to assert their claims, providing another jurisdictional basis for dismissal.  Nor could Plaintiffs succeed on the merits of their claims even if they could establish jurisdiction, requiring dismissal for failure to state a claim as well.

## BACKGROUND

## I.    STATUTORY BACKGROUND

### a.  The President's Authority to Manage the Federal Workforce.

Article II of the Constitution provides that "the executive Power shall be vested in a President of the United States of America." U.S. Const., Art. II, § 1, cl. 1.  This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), including the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Prior to Congress's enactment of the FSLMRS, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees" by Executive Order.  *See, e.g.*, *Loc. 1498, Am. Fed'n of Gov't Emp. v. Am. Fed'n of Gov't Emp., AFL/CIO*, 522 F.2d 486 (3d Cir. 1975).  "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d at 452.  Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988 in 1962.  Exec. Order No. 10,988, 3 C.F.R. 521 (1959-1963); *see Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 91–92, (1983) ("*BATF*").  In doing so, he recognized that labor relations are closely linked to "the efficient administration of the Government" and the "effective conduct of public business."  *See* Exec. Order No. 10,988. That Executive Order has been amended by multiple Presidents in the more

2

than sixty years since. *See* Exec. Order No. 11491, 3 C.F.R. 861 (1966-1970), as amended by Exec. Orders Nos. 11616, 11636, and 11838, 3 C.F.R. 605, 634 (1971-1975) and 3 C.F.R. 957 (1971-1975).

  **b.  Historic Authority to Engage in RIFs.**

  For approximately 150 years, Congress has recognized federal agencies' authority to engage in RIFs.  The first such statute, enacted in 1876, required that agencies afford veterans preference over other employees when undertaking reductions. 19 Stat. 169 (Aug. 15, 1876); *see also Hilton v. Sullivan*, 334 U.S. 323, 336-39 (1948) (summarizing history of veterans' preferences in RIFs).  Interpreting this statutory framework, courts repeatedly rejected challenges to RIFs, recognizing that they were a matter of executive discretion. *See Medkirk v. United States*, 45 Ct. Cl. 395, 401 (Ct. Cl. 1910) ("The matter of qualification as between the persons then employed in the service was an administrative function which the courts could neither supervise nor inquire into after the exercise of the discretion of the proper official in dispensing with the services of those adjudged to be least qualified under the law which required a reduction in the force."); *Keim v. United States*, 177 U.S. 290, 295 (1900) (provision authorizing reductions in force "do[es] not contemplate the retention in office of a clerk who is inefficient, nor attempt to transfer the power of determining the question of efficiency from the heads of departments to the courts").

  Under current regulations, agencies may invoke RIF authority when reductions are "required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties." 5 C.F.R. § 351.201.  A "reorganization" is defined as "the planned elimination, addition, or redistribution of functions or duties in an organization." *Id*. § 351.203.  The regulations acknowledge agencies' discretion when deciding that RIFs are

necessary. "Each agency is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated." *Id*. § 351.201(a)(1). "This includes determining when there is a surplus of employees at a particular location in a particular line of work." *Id*. The regulations further emphasize that "[e]ach agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction [in] force is necessary." *Id*. § 351.204.

The federal government has exercised its authority to conduct RIFs several times. Widespread workforce reductions were necessary after World War II due to the shift from a wartime to peacetime footing. *See* 64 Ann. Rep. U.S. Civil Service Comm'n 10 (1946-1947). President Truman acknowledged those needs, and expressed hope that separated employees would be able to compete for other federal positions, while noting that "[i]t is unrealistic to expect . . . that all these employees can be placed in current vacancies in the Federal service, which very properly is contracting in size." Harry S. Truman, Statement by the President on Federal Employees Displaced by the Reduction-in-Force (Sept. 3, 1949), https://www.trumanlibrary.gov/library/publicpapers/ 201/statement-president-federal-employees-displaced-reduction-force. The 1980s also featured Executive Branch workforce reduction efforts under a Reagan Administration policy. As President Reagan explained, "[f]ifteen departments, agencies, and commissions have been able to reduce their payroll numbers by 20 percent or more." Ronald Reagan, Radio Address to the Nation on Federal Civilian Employment (Aug. 20, 1983), *available at* https://www.reaganlibrary.gov/archives/speech/radio-addressnation- federal-civilian-employment.

The Reagan administration combined its emphasis on reducing the Federal workforce with increased oversight of federal agencies through OMB. *See* Executive Order 12498, 50 Fed. Reg.

1036 (Jan. 4, 1985).  Executive Order 12498 set out the following goals: "to create a coordinated process for developing on an annual basis the Administration's Regulatory Program, establish Administration regulatory priorities, increase the accountability of agency heads for the regulatory actions of their agencies, provide for Presidential oversight of the regulatory process, reduce the burdens of existing and future regulations, minimize duplication and conflict of regulations, and enhance public and Congressional understanding of the Administration's regulatory objectives." *Id*.  It required executive agencies to "submit to the Director of the Office of Management and Budget (OMB) each year, starting in 1985, a statement of its regulatory policies, goals, and objectives for the coming year and information concerning all significant regulatory actions underway or planned."  *Id*.  Further, the Executive Order required that "[t]he head of each Executive agency subject to this Order shall ensure that all regulatory actions are consistent with the goals of the agency and of the Administration, and will be appropriately implemented."  *Id*.

In the 1990s, the Clinton Administration maintained the policies of the Reagan Administration, both in terms of reducing the number of federal employees and in exercising control over agencies to ensure that they were responsive to the President's policy goals.  To promote the goal of reducing the size of the Federal Government, President Clinton issued Executive Order 12839 the month after he took office, outlining a plan to eliminate 100,000 federal positions.  Executive Order 12839, 58 Fed. Reg. 8515 (Feb. 10, 1993).

Relying on "the authority vested in me as President by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, section 3301 of title 5, United States Code, and section 1111 of title 31, United States Code[,]" Executive Order 12839 required that "[e]ach executive department or agency with over 100 employees shall eliminate not less than 4 percent of its civilian personnel positions (measured on a full-time equivalent (FTE)

basis) over the next 3 fiscal years." *Id*. It instructed that "[t]he positions shall be vacated through attrition or early out programs established at the discretion of the department and agency heads." *Id*. It required that "[a]t least 10 percent of the reductions shall come from the Senior Executive Service, GS-15 and GS-14 levels or equivalent." *Id*. It set "target dates" for these reductions: "Each department and agency shall achieve 25 percent of its total reductions by the end of fiscal year 1993, 62.5 percent by the end of fiscal year 1994, and 100 percent by the end of fiscal year 1995." *Id*. And it created a role for OMB, instructing the Director of OMB to "issue detailed instructions regarding the implementation of this order, including exemptions necessary for the delivery of essential services and compliance with applicable law." *Id*.

Later in 1993, President Clinton signed a presidential memorandum titled "Streamlining the Bureaucracy" in which he "direct[ed] each head of an executive department or agency to prepare . . . a streamlining plan to be submitted to the Director of [OMB] as part of a goal to reduce the executive branch civilian work force by 252,000." William J. Clinton, Memorandum on Streamlining the Bureaucracy (Sept. 11, 1993), https://www.presidency.ucsb.edu/node/327725 (last accessed June 11, 2025). Also in 1993, President Clinton signed a presidential memorandum directing departments and agencies to appoint officials responsible for, among other things, "overseeing agency-specific application of . . . personnel reduction." William J. Clinton, Memorandum on Implementing Management Reform in the Executive Branch (Oct. 1, 1993), https://www.presidency.ucsb.edu/node/327737. Ultimately, the Clinton Administration saw a substantial reduction in the number of federal employees, due in part to RIF implementations. William J. Clinton, Memorandum on Career Transition Assistance for Federal Employees, (Sept. 12, 1995) https://www.presidency.ucsb.edu/documents/memorandum-career-transitionassistance-

for-federal-employees (transition services to federal employees who "either have been or are likely to be separated from Federal service due to a reduction in force").

### c. The Federal Service Labor-Management Relations Statute.

In enacting the Civil Service Reform Act of 1978 (CSRA), Pub. L. No. 95-454, 92 Stat. 1111, Congress "established a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (citation omitted). If an agency takes a final adverse action against an employee no longer in his or her probationary period—including removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less, 5 U.S.C. § 7512—the employee may appeal to the Merit Systems Protection Board (MSPB). *Id*. § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Non-probationary employees[1] may appeal final MSPB decisions to the Federal Circuit, which generally has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This statutory review scheme, too, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.

The FSLMRS, 5 U.S.C. § 7101 *et seq*., enacted as Title VII of the CSRA, provides "a scheme of administrative and judicial review" for federal employee union claims. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). Administrative review is

---

[1] Federal employees serving in their probationary periods (for the Competitive Service) or trial periods (for the Excepted Service) generally do not enjoy a right to appeal to the MSPB, as they are not considered "employee[s]" for purposes of the CSRA's Chapter 75, 5 U.S.C. § 7511(a)(1), but remain properly considered as "applicants" for employment under an extended hiring and evaluation period. *See* 5 U.S.C. § 7511(a)(1)(A)-(B) (one-year trial period), (C) (two-year trial period); 5 C.F.R. §§ 315.801, 301.806. However, many of the protections of the CSRA's Chapter 23 extend to both "applicants and employees." *See, e.g.,* 5 U.S.C. § 2302(a)(2)(A)(i)–(xii) (identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in an agency").

provided by the Federal Labor Relations Authority ('FLRA'), a three-member agency charged with adjudicating federal labor disputes, including "negotiability" disputes and "unfair labor practice" disputes. *Id*. (citing 5 U.S.C. § 7105(a)). In negotiability disputes, the FLRA determines whether agencies and unions must bargain over certain subjects. *Id*. (citing 5 U.S.C. §§ 7105(a)(2)(E), 7117(c)(1)). In unfair labor practice proceedings, the FLRA resolves whether an agency must bargain over a subject, has violated the duty to bargain in good faith, or has otherwise failed to comply with the FSLMRS. *Id*. (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118). The FLRA's decisions are subject to direct review in the courts of appeals. *Id*. (citing 5 U.S.C. § 7123(a), (c)).

These directives are subject to certain limitations. As the Supreme Court has noted, Congress "[r]ecogniz[ed] 'the special requirements and needs of the Government,'" thus "exempt[ing] certain matters from the duty to negotiate." *Fed. Lab. Rels. Auth. v. Aberdeen Proving Ground, Dep't of the Army*, 485 U.S. 409, 410 (1988) (per curiam) (quoting 5 U.S.C. § 7101(b)). Section 7117(a)(1), for instance, precludes bargaining over proposals that are "inconsistent with any Federal law or any Government-wide rule or regulation," and over "matters which are the subject of . . . a Government-wide rule or regulation." 5 U.S.C. § 7117(a)(1). And the Statute does not disturb the President's express statutory authority to prescribe such Government-wide rules for the conduct of employees in the Executive Branch, *id*. at § 7301, or for the admission of individuals into the civil service. *Id*. at § 3301. Moreover, section 7106(a) provides that "nothing in this chapter shall affect the authority of any management official of any agency" with respect to certain enumerated "management rights." *See* H.R. Rep. No. 95-1403 (1978), *reprinted in* U.S.C.C.A.N. 2723. Finally, the Statute itself makes clear that "[e]xcept as otherwise expressly provided," none of its provisions should be construed to "limit, curtail,

abolish, or terminate any function of, or authority available to, the President which the President had immediately before" the Statute's effective date.  Pub. L. 95-454, § 804, 92 Stat. 111.

## II.    FACTUAL BACKGROUND

### a. OPM's Guidance Memorandum on Probationary Periods, Administrative Leave and Details.

On January 20, 2025, OPM Acting Director Charles Ezell transmitted a guidance memo to Executive Branch agencies directing them, in pertinent part, to "identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees[.]"  Mem. from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, titled "Guidance on Probationary Periods, Administrative Leave and Details" (Jan. 20, 2025) ("OPM Mem.").  Further, the OPM Memorandum directed agencies to "promptly determine whether those employees should be retained at the agency."  *Id*.

### b. The Deferred Resignation Programs.

On January 28, 2025, OPM sent an email to federal employees informing them of a "deferred resignation program,"  ("DRP") effective between January 28 and February 6, 2025, under which most federal employees[2] would be eligible to resign yet "retain all pay and benefits regardless of your daily workload and [] be exempted from all applicable in-person work requirements until September 30, 2025 (or earlier if you choose to accelerate your resignation for any reason)."  *See www.opm.gov/fork*.  The email further explained that decisions to elect the DRP

---

[2] The voluntary resignation program was not available for military personnel, employees of the Postal Service, those in positions related to immigration enforcement and national security, and those in any other positions specifically excluded by employing agencies.

were voluntary and that OPM intended to use the responses to the DRP "to assist in workforce reorganization efforts in conjunction with employing agencies." *Id.* (citing 88 Fed. Reg. 56058; 80 Fed. Reg. 72455).

Following its January 28 email, OPM provided a list of Frequently Asked Questions ("FAQs") concerning the DRP. *www.opm.gov/fork/faq*. Among other things, the FAQs explained that for eligible employees electing deferred resignation, the employing agency could execute paperwork reflecting all the terms of the agreement. *Id.* The FAQs further explained that any lapse in appropriations might affect DRP-electing employees' pay, but that such employees would still be entitled to backpay under the Government Employee Fair Treatment Act of 2019 in the event of a lapse. *Id.* (citing 31 U.S.C. 1341(c)(2)).

On February 4, 2025, OPM provided a memorandum to all heads and acting heads of Departments and agencies regarding the DRP's legality. Legality of Deferred Resignation Program, https://www.chcoc.gov/content/legality-deferred-resignation-program. The February 4 memorandum explained that Congressional approval of the DRP was unnecessary because employees would remain in duty status and entitled to their regular pay and benefits. *Id.* The memorandum further explained that the program does not promise employees any additional compensation that might require special congressional appropriations. *Id.*

On February 4, 2025, several federal unions sued in the District of Massachusetts, asserting organizational standing and seeking a temporary restraining order that would suspend the deadline OPM had set for submission of deferred resignation requests. Following expedited briefing and argument on the plaintiff unions' motion (during which the court briefly stayed the response deadline to allow for orderly submission of briefing and argument), the court denied the motion, holding that the unions could not show standing to sue and that district court review of

10

their claims as pleaded was statutorily precluded under the FSLMRS.  *See AFGE, et al., v. Ezell, et al.*, No. 25-cv-10276, Slip Op. at 2-3 (standing), 3-5 (preclusion) (D. Mass. Feb. 12, 2025) (ECF No. 66).  OPM closed the submission period later on the evening of February 12.

In April 2025, certain agencies issued another deferred resignation program—"DRP 2.0." Second Am. Compl. ¶ 91.  Like the original DRP, DRP 2.0 offered eligible employees the chance to voluntarily resign with specific benefits like continued pay and administrative leave leading up to final separation dates.  *DRP 2.0 & VERA – Current Offers, Agencies, & Key Deadlines*, MyFedBenefits (Apr. 2, 2025), https://myfedbenefitshelp.com/deferred-resignation-program-2-0-and-vera-updates/#:~:text=Several%20federal%20agencies%20have%20reopened,Specialists%20%E2%80%93%20there's%20really%20no%20substitute.  Details as to deadlines, eligibility criteria, and incentive structures varied agency to agency.[3]  *Id.*

### c.  Executive Order 14210.

On February 11, 2025, the President issued Executive Order 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" (EO). *See* https://public-inspection.federalregister.gov/2025-02762.pdf  Key substantive provisions are set forth in Section 3, titled "Reforming the Federal Workforce to Maximize Efficiency and Productivity."  *Id.*  In four subparts, that section identified directives under the headings "Hiring Ratio" (subpart a), "Hiring Approval" (subpart b), "Reductions in Force" (subpart c), and "Rulemaking" (subpart d).  *Id.*  The provision most pertinent to Plaintiffs' claims is subpart c, which directs that "Agency Heads shall promptly undertake *preparations* to initiate large-scale

---

[3] For example, DRP 2.0 for Veterans Affairs ("VA") was open until April 30, 2025, but subsequently extended to May 16, 2025.  VA also instituted additional layers of approval for employees in direct care positions wishing to participate in the program.

reductions in force (RIFs), *consistent with applicable law*, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id*. (emphasis added). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id*. Finally, it directs that "[t]his subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement." *Id*.

The EO further provides that, within 30 days of issuance (i.e., by March 13, 2025), "Agency Heads shall submit to" OMB and OPM "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id*. § 3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id*. The EO states that agency heads "may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id*. § 4(b). The Director of OPM is also authorized to "grant exemptions from [the] order." *Id*. § 4(c). Finally, the order states that it "shall be implemented consistent with applicable law and subject to the availability of appropriations," *id*. § 5(b), and shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof," *id*. § 5(a)(i).

The EO does not direct specific RIFs and contains no specific requirements related to RIFs except for the guidance set forth above. Consistent with the EO's language, the President

has confirmed that agencies have ultimate responsibility for planning and implementing RIFs. *See* Reuters, *Trump Tells Cabinet Secretaries They, Not Musk, are in Charge of Staff Cuts* (March 7, 2025), available at https://www.reuters.com/world/us/trump-tells-cabinetsecretaries- they-not-musk-are-charge-staff-cuts-2025-03-06/.

### d.  February 26, 2025 Memorandum

On February 26, 2025, OPM and OMB jointly issued a Memorandum titled "Guidance on Agency RIF and Reorganization Plans Requested by *Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative*" (Workforce Memorandum). S*ee* https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.  Noting the EO's requirement that agencies submit Agency RIF and Reorganization Plans ("ARRPs") by March 13, the Workforce Memorandum provides guidance on the submission of ARRPs to OMB and OPM.  *Id.*  AARPs should seek to achieve five principles: (1) "Better service for the American people; (2) "Increased productivity"; (3) "A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required"; (4) "A reduced real property footprint"; and (5) "Reduced budget topline."  *Id.* at 1-2.  Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* at 2.  The Workforce Memorandum cautions that "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority."  *Id.*

The Memorandum provides a list of "available tools" for agencies to consider in crafting their ARRPs to effectuate the President's directive.  *See id.* at 3.  Those tools include the hiring freeze announced by the January 20, 2025 Presidential Memorandum; processes to ensure that agency heads have visibility and sign off on potential job offers; elimination of non-statutorily mandated functions through RIFs; review of underperforming employees, employees engaged in misconduct, and probationary employees; reduction of headcount through attrition and expiration of term or temporary appointments; separation of reemployed annuitants in areas likely subject to RIFs; and renegotiation of collective bargaining agreements that inhibit government efficiency and employee accountability.  *Id.* at 3.  The Workforce Memorandum also notes that agencies should consider changes to regulations and agency policies that would reduce or eliminate agency subcomponents and otherwise hasten implementation of ARRPs, while cautioning that some such changes "must be pursued through notice-and-comment rulemaking[.]"  *Id.*

The Memorandum directed agencies to submit ARRPs in two phases: Phase 1 ARRPs, to be submitted by March 13, 2025, to "focus on initial agency cuts and reductions, *id.* at 3; and Phase 2 ARRPs, to be submitted by April 14, 2025, to "outline a positive vision for more productive, efficient agency operations going forward," *id.* at 4.

Phase 1 ARRPs should provide a list of agency subcomponents or offices that provide direct services to citizens, any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities, any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities[,]" tools the agency intends to use to increase efficiencies, "[a]

14

list by job position of all positions categorized as essential for purposes of exclusion from largescale RIFs," "[t]he agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts," and the agency's timetable for implementation of each part of the Phase 1 AARP. *Id*.

Phase 2 ARRPs should provide, among other things: confirmation that the agency has reviewed all its personnel data, plans to ensure that employees are grouped based on like duties and functions to the maximum extent possible, any proposed relocations from Washington, D.C. to less expensive areas, "[t]he competitive areas for subsequent large-scale RIFs[,]" all reductions (of FTE positions and otherwise), the agency's plan to ensure new career appointment hires are in highest-need areas, any collective bargaining agreement provisions that inhibit efficiency and cost-savings (and the agency's plan to renegotiate any such provisions), an explanation how the ARRP will improve services for Americans and advance the President's priorities, "[f]or agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services" (a certification that "should include a written explanation from the Agency Head"), plans to improve efficiency and reduce costs through improved technology, "[a]ny changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking," as well as the agency's timetable and plan for implementing the ARRP. *Id*. at 5-6. The Workforce Memorandum further states that agencies should continue sending monthly progress reports on May 14, 2025, June 16, 2025, and July 16, 2025. *Id*. at 6. Phase 2 Plans should be planned for implementation by September 30, 2025.[4] *Id*. at 4.

---

[4] The Memorandum contains several exclusions, including the Postal Service, positions "necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities[,]" the Executive Office of the President, military personnel in the armed

ARRPs are distinct from RIFs. The Workforce Memorandum states, before a RIF is implemented and an employee separated from service, there must be a formal RIF notice period of 60 days (or 30 days if the agency obtains a waiver from OPM), in which affected employees are issued formal RIF notices, as well as provided appeal rights, career transition assistance, and priority placement options. *Id*. at 7. OPM's regulations independently codify these notice requirements. Reduction in Force Notice-Certification of Expected Separation; Exception to 60 Days Specific Notice; Permissive Temporary Exception, 60 Fed. Reg. 2,677 (Jan. 11, 1995) (codified at 5 C.F.R. § 351.801–807).

### III.    PROCEDURAL HISTORY

Plaintiffs filed suit on February 12, 2025, and moved for a temporary restraining order late in the day on February 14. TRO Mot., ECF No. 11. By minute order on February 15, the Court directed Defendants to respond to Plaintiffs' TRO motion by 5 p.m. on February 17, with Plaintiffs to submit a reply by noon on Tuesday, February 18. The Court held a hearing on February 18, *see* Minute Order of Feb. 15, 2025, and denied Plaintiffs' request for both a temporary restraining order and a preliminary injunction on February 20, 2025. *See* TRO Op., ECF No. 28 at 16.

Plaintiffs amended their complaint on February 17, 2025. First Am. Compl., ECF No. 13. Defendants moved to dismiss on May 15, ECF No. 41, and Plaintiffs sought and obtained leave of Court (over Defendants' opposition) to file a Second Amended Complaint on May 27. Second Am. Compl., ECF No. 42. The Second Amended Complaint alleges that the Department of Health and Human Services (HHS) and Internal Revenue Service (IRS) have begun RIFs, that Defendants

---

forces and Federal uniformed personnel. Workforce Memorandum at 6. Agencies providing direct services to citizens may "not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services." *Id*.

have fired probationary employees, and that multiple agency Defendants have offered a new DRP, which employees have accepted.  Second Am. Compl. ¶¶54–66, 73–81, 90–94.

The Second Amended Complaint alleges five Courts: Count I alleges that Defendants' actions are ultra vires because they violate the separation of powers; Count II alleges Defendants' actions at the IRS in particular are ultra vires because they conflict with the Inflation Reduction Act; Count III alleges OPM and OMB's implementation of the EO violates the APA because they are exceeding their statutory authority; Count IV alleges OPM and OMB's implementation of the EO violates the APA because it is arbitrary and capricious; and Count V alleges the agency Defendants' implementation of their ARRPs violates the APA because it is arbitrary and capricious. Second Am. Compl., ¶¶113–126.  Plaintiffs' Request for Relief asks the Court to: (A) declare the firing of "nonessential, probationary, and other employees and the. . . deferred resignation program" unlawful; (B) enjoin the implementation of Section 3(c) of the EO; (C) enjoin OPM and OMB from implementing the Workforce Memorandum "and their approval of agencies' ARRPs pursuant to the memo;" (D) enjoin "the agency Defendants' implementation of their ARRPs;" (E) enjoin "the implementation of OPM's directive to terminate probationary employees;" and (F) enjoin Defendants from "extending, expanding, or replicating its deferred resignation programs[.]" Second Am. Compl., Request for Relief (A–F), 30–31.

## LEGAL STANDARD

The plaintiff bears the burden of establishing the court's subject-matter jurisdiction.  *See, e.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  If the plaintiff is unable to do so, the Court must dismiss the action.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  Under Rule 12(b)(1), a court may consider material beyond the allegations in the complaint.  *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005);

*Transp. Trades Dep't, AFL-CIO v. Nat'l Mediation Bd.*, 530 F. Supp. 3d 64, 69 (D.D.C. 2021) (Nichols, J.). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

## ARGUMENT

This Court should dismiss the Complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) for two reasons: Plaintiffs' claims are channeled away from district court review under the FSLMRS, as the Court previously held, and they cannot show standing in any event. Even if Plaintiffs could establish jurisdiction, they fail to state a claim on which relief can be granted, and their Complaint should be dismissed under Rule 12(b)(6).

## I.    THE COURT LACK SUBJECT-MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS.

The Complaint falls outside of the Court's subject-matter jurisdiction for at least three reasons. *First*, the FSLMRS precludes district court jurisdiction over Plaintiffs' challenges to Defendants' management of the federal workforce. *Second,* Plaintiffs lack organizational standing to remedy any alleged injury flowing from the challenged actions. *Third*, Plaintiffs lack associational standing to seek relief for intangible harms, including purported increased risks of

certain harms, ultimately stemming from Plaintiffs' disagreements with the Executive Branch's employment policy choices.

> a. **Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance.**

Congress has "established a comprehensive system for reviewing personnel action[s] taken against federal employees" that provides the "exclusive means" for review. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (citation omitted). The FSLMRS,[5] 5 U.S.C. §§ 7101–35, part of the broader CSRA, Pub. L. No. 95-454, 92 Stat. 1111 (1978), sets out an "integrated scheme of administrative and judicial review" for federal labor disputes and most challenges to personnel actions taken against members of the civil service. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("AFGE") (exclusivity of FSLMRS); *United States v. Fausto*, 484 U.S. 439, 445 (1988) (exclusivity of CSRA). As this Court previously noted in denying Plaintiffs' request for temporary and preliminary injunctive relief, "[t]he D.C. Circuit has repeatedly held that this scheme 'provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims.'" TRO

---

[5] On March 27, 2025, President Trump issued an Executive Order titled "Exclusions from Federal Labor-Management Relations Programs[,]" Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025), excluding certain agencies and subdivisions from the collective-bargaining requirements of the FSLMRS due to "hav[ing] as a primary function intelligence, counterintelligence, investigative, or national security work[.]" Among those agencies were several where NTEU represents employees as their exclusive collective bargaining unit representative. *See Nat'l Treasury Emps. Union v. Trump*, No. CV 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025), at *3. Another court in this district preliminarily enjoined the implementation of EO 14251, *see id.*, but on appeal, the D.C. Circuit issued a stay of the district court's preliminary injunction, holding that NTEU had not shown irreparable harm and that the government, by contrast, would suffer irreparable harm from the preliminary injunction. *Nat'l Treasury Emps. Union v. Donald J. Trump*, No. 25-5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025). The D.C. Circuit likewise observed that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest." *Id.*

Op. at 8 (citing *AFGE*, 929 F.3d at 752) (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013)).

### i. This Court Previously Determined Plaintiffs' Claims Were Channeled at the TRO Stage.

Plaintiffs do "not dispute the claims [they] assert[] are of the type generally covered by the FSLMRS scheme." TRO Op. at 10. Instead, they have argued that their claims arise from "limited circumstances" that fall outside of the statutory scheme, suggesting that their "irremediable harm" from lost revenue and loss of bargaining power would deprive them of meaningful judicial review. *Id.*; *see also* Reply in Opp., ECF No. 16, at 4-5. Plaintiffs thus have asserted that their situation qualifies as a "here-and-now injury," under *Axon Enterprise, Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023), that would permit the Court to adjudicate their claims despite the FSLMRS's otherwise comprehensive channeling of federal labor disputes. *Id.*

But the Court has carefully considered and rejected that argument. *Id.* at 11. In denying Plaintiffs' request for temporary and preliminary injunctive relief, the Court concluded that *Axon* did not "stand for the proposition that *any* irreparable injury suffices to defeat preclusion." *Id.* Rather, it explained, the alleged injury in *Axon* was that the plaintiffs, who were challenging enforcement actions by the SEC and FTC on the grounds the Administrative Law Judges assigned to hear their claims were unconstitutionally appointed, "would be subjected to 'an illegitimate proceeding, led by an illegitimate decisionmaker.'" *Id.* at 12 (quoting *Axon* at 183, 143 S. Ct. 890). "Such a harm qualified as a 'here-and-now injury' that could not be remedied after the fact by a court of appeals, because '[a] proceeding that has already happened cannot be undone.'" *Id.* (quoting *Axon* at 183, 143 S. Ct. 890). By contrast, Plaintiffs' claims here—which do not argue that the FLRA is unconstitutionally structured or that they would be subject to illegitimate

proceedings—are premised on "routine burdens" that must go through agency adjudication processes even if they represent significant alleged injuries. *Id*. (citing *Axon*, 598 U.S. at 192, 143 S. Ct. 890). Thus, the Court held that *Axon* would not permit Plaintiffs to bypass the FSLMRS based on their alleged injuries. *Id*.

Plaintiffs also attempted to avoid the FSLMRS by painting their claims as constitutional separation-of-powers challenges, a contention they maintain in their Second Amended Complaint. TRO Mot. at 18; *see also* Second Am. Compl. ¶¶ 113–115. But the Court rejected that contention as well, holding "that whether a claim is precluded 'does not turn on [its] constitutional nature . . . but rather on the type of the employee and the challenged employment action.'" TRO Op. at 13 (quoting *Elgin*, 567 U.S. at 15, 132 S.Ct. 2126). Thus, the Court determined the FLRA could properly review Plaintiffs' constitutional claims and, even possibly, "moot the need to resolve the [claims]" by finding the challenged actions violated RIF statues. *Id*. at 15 (quoting *AFGE*, 929 F.3d at 761) (internal citations omitted). Even if the FLRA did not have authority to decide Plaintiffs' constitutional claims, the Court emphasized that "it is of no dispositive significance. . . so long as the claims can eventually reach 'an Article III court fully competent to adjudicate' them." *Id*. at 13 (quoting *AFGE*, 929 F.3d at 758). On that basis, the Court, found Plaintiffs' constitutional claims precluded by the FSLMRS. *Id*.

Plaintiffs have also argued that the probationary removals at issue are so numerous that they would overwhelm the FLRA, thereby foreclosing any meaningful review without the district court interceding to enjoin those personnel actions. *Id*. at 13. The Court rejected this argument as well, noting Plaintiffs could seek relief from the FLRA on behalf of a class of union members and that, if a constitutional holding by a court of appeals were ultimately necessary, such a holding would likely be broadly applicable to other plaintiffs challenging the same set of actions. *Id*. The

21

Court likewise emphasized that the D.C. Circuit has previously rejected this same efficiency argument, holding that plaintiffs "may not avoid the statutory review scheme[s] 'because it provides only an 'inconvenient' remedy.' *Id.* (quoting *Sec'y of Air Force*, 716 F.3d at 639).

Plaintiffs' final attempt to evade jurisdictional channeling was to argue that the FLRA's expertise regarding federal employment claims is no longer a relevant consideration in determining statutory claim preclusion following *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L.Ed.2d 832 (2024). But the Court rejected this argument too, noting that the Supreme Court has never suggested that agency expertise is no longer a part of the statutory preclusion analysis, TRO Op. at 15. The Court also considered that an agency's interpretation of a statute may be especially informative "'to the extent it rests on factual findings within [the agency's] expertise.'" *Id.* (citing *Loper Bright*, 603 U.S. at 402). For these reasons, the Court held Plaintiffs' claims were precluded by the FSLMRS. *Id.* at *4.

### ii. Plaintiffs' Second Amended Complaint Does Not Change This Court's Previous Analysis, which is Further Supported by Recent Rulings.

The Second Amended Complaint's new allegations provide no reason for the Court to revisit its earlier jurisdictional holding. Multiple courts in recent months have similarly held that the FSLMRS and the CSRA preclude district court jurisdiction over challenges to agencies' implementation of EO 14210, probationary employee removals, and the deferred resignation program. *See, e.g., Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) (district court lacked jurisdiction over unions' challenge to original DRP because they lacked standing and because unions' claims fall within FSLMRS scheme); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762, at *11 (D.D.C. Feb. 21, 2025) (FSLMRS divests district courts of jurisdiction to hear employment-based

challenges involving USAID); *Maryland v. United States Dep't of Agric.*, No. CV JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) (stayed by appeal) *Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, (4th Cir. Apr. 9, 2025) (states challenging agencies' alleged failure to follow RIF requirements cannot assert claims that would be statutorily channeled under FSLMRS if brought by employees themselves).[6]   In particular, on July 8, the Supreme Court stayed a decision from the Northern District of California preliminarily enjoining multiple RIFs on the theory that EO 14210 and a joint OPM and OMB memorandum implanting it were unlawful, granting the Government's stay application in part "[b]ecause the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful[.]"  *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025).

In prior briefing, Plaintiffs urged the Court to disregard the earliest of those decisions, citing four other decisions to suggest that "the legal landscape on the channeling doctrine is changing[:]" *AFGE v. Trump*, *AFGE v. OPM*, *Widakuswara v. Lake*, and *Nat'l Ass'n of Immigr. Judges v. Owen* (*NAIJ*).   Reply, ECF No. 46 at 3; *see also* Leave Mot., ECF No. 42 at 4.  But those decisions are unpersuasive.

---

[6] Two courts within the Northern District of California have found subject matter jurisdiction over similar claims despite the FSLMRS and CSRA channeling schemes.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025) (stayed by appeal) *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025); *but cf. Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 1150698 (N.D. Cal. Apr. 18, 2025) (holding the district court had jurisdiction over the union plaintiffs' claims and enjoining defendant agencies from following any OPM orders to fire employees) ; *and Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-CV-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025), *appeal filed*, Case No. 25-3030 (9th Cir. May 9, 2025).  (The most recent of those preliminary injunction rulings was stayed by the Supreme Court on July 8, as noted *supra*. *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025))  Plaintiffs claim these cases demonstrate this "Court has subject-matter jurisdiction too."  Pls. Leave Mot., ECF No. 42 at 4.  But, as explained later, these decisions are neither binding on this Court nor persuasive, and should be disregarded.

First, *AFGE v. Trump* and *AFGE v. OPM* are both decisions of the Northern District of California, and thus of no precedential value in this district. And both decisions' reasoning was particularly flawed because each considered binding precedent within the D.C. Circuit, *AFGE*, 929 F.3d 748, to be unpersuasive or inapplicable. *See AFGE v. Trump*, No. 25-cv-03698-SI, 2025 U.S. Dist. LEXIS 89344, at \*43 (N.D. Cal. May 9, 2025) ("the D.C. Circuit's 2019 decision in *AFGE v. Trump* is not particularly helpful to resolving the claims channeling question here."); *AFGE v. United States OPM*, No. C 25-01780 WHA, 2025 U.S. Dist. LEXIS 54382, at \*16 (N.D. Cal. Mar. 24, 2025) (finding *AFGE v. Trump 2019* inapplicable since the challenged executive order "sought to constrain how agencies bargained."). But no matter how it is viewed by one or more district courts outside this Circuit, *AFGE v. Trump 2019* is binding precedent here, and "[t]hose decisions, however, no matter how persuasive, do not grant the court license to disregard D.C. Circuit precedent." *Liuksila v. Turner*, 351 F. Supp. 3d 166, 184 (D.D.C. 2018). Furthermore, this Court explicitly relied on *AFGE v. Trump 2019* at the preliminary injunction stage, emphasizing that "[t]he claims here are brought by a union representing federal employees against their federal employers—thus, they are 'federal labor-management relations claims.'" 2025 WL 561080, at \*5. Nothing in Plaintiffs' Second Amended Complaint warrants a different finding now. Plaintiffs still challenge the *way* RIFs are being or will be carried out—claims that could be raised in an *unfair labor practice* challenge. *See* Second Am. Compl. ¶ 120 (Count III) ("OPM and OMB lack statutory authority. . . to approve agencies' plans"); *id*. ¶ 122 (Count IV) ("OPM and OMB's direction[s]. . . is 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.") (quoting 5 U.S.C. § 706(2)(A)); *id*. ¶ 126 ("the execution of [] ARRPs. . . are" arbitrary and capricious). Thus, the Court's earlier holding remains applicable.

Second, Plaintiffs' only decision from within this district, *Widakuswara*, provides them no support, as the only portion of its holding relevant to Plaintiffs' claims here has been stayed by the D.C. Circuit.  Multiple sets of plaintiffs there challenged actions taken under Executive Order 14238, which directed the United States Agency for Global Media (USAGM) to reduce the agency to the minimum level of operations required by statue.  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025); Continuing the Reduction of the Federal Bureaucracy, 90 Fed. Reg. 13043 (Mar. 20, 2025). USAGM placed approximately 1,000 employees on administrative leave, terminated nearly 600 personal-service contractors, directed its personnel abroad to cease broadcasting, and terminated grants to affiliate networks. 2025 WL 1288817, at *1.  The district court granted the plaintiffs' motion for a preliminary injunction, ordering defendants to: (1) reinstate all terminated USAGM employees and contractors; (2) restore USAGM grants to two affiliate networks as provided by congressional appropriations; and (3) "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news[.]'"  *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at * 18, (D.D.C. Apr. 22, 2025) (quoting 22 U.S.C. § 6202(c)). On May 3, 2025, a D.C. Circuit motions panel granted the government's motion for a stay pending appeal as to all but provision (3) (which the government did not seek to stay pending appeal), holding in particular that review of the plaintiffs' personnel-related claims likely falls outside of district court jurisdiction under the CSRA and FSLMRS.  2025 WL 1288817, at *1.

The D.C. Circuit sitting *en banc* later reversed the panel stay of provision (2), relating to specific grant terminations, but denied the plaintiffs' request to stay provision (1), thus leaving intact the panel's order staying the preliminary injunction as to the personnel-related claims. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025), at **1-2.  As

to the latter, the *en banc* Circuit expressly denied the plaintiffs' employment-related-relief. Or. Denying Stay, *Widakuswara, et al. v. Lake, et al.*, 25-4144 (D.C. Cir. May 22, 2025); *see also Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025).

Finally, *NAIJ* also does not change the channeling doctrine because it is inconsistent with controlling precedent—*Elgin v. Dep't of the Treasury*, 567 U.S. 1 (2012). In *NAIJ*, the Fourth Circuit found remand of immigration judges' claims of First and Fifth Amendment violations was necessary to determine if the CSRA's adjudicatory scheme for personnel actions continued to function in light of removals of Special Counsel and two members of Merit System Protection Board (MSPB). 2025 WL 1560373, at *5, 8. The Fourth Circuit opined the CSRA was designed "to serve as 'a vigorous protector of the merit system'—the crux of [which] was the 'establishment of a *strong and independent* [MSPB] and Special Counsel[,]'" *id.* *6 (quoting S. Rep. 95-969, at 6–7 (1978)). The court stated Congress' desire that the MSPB and Special Counsel be free from "'any control or direction by the President[,]'" *id.* *7 (quoting S. Rep. 95-969, at 24 (1978), meant the government's arguments in *Harris v. Bessent*, and *Dellinger v. Bessent*, that the CSRA's removal protections are violations of the separation of powers, called into question the constitutionality and "continued vitality of the statute's adjudicatory scheme." 2025 WL 1560373, at *8 (citing *Harris v. Bessent*, Gov't Br. At 7–9, ECF No. 6, No. CV 25-412 (RC), 2025 WL 679303 (D.D.C. Mar. 4, 2025), *hearing in banc denied*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025)) (citing *Dellinger v. Bessent*, Gov't Br. At 5–8, ECF No. 11, No. 25-5052, 2025 WL 935211 (D.C. Cir. Mar. 27, 2025)).

The Fourth Circuit conceded the plaintiffs' claims would normally have been channeled by the CSRA since the scheme's "'elaborate' framework and purpose demonstrate" Congress's intent "to proceed exclusively through the [CSRA]." 2025 WL 1560373, at *6 (quoting *Elgin v. Dept.*

*of Treasury*, 567 U.S. 1, 10–11).  Nevertheless, the court maintained "the framework of the CSRA would be thwarted" if, "for example, the Senate-confirmed roles in the MSPB and Special Counsel go unfilled, or if the agencies fail to perform their duties such that covered employees' claims are not adequately processed[.]" *Id*. *8.  Reasoning such a result would "defeat congressional intent," the Fourth Circuit thus remanded the case back to the district court to "to conduct a factual inquiry whether the CSRA continues to provide a functional adjudicatory scheme." *Id*. *6, 8.

    *NAIJ* is inconsistent with *Elgin*.  Even assuming that some aspect of the administrative review process is not functioning as intended (for which there is no factual basis), Congress' intent to channel claims is clear so long as those claims can eventually receive meaningful judicial review.  *Elgin*, 567 U.S. 17–21.  In *Elgin*, the Supreme Court opined "that Congress' intent to preclude district court jurisdiction was fairly discernible" "'[e]ven if' the [MSPB] could not decide the constitutionality of a federal law[]" because that issue "could be 'meaningfully addressed in the Court of Appeals'" which the CSRA provided for through Federal Circuit review.  *Elgin*, 567 U.S. at 17 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 201 (1994)).  Thus, the authority of an administrative body to rule on a constitutional claim "is of no dispositive significance . . . so long as the claims can eventually reach an Article III court fully competent to adjudicate them."  *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *7 (D.D.C. Feb. 20, 2025) (citation omitted); *see also Thunder Basin*, 510 U.S. at 218 (explaining review before an administrative body followed by appeal to the circuit courts was meaningful even though there was no way to assert a pre-enforcement challenge to civil penalties either before the body or the district court); *accord Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013) ("The CSRA can preclude a claim from being brought in a district court even if it forecloses the claim from administrative review"); and *AFGE*, 929 F.3d at

27

756 ("Congress may require [plaintiffs] to litigate their claims solely through the statutory scheme, at least so long as they can eventually obtain review and relief.").

Contrary to the Fourth Circuit's reasoning in remanding *NAIJ* for district court fact-finding, *Elgin* shows Congress' intent that the statutory review scheme is exclusive despite the President's terminations of the Special Counsel and several members of the MSPB.  The CSRA "was designed to replace an 'outdated patchwork of statutes and rules'" allowing employees to challenge employment actions in "district courts across the country."  567 U.S. at 13–14 (quoting *United States v. Fausto*, 484 U.S. 439, 444–445 (1988)).  Such widespread judicial review . . . produced 'wide variations in the kinds of decisions . . . issued on the same or similar matters' . . . [which] was 'wasteful and irrational.'"  *Id*. (quoting *Fausto*, 484 U.S. at 445).  *Elgin* warned that allowing petitioners to challenge an employment action first in district court "would reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review the CSRA was designed to avoid."  *Id*. at 14.  The Court further explained that bringing actions first in the MSPB can resolve many "preliminary questions unique to the employment context" which "may obviate the need to address the constitutional challenge."  *Id*. at 22–23.  That rationale underlying *Elgin*'s holding supports finding Congress' intent to channel despite the temporary lack of a Senate-confirmed Special Counsel or vacancies on the MSPB.

At bottom, *AFGE v. Trump*, *AFGE v. OPM*, *Widakuswara v. Lake*, and *Nat'l Ass'n of Immigr. Judges v. Owen* have not altered the legal landscape as to the personnel claims at issue here, and Plaintiffs' claims remain channeled by the FSLMRS and CSRA.

### b.  Plaintiffs Lack Organizational Standing Because They Have Not Pleaded Cognizable Injury to Their Professed Missions.

Statutory channeling aside, Plaintiffs cannot show that they have organizational standing to sue on behalf of themselves. Plaintiffs here are not agency employees, so they are not themselves "the object of the government action or inaction" they "challenge," meaning that although "standing is not precluded . . . it is ordinarily 'substantially more difficult' to establish." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). And organizations, like all plaintiffs, must prove an injury-in-fact that is fairly traceable to the challenged actions. For organizations like Plaintiffs, that showing requires "more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Each organization must establish that the challenged conduct "'perceptibly impaired' the organization's *ability to provide* services." *Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)) (emphasis added).

The limited scope of organizational standing under *Havens* is clarified in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The *Alliance* plaintiffs, four medical associations and several individual doctors, challenged FDA actions regarding the regulation of mifepristone, a pregnancy-termination drug, making it easier for doctors to prescribe and for pregnant women to obtain the drug. *Id.* at 376. Plaintiffs did not prescribe or use mifepristone, and FDA did not impose any requirements on plaintiffs. The *Alliance* Court observed that organizations may "sue *on their own behalf* for injuries they have sustained," *id.* at 393 (citing *Havens*, 455 U.S. at 379 n.19) (emphasis added), but made clear that an organization cannot establish injury by asserting the right of others: "By requiring the plaintiff to show an

29

injury in fact, Article III standing screens out plaintiffs who might only have a general legal, moral, ideological, or policy objection to a particular government action," *id.* at 381.

The *Alliance* Court explicitly rejected the organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Alliance*, 602 U.S. at 395. The *Alliance* Court noted that the organization plaintiff in *Havens*, HOME, "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* The false information provided by the realty defendant about apartment availability "perceptibly impaired" HOME's counseling and referral services, meaning that the realty's "actions directly affected and interfered with" the organization's "core business activities" distinct from its advocacy activities—"not dissimilar," the *Alliance* Court added, "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* By contrast, FDA's relaxation of the regulation of mifepristone in *Alliance* did not present any similar impediment to the medical associations' business. *Id.* A plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id.* at 394. Indeed, if diversion of resources could confer standing on an organization, that "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies," which take the Article III courts far outside their properly limited role. *Id.* at 395.

Like the plaintiffs in *Alliance*, Plaintiffs here are unable to identify direct harms to them. Plaintiffs claim they "will immediately lose millions of dollars of revenue" if all employees covered by the EO are terminated. Second Am. Compl. ¶ 101. Plaintiffs further allege that the corresponding loss of dues will adversely impact Plaintiffs' ability to carry out their missions.

Second Am. Compl. ¶ 102.  But here, what is at issue is, at most, each Plaintiffs' "pocketbook injury" (the lost dues) from individual employee-specific agency decisions.  *Collins v. Yellen*, 594 U.S. 220, 243 (2021).  Although Plaintiffs have sought broad relief against a vast array of agency decisions regarding employment, in Article III courts, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Gill v. Whitford*, 585 U.S. 48, 72, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

Going further than those pocketbook injuries would flout the principle that the "standing inquiry [must be] especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).  In that regard, no Plaintiff can show Article III standing based on anything less than "concrete" injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Plaintiffs' broad fears about employment outcomes or loss of bargaining power lack the requisite concreteness.  *See, e.g.,* Second Am. Compl. ¶¶ 99–101 ("NTEU has thousands of dues-paying members who would be considered nonessential during a lapse of appropriations. . . If all employees previously designated as nonessential during the lapse in appropriations were terminated, . . . NTEU will immediately lose millions of dollars of revenue.").  And Plaintiffs' forecasts of harms to their status and bargaining power "amount[] to nothing more than speculation about future events that may or may not occur[.]"  *See Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict

with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd*, 2003 WL 349713 (D.C. Cir. 2003).

Plaintiffs argue the Second Amended Complaint's allegations that RIFs and other firings have terminated bargaining unit employees "directly address" Defendants' standing arguments. Reply, ECF No. 46 at 3. But Plaintiffs miss the point. Even if Defendants' actions were unlawful (which they were not, *see infra*, Section III) Plaintiffs would only have standing to redress for their "pocketbook injury"—lost dues—not to enjoin personnel actions government-wide.

Plaintiffs' reliance on *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) does help their standing here. There, the unions contested a final rule that would allow the Department of Homeland Security (DHS) to "unilaterally abrogate lawfully negotiated and executed collective bargaining agreements." *Id*. at 848. The unions argued that the final rule would hurt their bargaining power because they could not "effectively formulate strategies. . . to secure concessions from DHS because DHS. . . could later neutralize any concession [it] made[.]" *Id*. at 853. Thus, the final rule meant the unions would "enter collective bargaining with little to bargain over. . . fac[ing] an ever-present threat that DHS will abrogate any agreement that they reach with management." *Id*.

Contrast *Chertoff* with the current situation. Here, by Plaintiffs' admission, the only alleged harm is an expectation of reduced dues, which Plaintiffs in turn allege will lead to a loss in bargaining power. Second Am. Compl. ¶¶ 98-112. True, Plaintiffs claim some adverse personnel actions, Second Am. Compl. ¶ 82 ("NTEU has at least 7,000 probationary employees or trial dues-paying members who have been terminated."); *id*. ¶ 59 ("HHS told NTEU that 2,453 NTEU bargaining unit employees received a RIF notification letter."), but they do not explain how those terminations have injured their bargaining power beyond conclusory statements that "[t]he strength

32

and influence of any union correlate directly with the size of its membership[]" and "the union's influence in negotiating agreements with other agencies or lobbying Congress for benefits that help federal employees will be diminished."  Second Am. Compl. ¶¶ 108–109.  This speculative chain of possibilities fails to establish cognizable injury.  Furthermore, alleged injuries from union members electing deferred resignations would represent losses attributable to those members' free choices, and "[i]t is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the independent responses and choices of third parties."  *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019) (Wilkinson, J.).  Thus, even if Plaintiffs have standing to litigate their "pocket-book injury" over lost dues, they have not demonstrated standing to seek relief against the vast array of challenged actions.

### c.   The Union Plaintiffs Lack Associational Standing Because the Claims Asserted Necessitate Individualized Findings.

Nor can Plaintiffs show associational standing.  Associational standing requires each Plaintiff to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  At issue here is the first prong because Plaintiffs neglect to name even one employee who has individual standing.

Plaintiff's associational standing allegations focus on the challenged actions' purported impact on its members.  Second Am. Compl. ¶ 95 ("The Unions bring this action on behalf of themselves because the Executive actions described above will end the federal employment of tens of thousands of their members.").  An organization asserting standing on behalf of its members

33

must, as threshold matter, "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "[I]t is not enough to aver that unidentified members have been injured." *Sorenson Commc'n, LLC v. FCC*, 897 F.3d 214, 224 (D.C. Cir. 2018). "Instead, at the very least, the identity of the party suffering an injury in fact," and who would thus have standing to bring suit individually, "must be firmly established." *Pub. Citizen v. Trump*, 297 F. Supp. 3d 6, 19 (D.D.C. 2018) (internal alterations and quotation marks omitted); *see also Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011).

Yet Plaintiffs fail to identify any specific member that has standing. *See generally* Second Am. Compl. Instead, Plaintiffs assert "NTEU has at least 7,000 probationary or trial dues-paying member who have been terminated[,]" Second Am. Compl. ¶¶ 82; "that 2,453 NTEU bargaining unit employees received a RIF notification" at HHS and seventy members received RIF notices at CFPB; Second Am. Compl. ¶ 53, 59; that the "IRS plans to cut up to 40% of its workforce," Second Am. Compl. ¶ 64; and that "'swaths of the workforce'" have elected deferred resignation, Second Am. Compl. ¶¶ 86–94. But "the questions of who specifically will suffer harm—and when, how, or why they will suffer it—remain unanswered. The associational-standing doctrine demands more." *Ctr. for Biological Diversity v. Nishida*, No. CV 21-119 (RDM), 2021 WL 827189, at *1– 2 (D.D.C. Mar. 4, 2021); *see also Pub. Citizen*, 297 F. Supp. 3d at 18 (no associational standing where plaintiffs "made no effort—either in their complaint or in the multiple declarations they have submitted—to identify a specific member who has suffered, or who is likely to suffer, an injury in fact"). Plaintiffs' failure to identify even a single member alleged injured by the challenged policies compels dismissal of its suit.

## II.    COUNTS III, IV, AND V ARE UNREVIEWABLE UNDER THE APA.

Even if Plaintiffs had sufficiently alleged and proven subject-matter jurisdiction (which they have not), their claims do not plausibly state a claim under the APA for the following reasons: (1) Plaintiffs do not allege any *agency* action, (2) they do not allege any *final* action, and (3) an adequate alternative remedy is available to Plaintiffs.

### a.   Plaintiffs Do Not Allege Any Agency Action.

Review under the APA is available only for "agency action." 5 U.S.C. § 704. Presidential actions are not agency actions reviewable under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Tulare Cnty.*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001).

Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to the EO under the APA are not reviewable, irrespective of whether they bring those claims against the President, as a technicality. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (cause of action under APA unavailable to challenge executive order because APA applies only to "person suffering legal wrong because of *agency* action."). Thus, Plaintiffs' request to enjoin the EO as contrary to law are non-cognizable under the APA.[7]

Plaintiffs' challenge to EO implementation likewise fails. First, where Plaintiffs effectively seek review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (where Department of State was acting on President's behalf,

---

[7] Though Plaintiffs do not directly claim the EO violates the APA, *see* Second Am. Compl. ¶¶ 113—126 (Counts I–V), they request the Court to "[e]join[] the implementation of Section 3(c) of [the EO.]" *Id.*, Request for Relief (B), at 31. Defendants include this argument to refute Plaintiffs' Requested Relief under any applicable theory.

actions not reviewable under APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co v.*

*Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("several cases have concluded that an agency's

action on behalf of the President, involving discretionary authority committed to the President, is

'presidential' and unreviewable under the APA[,]" thus State Department action on behalf of

President unreviewable under APA), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018).

Second, and even more fundamentally, Plaintiffs identify no discrete action that any of the

defendant agencies have taken here that is subject to APA review.  A plaintiff must plead "an

identifiable action or event."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *see Norton*

*v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 62 (2004).  The agency actions that can properly

be challenged under the APA are those that are "circumscribed [and] discrete."  *SUWA*, 542 U.S.

at 62.  By contrast, the APA does not provide for "general judicial review of" agency conduct,

*Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a

contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir.

2013) (cited approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 n.13 (5th Cir. 2020)), or

making a budget request, *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13,

20 (D.C. Cir. 2006).  The APA thus contains "a prohibition on programmatic challenges," meaning

"challenges that seek 'wholesale improvement' of an agency's programs by court decree."

*Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting

*Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)); *Am. Forest Res. Council v. United*

*States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the

plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed

to carry out the . . . Act's general directives").

Here, Plaintiffs' Second Amended Complaint does not challenge a discrete agency action but seeks "wholesale improvement" of Defendants' employment policies.  Though they cite several individual employment actions, Second Am. Compl. ¶¶ 59, 64, 82, their claims do not directly challenge these actions but, instead, broadly oppose "attempts to dismantle the federal government through the mass firings of hundreds of thousands of employees. . ."  Second Am. Compl., at 4; *see also id.*, Requested Relief (A–F) (seeking declarative and injunctive, not compensatory, relief).  These are the exact types of broad programmatic challenges that seek a "wholesale improvement" of an agency's general processes by court decree.  *Alabama-Coushatta Tribe of Tex.* 757 F.3d at 490.  And courts are simply not "empowered to enter [such] general orders compelling compliance with broad statutory mandates," under the APA.  *Lujan*, 497 U.S. at 66-67.

If Plaintiffs challenge the Workforce Memorandum, *see* Second Am. Compl. ¶¶ 48–51, that too is unreviewable.  The APA defines "agency action" to include rules, orders, licenses, sanctions, and relief. 5 U.S.C. § 551(13).  The Act further defines each of these terms. *Id.* § 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief").  Even construed expansively, none encompasses the Workforce Memorandum, which is *inter-agency correspondence* regarding agency' submission of ARRPs and setting forth guidance on what those ARRPs should contain, in-line with OPM's statutory functions.  *See* 5 C.F.R. § 351.205 ("[OPM] may establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force. OPM may examine an agency's preparations for reduction in force at any stage.").

### b.  Plaintiffs Do Not Allege Any Final Action.

Further, agency action must be "final" to be reviewable under the APA.  5 U.S.C. § 704. Agency action is final only if two requirements are met.  The agency action "must mark the consummation of the agency's decisionmaking process," and "must be one by which rights or

obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

Any alleged removals, threatened removals, or other personnel actions taken as to any of Plaintiffs' members are not actions involving the determination of rights or obligations belonging to Plaintiffs as federal employee unions. As explained above in describing Plaintiff's lack of Article III standing, there is no plaintiff before the Court who has been removed or otherwise suffered an unwelcome personnel action; thus, Plaintiffs cannot obtain APA review of any such personnel actions.[8] Plainly, there is no final agency action here so far as the instant Plaintiffs are concerned. And with respect to their members, as discussed above the only rights or obligations that have been determined plainly relate to their employment, and those claims are subject to the exclusive channeling provisions of the CSRA or the FSLMRS.

As to the Workforce Memorandum, Plaintiffs do not explain how it "consummat[es]" any agency's decisionmaking process in such a way that legal consequences flow to Plaintiffs. *U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (citation omitted). As the D.C. Circuit has explained, this prong of the *Bennet* test is measured by the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

The Workforce Memorandum has no such effect. It begins an iterative process between agencies and OPM and OMB, while explaining in broad terms what the agency ARRPs should include. Although Plaintiffs imply that the Workforce Memorandum provides final direction to

---

[8] APA review is inapplicable in any event, as the CSRA displaces the broader APA in the federal personnel context. *See United States v. Fausto*, 484 U.S. 439, 444, 108 S. Ct. 668, 672, 98 L. Ed. 2d 830 (1988) (CSRA prevents review of personnel actions in district court); *Fornaro v. James*, 416 F.3d 63, 68 (D.C. Cir. 2005) (persons that generally fall within the CSRA's scheme, even those that lack rights or remedies, cannot assert claims under the broader APA).

agencies, *see* Second Am. Compl. ¶¶ 48–51, the cited passages underscore that it provides broad guidance. *Id.* ¶¶ 49 ("The [Workforce Memorandum] directed agencies to submit Phase 1 Agency ARRPs. . . that included, among other information, any statutes that established the agency, a list of employees 'not typically designated as essential during a lapse in appropriations,' whether parts of the agency should be eliminated or consolidated, a 'suggested plan for congressional engagement to gather input and agreement on major restructuring efforts,' and the agency's timeline for implementation.") (quoting Workforce Memorandum at 2–4).

More fundamentally, the finality requirement is "interpreted in a pragmatic and flexible manner" that "focus[es] on the practical . . . effects of the agency action." *Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (citation omitted). The Workforce Memorandum is multiple steps removed from any agency action that might have any actual effect on Plaintiffs (i.e., any RIFs undertaken pursuant to the EO and an ARRP), which include: (1) the relevant agency's preparation of a Phase 1 ARRP; (2) that agency's preparation of a Phase 2 ARRP; and (3) any RIFs that are noticed and effectuated.

The statement in the Workforce Memorandum that agencies should submit ARRPs to OMB and OPM for "review and approval" does not change this analysis. That language cannot possibly bear the weight that Plaintiffs seem to assign to it, *see* Second Am. Compl., Counts II & III, and does not alter the fundamental point that individual agencies (not OPM and OMB) are in charge of crafting and implementing ARRPs, as well as making decisions on RIFs.

This is clear for at least eight reasons. First, the EO simply provides agencies with broad guidance and does not dictate specific RIFs. Second, the EO directly states that it shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof." EO, § 5(a)(i). Third, President Trump has publicly stated that

39

agencies are responsible for developing and implementing RIFs. *See* Reuters, *Trump Tells Cabinet Secretaries They, Not Musk, are in Charge of Staff Cuts* (March 7, 2025), *available at* https://www.reuters.com/world/us/trump-tells-cabinetsecretaries-they-not-musk-are-charge-staff-cuts-2025-03-06/. Fourth, even the Workforce Memorandum's very broad guidance concerning the contents of ARRPs relates only to the *information* to be included in the ARRPs, not what agencies *should do* (to take just one example, Phase 2 ARRPs should include "all reductions" of FTE positions and otherwise, Workforce Memo at 5, but a requirement that the agency list all reductions it has chosen does not mean the agency has to make any specific reductions in the first place). Fifth and sixth, the Workforce Memorandum makes clear that agencies should only take actions consistent with their statutory authority and that agencies should not undertake any action that would impair service delivery functions. *Id*. at 1, 2, 3. Seventh, ARRPs themselves are nothing more than agency planning documents that are distinct from any RIFs themselves. *See id*. at 7 (before a RIF is implemented and an employee separated from service, there must be a formal RIF notice period of 60 days (or 30 days if the agency obtains an OPM waiver), in which affected employees are issued formal RIF notices, as well as provided appeal rights, career transition assistance, and priority placement options). And eighth, this argument ignores the roles OMB and OPM play in this context. "OPM may examine an agency's preparations for reduction in force at any stage." 5 C.F.R. § 351.205. "When OPM finds that an agency's preparations are contrary to the express provisions or to the spirit and intent of these regulations or that they would result in violation of employee rights or equities, OPM may require appropriate corrective action." *Id*. And the EO directed agency heads to submit their reorganization plans to OMB.

The Workforce Memorandum is thus far removed from any action with an actual effect on Plaintiffs. Plaintiffs cannot challenge employee removals under the APA, *see supra*, but if they

could, nothing short of removal would qualify as "final" agency action.  And even if the Workforce Memorandum and ARRPs represented "agency action," they would be "preliminary, procedural, or intermediate agency action" not "subject to review on the review of the final agency action."  5 U.S.C. § 704.

### c.  The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs.

Review under the APA is available only where "there is no other adequate remedy in a court."  5 U.S.C. § 704.  The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'"  *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted).  A remedy may be adequate even if "the arguments that can be raised [in the alternative proceeding] are not identical to those available in an APA suit."  *Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016).  A plaintiff lacks a cause of action under the APA if an alternative adequate judicial remedy exists.  *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit).  As already described above in Section I, this suit is, in essence, an attempt to obtain mass adjudication of employment claims, and the FSLMRS provides an adequate alternative.  Plaintiffs are therefore barred from bringing this suit in this Court in the first instance.  After all, as this Court has already ruled, "it likely lacks subject matter jurisdiction over NTEU's

claims[]" because "the union's claims fall within the exclusive statutory scheme[.]" *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025) (citing *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025)) (holding likewise as to unions' claims DRP challenge).

### III.    THE EO AND WORKFORCE MEMORANDUM SATISFY THE APA.

Even if the Court could review the EO and Workforce Memorandum under the APA both are plainly lawful and should be upheld requiring dismissal of Counts III, IV, and V for that reason.

The EO makes clear that any RIFs may be conducted only where "consistent with applicable law." EO, § 3(c). The Order also states it shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof." *Id*. § 5(a)(i). This consistent-with-applicable-law proviso is a lawful way for a President to exercise his undoubted authority over the federal workforce. In fact, in staying a preliminary injunction previously entered by a district court in the Northern District of California, *see* Part I.ii and n.6, *supra*, the Supreme Court recently opined that the Government is likely to succeed on its argument that the EO is lawful. *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025). And in a concurrence, Justice Sotomayor emphasized that the EO "directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,' . . . and the resulting joint memorandum from the Office of Management and Budget and the Office of Personnel Management reiterates as much." *Id*. (Sotomayor, J., concurring). Thus, she opined that the Court had "no occasion to consider whether [reorganizations and RIFs] can and will be carried out consistent with the constraints of law[]" without having any such reorganizations and RIFs themselves before it. *Id*.

42

Justice Sotomayor's concurrence underscores that courts "cannot ignore . . . unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing" presidential directives, such as the EO at issue here. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. Nov. 25, 2020) (majority opinion for three-judge district court). A court that disregards such qualifications fails to give effect to the presidential directive as drafted, and also acts contrary to the presumption of regularity under which courts assume that co-equal branches of government will follow the law. *See NARA v. Favish*, 541 U.S. 157, 174 (2004) (stating that "in the absence of clear evidence to the contrary, courts presume that [public officials] have properly discharged their official duties" (citation omitted)). Rather, an Executive Order with a lawfulness constraint almost uniformly cannot be unlawful because, if the agency "may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Construction Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

This type of directive is a straightforward way for a President to exercise his undoubted authority to require a subordinate agency to determine what the law allows and then take whatever action is legally available to promote the President's priorities. The EO fits that mold. It does not mandate any RIFs, but directs agencies to prioritize certain areas in RIFs that do take place—e.g., "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives" as well as "all agency initiatives, components, or operations that my Administration suspends or closes." EO, § 3(c). And again, it does so only to the extent the law allows such prioritization. *Id*.

A consistent-with-law proviso does not categorically immunize an Executive Order or similar directive from review. In the rare instances where courts have held that such consistent

with- law qualifications are not dispositive, they have done so in only narrow circumstances, where a directive could not be implemented lawfully.  In *Allbaugh*, for example, the D.C. Circuit suggested that despite such a clause the plaintiffs there could facially challenge the Executive Order at issue if it lacked "any valid application."  295 F.3d at 33.  And other courts have reached similar conclusions where a directive "unambiguously commands action" incompatible with the law. *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018); *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) (similar).

The Ninth Circuit's decision in *San Francisco* is particularly instructive on the narrowness of this exception.  There, the Ninth Circuit concluded that giving effect to the savings clause would mean the Executive Order itself would do nothing, and the court refused to accept the assertion that the Order there was meaningless.  897 F.3d at 1238 (declining to credit argument "that the Executive Order is all bluster and no bite").  Similarly, in *HIAS* the Fourth Circuit considered an Executive Order it found essentially "supplant[ed]" the statutory criteria.  985 F.3d at 322.

By contrast, the EO does not come close to commanding actions that are incompatible with law.  Congress has expressly recognized agencies' authority to implement RIFs for decades.  *See supra*, ppg 3–7.  OPM has promulgated an extensive set of regulations governing use of RIFs (regulations Congress has also authorized and directed OPM to promulgate).  5 U.S.C. § 3502.  Agencies have repeatedly engaged in RIFs, including Presidentially directed RIFs during the Truman, Reagan, and Clinton Administrations. *See supra* pp. 3–8.  Indeed, if anything, the EO is less extensive than previous Presidentially-directed RIFs—President Clinton directed reductions in the form of specific percentage requirements; directed that at least ten percent of cuts come from the Senior Executive Service, GS-15 and GS-14 levels; and provided agencies with a required timeline to complete the cuts in Executive Order 12839. *See supra* pp. 6-8.  Finally, Justice

Sotomayor's concurrence makes clear the Supreme Court's recognition that agencies can lawfully comply with the EO. *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) (Sotomayor, J., concurring). Thus, there is no colorable argument that the EO is unlawful on its face.

Likewise as to the Workforce Memorandum: even if Plaintiffs' challenge to it were reviewable under the APA, it too is lawful. It simply provides broad guidance on what ARRPs should contain, and makes clear to agencies that they should only take actions consistent with their statutory authority. Workforce Memorandum at 2. Likewise, it makes clear that agencies should not undertake any action that would impair service delivery functions. *Id.* at 2–3.

In addition, it is logical (and lawful) to rely on OPM and OMB in this manner. As noted above, Congress expressly empowered OPM to promulgate regulations governing RIFs, and OPM has done just that. The regulations make clear that "OPM may examine an agency's preparations for reduction in force at any stage" and that "[w]hen OPM finds that an agency's preparations are contrary to the express provisions or to the spirit and intent of these regulations or that they would result in violation of employee rights or equities, OPM may require appropriate corrective action." 5 C.F.R. § 351.205. And just as President Trump relied on OMB to set out the details of his policy governing reduction of federal personnel, President Clinton relied on OMB to prescribe similar guidance on the same issue. Exec. Order 12839, 58 Fed. Reg. 8515 (Feb. 10, 1993).

More generally, the Workforce Memorandum is consistent with the practice of previous administrations that have relied upon OMB to ensure that agency policy was responsive to the President's policy goals. As now-Justice Kagan explained, President Clinton exercised "presidential directive authority to initiate agency action[,]" thus "accelerat[ing] the shift toward[s] early White House involvement by establishing an instrument for centralized control that

functioned before the agencies had adopted a proposal (or perhaps even taken up an issue in the first instance)."  *See* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2316 (2001).  In this way, President's Clinton's efforts corresponded to President Reagan's efforts to "attain[] an ever greater capacity to oversee, supervise, and even to direct administrative action." *Id*. at 2317.  Such efforts are not unlawful; rather, they "promote[] accountability" by "enhanc[ing] transparency" and "establish[ing] an electoral link between the public and the bureaucracy, increasing the latter's responsiveness to the former." *Id*. at 2332.  The Workforce Memorandum is more of the same, and so it is straightforwardly lawful.

## IV.    COUNTS I AND II PLEAD NO CONSTITUTIONAL VIOLATION.

Plaintiffs also cannot succeed on their claims in Counts I and II that Defendants violated the Constitution.  As noted above, *see supra* Section I(B), Plaintiffs have not established standing to sue.  Moreover, Plaintiffs' claims are statutory, not constitutional.  Plaintiffs' Count II alleges that Defendants' actions "conflicts with Congress's [*sic*] mandate in the [Inflation Reduction Act] to expand and fortify the IRS to improve taxpayer services."  Second Am. Compl. ¶ 117 (Count II).  But even if Plaintiffs were correct (which they are not), that claim alleges only a statutory violation.   The Supreme Court has rejected the argument, asserted by Plaintiffs here, "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Dalton v. Specter*, 511 U.S. 462, 471 (1994).  Plaintiffs' "claims simply alleging that the President has exceeded his statutory authority" under RIF regulations or any other statute "are not 'constitutional' claims." *Id.* at 473.

This case thus sharply contrasts with *Youngstown Sheet & Tube Co. v. Sawyer*, in which the President had directed the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," and conceded the absence of statutory

authority. 343 U.S. 579, 585-87 (1952). Plaintiffs have not suggested that either Defendants'
regulations or their statutory authority for promulgating these regulations are themselves
unconstitutional. *Dalton*'s reasoning thus applies here and refutes Plaintiffs' argument that they
are likely to succeed on their separation-of-powers claim. *See Ctr. for Biological Diversity v.
Trump*, 453 F. Supp. 3d 11, 51-54 (D.D.C. 2020) (rejecting separation-of-powers claim based on
Appropriations Clause under *Dalton* because "[a]t bottom, this is just an allegation that [executive
officials] exceeded their statutory authority"). This case concerns "simply" whether Defendants
have "exceeded [their] statutory authority" and "no constitutional question whatever is raised"—
"only issues of statutory interpretation." *Dalton*, 511 U.S. at 473-74 & n.6 (citation omitted).

In contending that the challenged actions violate the separation of powers, Plaintiffs
advance the same argument the Supreme Court rejected in *Dalton*. Plaintiffs' putative separation-
of-powers claims hinge entirely on, respectively, whether Defendants acted in accordance with
regulations regarding agency reductions in force (and their concomitant statutory authorization),
and whether Section 3(c) of the EO is, on its face, inconsistent with existing statutes. *See* Pls. TRO
Mot. at 13–14. The outcome of these questions depends on the resolution of statutory and
regulatory claims rather than any unique separation-of-powers principles. If Plaintiffs' argument
were accepted, then any action by an agency alleged to be in violation of a statutory provision
could also for the same reason be alleged to violate the constitutional separation of powers. "Under
*Dalton*, [Plaintiffs] cannot recast these types of claims as constitutional." *Ctr. for Biological
Diversity*, 453 F. Supp. 3d at 53; *see Dalton*, 511 U.S. at 474 ("distinction between claims that an
official exceeded his statutory authority, on the one hand, and claims that he acted in violation of
the Constitution, on the other, is too well established to permit this sort of evisceration.").

47

Plaintiffs' Count I fares no better than Count II. Count I alleges that Defendants' actions are *ultra vires* because "they undermine Congress's [*sic*] authority to set and fund the missions of federal agencies[]" violating the separation of powers. Second Am. Compl. ¶¶ 113—117. But *ultra vires* claims are generally limited to circumstances where a plaintiff is completely deprived of a means of vindicating its statutory rights and lacks any "alternative procedure" for judicial review. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022); *see Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (*ultra vires* imposes "demanding standard" because it is based on assumption Congress has not statutorily barred judicial review of agency action). The strict limitations on non-statutory review are "nearly insurmountable." *DOJ v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993); *see Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (describing such a claim as "essentially a Hail Mary pass" that "rarely succeeds") (Kavanaugh, Cir. J., for the Court). Indeed, Plaintiffs must plausibly allege that denial of judicial review would "wholly deprive [them] of a meaningful and adequate means of vindicating" their rights. *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991). But Plaintiffs here have an adequate means of vindicating their rights through the FSLMRS framework. *See supra*, Section I(A).

In any event, the *ultra vires* claims fail on their merits for the same reasons as those described above as to the APA, given that "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrower scope.'" *See Fed. Express*, 39 F.4th at 766 (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)); *see also supra*, Section III. Thus, Plaintiffs fail to allege a plausible constitutional violation in either Count I or II.

**CONCLUSION**

For these reasons, the Court should grant Defendants' motion to dismiss and dismiss this case in its entirety.

Dated: July 11, 2025

Respectfully submitted,

BRETT SCHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER HALL
Assistant Branch Director
Federal Programs Branch

*/s/ Richard C. Giles*
RICHARD C. GILES
Trial Attorney (WY Bar No. 8-7222)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
(202) 616-8482
Richard.C.Giles@usdoj.gov

*Counsel for Federal Defendants*