# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:25-cv-00420-CRC |
| v. | ) ) | |
| DONALD J. TRUMP, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS</u>

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ....................................................................................iii

INTRODUCTION .....................................................................................................1

BACKGROUND ........................................................................................................3

    I.     Factual Background. ......................................................................................3

        A.    The President has ordered widespread RIFs. .........................................3

        B.    OPM directed RIFs of probationary employees. ...................................5

        C.    OPM pressured employees to opt into an early retirement program. ...5

    II.    Procedural Background. ................................................................................5

    III.   Legal Background. .........................................................................................6

ARGUMENT .............................................................................................................8

    I.     This Court Has Jurisdiction Because Alternate Administrative Channels Are No Longer Available and the *Thunder Basin* Factors Weigh Against Channeling. .................................................................................................9

        A.    Congress could not have intended claims to be administratively channeled when the Administration has deliberately abolished those channels. ...............................................................................................10

            1.    Exclusions Executive Order. ......................................................11

            2.    Weakening of independent agencies. ........................................13

        B.    *Thunder Basin* factors weigh against channeling. ..............................16

    II.    The Unions Have Suffered Concrete Loss of Dues and Bargaining Power and Thus Have Standing. ...............................................................................20

        A.    Loss of dues. .........................................................................................21

        B.    Loss of bargaining power. ....................................................................21

    III.   Congress Establishes and Funds Agencies to Carry Out Their Missions, and the Administration's Evisceration of Those Agencies Violates Separation of Powers (Count I). ................................................................25

A.   Congress has the constitutional authority to create and fund agencies. .................................................................................... 25

B.   The President's actions intrude on Congress's powers. ........................ 27

C.   Defendants mistakenly argue that Count I pleads only a statutory violation. ................................................ 30

IV.   The Administration Has Acted Ultra Vires by Slashing the IRS in Contravention of the Inflation Reduction Act (Count II). ......................... 31

V.   Defendant OMB, OPM and Other Agencies' Implementation of the Workforce Order and Other Actions Violate the APA (Claims III-V). ...... 34

A.   Claims III-V challenge agency, not Presidential, action reviewable under the APA. .......................................................... 34

B.   The OMB/OPM Memo and ARRPs are discrete agency actions reviewable under the APA. ................................................ 35

C.   The OMB/OPM Memo and implementation of the ARRPs are "final" actions reviewable under the APA. ...................................... 38

1.   The OMB/OPM Memo. ........................................................ 39

2.   OMB's and OPM's Approvals of ARRPs. ........................................ 40

3.   Agencies' ARRPs and Their Execution. ........................................ 41

D.   The Unions have no alternate, adequate remedy to the APA. ............. 42

E.   Claims III-V allege plausible APA violations on the merits................. 43

CONCLUSION............................................................................ 50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012) .................................................. 44

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ........................................................... 39

*AFGE v. OPM*, 771 F. Supp. 3d 1127 (N.D. Cal. 2025) ........................................ 18, 19

*AFGE v. Trump*, No. 25-cv-03698-SI, 2025 U.S. Dist. LEXIS 89344 (N.D. Cal. May 9, 2025) ..................................................................................................... 18

*AFGE v. Trump*, No. 25-cv-03698-SI, 2025 U.S. Dist. LEXIS 98195 (N.D. Cal. May 22, 2025) ................................................................................................... 41

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) ........................................ 9, 10, 19, 20

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023)............ 37, 38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................................... 9

*Axon Enter. v. FTC*, 598 U.S. 175 (2023) ................................................................... 19

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004) ......................................................... 8

*Bennett v. Spear*, 520 U.S. 154 (1997)........................................................ 24, 39, 40, 42

*Bessent v. Dellinger*, No. 24A790 (Feb. 16, 2025) ...................................................... 15

*Bhd. of Locomotive Eng'rs & Trainmen v. FRA*, 972 F.3d 83 (D.C. Cir. 2020) ... 40, 41

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................... 43

*Buckley v. Valeo*, 424 U.S. 1 (1976)............................................................................ 26

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).......................... 33, 35

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................. 46

*Clinton v. City of New York*, 524 U.S. 417 (1998)...................................................... 33

*Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239 (D.C. Cir. 1983) ............................... 24

*Collins v. Yellen*, 594 U.S. 220 (2021) ....................................................................... 21

*CREW v. DHS*, 507 F. Supp. 3d 228 (D.D.C. 2020)................................................... 24

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) ............................................. 21

*Dalton v. Specter,* 511 U.S. 462 (1994) ........................................................................ 31

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .......... 48, 49

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265 (D.C. Cir. 2005) ................................................................................ 43

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) ............................................................. 19

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ....................................... 48, 50

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ......................................................... 32

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) .................... 26

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167 (2000) ........................................................................................................................ 23

*Fund for Animals, Inc. v. BLM*, 460 F.3d 13 (D.C. Cir. 2006) ............................ 38, 39

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) .................................................. 35

*Grundmann v. Trump*, No. 25-425, 2025 U.S. Dist. Lexis 113425 (D.D.C. June 13, 2025) ......................................................................................................................... 7

*Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511 (D.C. Cir. 2016) ............................. 25

*Harris v. Bessent*, No. 25-412 (D.D.C. Feb. 13, 2025) ................................................. 16

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ............................................. 2, 27, 29

*Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243 (D.C. Cir. 1970) ........................................................................................................ 22

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005) ....................... 8

*Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 U.S. Dist. LEXIS 105237 (D.D.C. June 3, 2025) ........................................................................................................... 35

*League of Cal. Cities v. FCC*, 118 F.4th 995 (9th Cir. 2024) ...................................... 50

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ...................................... 36

*McMahon v. New York*, No. 24A1203, 2025 U.S. LEXIS 2670 (July 14, 2025) ...... 9-10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .... 48

*Myers v. United States*, 272 U.S. 52 (1926)............................................................. 26, 30

*NAIJ v. Neal*, 693 F. Supp. 3d 549 (E.D. Va. 2023) .................................................... 14

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025) ........................................................................................................................ 47

*National Association of Immigration Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025) ................................................................................................................ 1

*National Mining Association v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002)............................................................................................... 17, 18

*New York v. Kennedy*, No. 25-cv-196-MRD-PAS, 2025 U.S. Dist. LEXIS 124822 (D.R.I. July 1, 2025) ........................................................................................... 18, 19

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ..................... 37, 38

*NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006)....................................................... 22

*NTEU v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268 (D.D.C. Apr. 28, 2025)............................................................................................. 11

*NTEU v. Trump*, No. 25-5157, 2025 U.S. App. LEXIS 11952 (D.C. Cir. May 16, 2025) ........................................................................................................................ 12

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) .................................................... 36

*Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131 (D.C. Cir. 2010) ................................. 39

*Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153 (1st Cir. 1995) ........................................ 22

*Scenic America, Inc. v. U.S. Department of Transportation*, 836 F.3d 42 (D.C. Cir. 2016) ....................................................................................................................... 40

*Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 512 F.3d 252 (6th Cir. 2008) ....................................................................................................................... 21

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) ....................... 25

*Soundboard Ass'n v. FTC*, 888 F.3d 1261 (D.C. Cir. 2018)....................................... 39

*Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021)................................................... 35

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)................................... 9, 10, 16

*Train v. New York*, 420 U.S. 35 (1974) ....................................................... 30

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)..................................... 21

*Trump v. AFGE*, No. 24A1174, 2025 U.S. LEXIS 2667 (July 8, 2025).... 18, 41, 44, 45

*Trump v. Wilcox*, 145 S. Ct. 1415 (2025)..................................................... 15

*Turgeon v. FLRA*, 677 F.2d 937 (D.C. Cir. 1982) ...................................... 12

*U.S. Att'ys Off. S.D. Tex.*, 57 F.L.R.A. 750 (2002)...................................... 12

*U.S. Dep't of Air Force, Air Force Materiel Command Robins Air Logistics Ctr. Robins Air Force Base, Ga.*, 66 F.L.R.A. 589 (2012) ............................... 12

*United States v. Fausto,* 484 U.S. 439 (1988) ............................................ 13

*Village of Bald Head Island v. U.S. Army Corps. of Engineers*, 714 F.3d 186 (4th Cir. 2013) ........................................................................................... 37

*Warth v. Seldin,* 422 U.S. 490 (1975)........................................................... 23

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................... 26, 28, 33

## Statutes and Bills

2 U.S.C. §§ 681–688................................................................................. 26

5 U.S.C. § 551.......................................................................................... 38

5 U.S.C. § 701.......................................................................................... 35

5 U.S.C. § 704.......................................................................................... 42

5 U.S.C. § 706.................................................................................... 47, 48

5 U.S.C. §§ 901–912................................................................................ 27

5 U.S.C. §§ 1101–1105............................................................................ 48

5 U.S.C. § 1202.................................................................................... 7, 13

5 U.S.C. § 1211.................................................................................... 8, 13

5 U.S.C. § 3502.................................................................................. 47, 48

5 U.S.C. § 7104.................................................................................... 6, 13

5 U.S.C. § 7105 ........................................................................................ 6

5 U.S.C. § 7117 ........................................................................................ 6

5 U.S.C. § 7118 ........................................................................................ 6

5 U.S.C. § 7511 ........................................................................................ 7

5 U.S.C. § 7512 ................................................................................... 7, 19

5 U.S.C. § 7513 ........................................................................................ 7

31 U.S.C. §§ 501–507 ............................................................................. 47

Antideficiency Act, 31 U.S.C. § 1341 *et seq.* .............................. 26, 29, 30, 45

Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978) ........................... 6

Federal Service Labor-Management Relations Statute ..................................... *passim*

H.R. 6787, 115th Congress (2017–2018) ...................................................... 27

Inflation Reduction Act, Pub. L. No. 117-169 (2022) ......................................... 1, 2, 32

S. 3137, 115th Congress (2017–2018) ......................................................... 27

## Executive Orders

Exec. Ord. No. 13,781, Comprehensive Plan for Reorganizing the Executive Branch, 82 Fed. Reg. 13,959 (Mar. 13, 2017) ...................................................... 27

Exec. Ord. No. 14,210, Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, 90 Fed. Reg. 9669 (Feb. 11, 2025) ................................................................ *passim*

Exec. Ord. No. 14,215, Ensuring Accountability for All Agencies, 90 Fed. Reg. 10447 (Feb. 24, 2025) ...................................................................... 16

Exec. Ord. No. 14,251, Exclusions from Federal Labor-Management Relations Programs, 90 Fed. Reg. 14,553 (Mar. 27, 2025) ...................................... 11

Exec. Order No. 14,284, Strengthening Probationary Periods in the Federal Service (Apr. 24, 2025) ...................................................................... 16

## Regulations and Guidance

5 C.F.R. § 1200.3 ..................................................................................... 8

vii

5 C.F.R. § 351 ................................................................................ 7, 19, 48

Charles Ezell, Acting Director, OPM, "Guidance on Executive Order *Exclusions from Federal Labor-Management Programs*" (Mar. 27, 2025) ........................ 11, 12

Charles Ezell, Acting Director, OPM, "Guidance on Probationary Periods, Administrative Leave and Details," (Jan. 20, 2025).................................................. 5

FLRA, "Unfair Labor Practice Case Processing in the Absence of a General Counsel - Questions and Answers," FLRA.gov (Mar. 3, 2008) .............................................. 7

Fork in the Road, OPM.gov, https://www.opm.gov/fork/original-email-to-employees/5

Mem. for the Dir. of OMB, Gov't Operations in the Event of a Lapse in Appropriations, O.L.C. Opinion (Aug. 16, 1995)..................................................... 29

Russell T. Vought, Director, OMB, & Charles Ezell, Acting Director, OPM, "Guidance on Agency RIF and Reorganization Plans Requested by *Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative*" (Feb. 26, 2025) https://perma.cc/UZU8-JR6Y,.............................. *passim*

## Constitutional Provisions

U.S. Const., Art. I, sec. 1 ............................................................................... 25

U.S. Const., Art. II, sec. 3 .............................................................................. 26

## Other Authorities

*About OSC*, U.S. Office of Special Counsel, https://perma.cc/9JWV-KYWW (last visited Aug. 7, 2025).................................................................................. 8

Congressional Research Service, The Internal Revenue Service's Strategic Operating Plan (June 2, 2023), https://crsreports.congress.gov/product/pdf/IF/IF12394 ......................................... 33

H. Rep. No. 95-1403 (July 31, 1978) .......................................................... 13

Henry B. Hogue, Cong. Rsch. Serv., R44909, Exec. Branch Reorganization (2017). 27

Josh Gerstein, *Federal Workforce Watchdog Who Was Fired by Trump Drops Legal Fight to Get His Job Back*, Politico (Mar. 4, 2025), https://www.politico.com/news/2025/03/06/federal-workforce-watchdog-who-was-fired-by-trump-drops-legal-fight-to-get-his-job-back-00215891 ............................... 8

*Members,* MSPB, https://perma.cc/LUE5-KHHV (last visited Aug. 11, 2025)............ 8

Michael Sainato, *Trump Continues Clearout of Top US Labor Officials with Fresh Firing*, The Guardian (Feb. 11, 2025), https://www.theguardian.com/us-news/2025/feb/11/trump-labor-flra-firing ................................................................ 7

National Taxpayer Advocate, Annual Report to Congress (2022) https://www.taxpayeradvocate.irs.gov/reports/2022-annual-report-to-congress/full-report/ ........................................................................................................................ 32

Parker Purifoy, *Trump Fires Democratic Member of Federal Staff Appeals Board*, Bloomberg News (Feb. 11, 2025), https://news.bloomberglaw.com/daily-labor-report/trump-fires-democratic-member-of-federal-employee-appeals-board ........... 7

Press Release, MSPB, *Member Raymond A. Limon Retiring* (Feb. 28, 2025) https://perma.cc/YPP8-QJXA ...................................................................................... 8

S. Rep. No. 95-969 (July 10, 1978) ........................................................................... 13

S. Rep. No. 115-381 (Nov. 26, 2018) ........................................................................ 27

U.S. Department of Treasury, Continuing Improvements to IRS Customer Service in Filing Season 2024 (June 7, 2024) https://home.treasury.gov ........................... 33

## INTRODUCTION

Plaintiffs National Treasury Employees Union (NTEU), National Federation of Federal Employees, International Association of Machinists and Aerospace Workers, and International Federation of Professional and Technical Engineers (the Unions) challenge the collective effect of three Administration actions that have eviscerated federal agencies' ability to function as Congress intended. The President issued an executive order mandating widespread reductions-in-force (RIFs); at the Administration's direction agencies have fired tens of thousands of probationary employees; and the Administration pressured tens of thousands more to resign with less than two weeks' notice. All these actions were carried out without Congress's authorization. Taken together, they violate the Constitution's separation of powers and statutes such as the Inflation Reduction Act.

In their motion to dismiss, Defendants ask this Court to accept that there is nothing it can do about these unprecedented, illegal actions. Each of Defendants' arguments is baseless. As a threshold matter, Defendants' argument that this Court lacks jurisdiction to consider the Unions' claims does not reflect recent factual and legal developments. Congress could not have intended for a litigant's claims to be channeled when the Administration has methodically been destroying those very channels. By executive order, the President has stripped federal sector unions of the ability to proceed through administrative processes *at all* for tens of thousands of employees at multiple agencies. He has also fired the very people who oversee the relevant administrative agencies and repeatedly argued in court that those same agencies are invalid. The Unions, moreover, are challenging the cumulative effect of

three broad Administration actions, which distinguishes this case from other channeling disputes.

Defendants argue that the Unions lack standing because they allege only vague fears about possible future harm. But that is not what the Unions have pled. They allege quite plainly that they have suffered a cognizable loss of dues and bargaining power, which establish standing.

On the merits, Defendants do not meaningfully argue that the Unions have failed to adequately plead their five claims. First, the Unions allege that the President's actions to dilute the federal workforce, collectively, violate the Constitution's separation of powers. The President may not hobble federal agencies that Congress creates, to which Congress assigns statutory missions, and that Congress funds so that they can accomplish those legislative directives. Defendants have no real response to the Unions' claim and instead mischaracterize it as an ultra vires statutory claim.

The Unions' second claim alleges that the President's actions conflict with the Inflation Reduction Act (IRA), which provided billions of dollars to the IRS to improve customer service and enforcement. The IRS has hired thousands of employees to fulfill Congress's intent. "[S]ettled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). Defendants do not even attempt to argue that slashing IRS staff is consistent with the IRA.

The Unions also raise three claims alleging that agencies' implementation of the President's RIF directive violates the Administrative Procedure Act (APA). The Office of Management and Budget (OMB) and Office of Personnel Management (OPM) required all federal agencies to submit "Agency RIF and Reorganization Plans" (ARRPs) for OMB's and OPM's approval. But OMB and OPM lack the authority to compel agencies to reorganize or to engage in large-scale RIFs. Because the ARRP mandate not only exceeds OMB's and OPM's authority but is also arbitrary and capricious, it violates the APA. Defendants-Agencies' execution of the ARRPs is similarly arbitrary and capricious because those agencies have improperly ceded their decision-making authority to OMB and OPM and ignored congressional intent.

## BACKGROUND

### I.    Factual Background.

#### A.    The President has ordered widespread RIFs.

On February 11, 2025, President Trump issued Executive Order No. 14,210, Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative (Workforce Order). 90 Fed. Reg. 9669 (Feb. 11, 2025); *see* 2d Am. Compl. ¶ 8 (June 6, 2025). The Workforce Order directed agencies to "promptly" begin mass firings through "large-scale" RIFs. Workforce Order § 3(c). The Order's purpose was to eliminate "waste, bloat, and insularity." *Id.* § 1. The Workforce Order directed agencies to fire, among others, workers who would be deemed "nonessential" for purposes of a government shutdown (Workforce Order

§ 3(c))—a figure that approximated 345,000 during the last major shutdown in 2018–19. 2d Am. Compl. ¶ 41.

Consistent with the Workforce Order, Defendants OMB and OPM issued a memorandum on February 26, 2025, instructing agency heads to submit ARRPs to OMB and OPM for approval. Russell T. Vought, Director, OMB, & Charles Ezell, Acting Director, OPM, "Guidance on Agency RIF and Reorganization Plans Requested by *Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative*" (Feb. 26, 2025) https://perma.cc/UZU8-JR6Y (OMB/OPM Memo). The OMB/OPM Memo told agencies to submit "Phase 1" ARRPs by March 13, 2025, and said this action was "directed" by the President. *See id.* at 1. Those Phase 1 ARRPs were to include a list of agency employees "not typically designated as essential" during a lapse in appropriations (using Agency Contingency Plans submitted to OMB in 2019) and whether parts of the agency should be eliminated or consolidated. *Id.* at 2.

The OMB/OPM Memo directed agencies to submit "Phase 2" ARRPs by April 14, 2025, and to include in those plans designated competitive areas for RIFs and a timetable for implementation. *Id.* at 4. Monthly progress reports were due May 14, June 16, and July 16, 2025. *Id.* at 6.

Mass firings pursuant to the Workforce Order have occurred at every defendant agency where NTEU represents employees. 2d Am. Compl. ¶ 52. Agencies have cited the Workforce Order in their notices about the firings. *Id.* ¶¶ 53, 56, 62. Dues-paying members have received termination notices. *Id.* ¶ 52.

B.    OPM directed RIFs of probationary employees.

On January 20, 2025, Defendant OPM directed agencies to provide it with lists of probationary employees along with a determination about "whether those employees should be retained." Charles Ezell, Acting Director, OPM, "Guidance on Probationary Periods, Administrative Leave and Details," (Jan. 20, 2025); *see* 2d Am. Compl. ¶ 67. Agencies began sending termination notices in February. 2d Am. Compl. ¶¶ 76, 78. NTEU has at least 7,000 probationary or trial dues-paying members who have been terminated. *Id.* ¶ 82.

C.    OPM pressured employees to opt into an early retirement program.

On January 28, 2025, OPM emailed the approximately 2.2 million federal civil employees, urging them to resign their positions through a "deferred resignation program" (DRP) or face losing their jobs. Fork in the Road, OPM.gov, https://www.opm.gov/fork/original-email-to-employees/ (last accessed February 14, 2025)). OPM gave employees less than two weeks to make their decision. *Id.* At least 75,000 employees (including many dues-paying union members) agreed to resign. 2d Am. Compl. ¶¶ 86, 89.

As just some examples of the impact of these three Administration actions, HHS announced in March that through RIFs and early retirement, 20,000 employees would be downsized, *id.* ¶ 54, while the IRS planned to cut 40% of its workforce. *Id.* ¶ 64.

II.    **Procedural Background.**

The Unions filed suit on February 12, 2025, alleging that the President's actions violated separation of powers, and that Defendant-Agencies violated the

5

APA (by implementing RIFs contrary to regulations). The Unions also sought emergency relief (Dkt. #11), which this Court denied on February 20, 2025. Memorandum Opinion and Order (Dkt. #28) (PI Order).

The Unions filed a Second Amended Complaint on June 6, 2025 (Dkt. #47). The Unions now assert claims based on violations of separation of powers and the IRA, and three APA claims relating to agencies' ARRP plans. 2d Am. Compl. ¶¶ 113–26. Defendants have moved to dismiss the Second Amended Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss (Dkt. #57) (Def. Mot.).

### III.   __Legal Background.__

The Federal Service Labor-Management Relations Statute (the Statute) is part of 1978's Civil Service Reform Act. Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–1216 (1978) (codified at 5 U.S.C. §§ 7101–35). Under the Statute, some union claims, such as unfair labor practice (ULP) allegations or negotiability disputes, may be filed with the Federal Labor Relations Authority (FLRA). 5 U.S.C. §§ 7105(a)(2), 7117, 7118; *see* PI Order at 8. The FLRA's three members serve five-year terms and can only be removed for cause. 5 U.S.C. § 7104. Unions can file ULP claims with the FLRA's General Counsel's office. The General Counsel, who is Senate-confirmed for a five-year term, 5 U.S.C. § 7104(f), can issue ULP complaints.

President Trump fired the FLRA Chair on February 11, 2025.[1] The FLRA currently has two members, and no General Counsel.[2]

Other claims, such as non-probationary employees' claims for removals, may be filed with the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d); *see* PI Order at 9. Under the Statute, probationary employees cannot bring adverse action claims to the MSPB at all, 5 U.S.C. § 7511(a), although they have some limited appeal rights by regulation. 5 C.F.R. § 315.806. The Statute does not provide for MSPB review of removal claims relating to RIFs, 5 U.S.C. § 7512(B), but OPM regulations promulgated in 1986 do allow for such review. 5 C.F.R. § 351.901. The MSPB is a three-member, independent Board whose members serve seven-year terms and who can only be removed for cause. 5 U.S.C. § 1202(d). President Trump fired a member of the MSPB on February 12, 2025.[3] Another member retired on

---

[1] Michael Sainato, *Trump Continues Clearout of Top US Labor Officials with Fresh Firing*, The Guardian (Feb. 11, 2025), https://www.theguardian.com/us-news/2025/feb/11/trump-labor-flra-firing; *see Grundmann v. Trump*, No. 25-425, 2025 U.S. Dist. Lexis 113425 (D.D.C. June 13, 2025), *stayed pending appeal*, 2025 U.S. App. LEXIS 16480 (D.C. Cir. July 3, 2025).

[2] *See* FLRA, "Unfair Labor Practice Case Processing in the Absence of a General Counsel - Questions and Answers," FLRA.gov (Mar. 3, 2008) https://perma.cc/C5WA-MUUQ (FLRA regional offices can investigate ULP allegations but "[u]nfair labor practice complaints may only be issued when the FLRA has a General Counsel.").

[3] Parker Purifoy, *Trump Fires Democratic Member of Federal Staff Appeals Board*, Bloomberg News (Feb. 11, 2025), https://news.bloomberglaw.com/daily-labor-report/trump-fires-democratic-member-of-federal-employee-appeals-board.

February 28, 2025,[4] leaving the Board with only one member.[5] Board regulations

require at least two members for a quorum. 5 C.F.R. § 1200.3.

The Office of Special Counsel (OSC) investigates and prosecutes prohibited

personnel practices.[6] The Special Counsel serves a five-year term and can only be

removed for cause. 5 U.S.C. § 1211(b). President Trump fired then-Special Counsel

Hampton Dellinger on February 7, 2025.[7]

## **ARGUMENT**

In evaluating a motion to dismiss, courts must review the complaint liberally

and grant plaintiffs "the benefit of all inferences that can be derived from the facts

alleged." *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting *Kowal v.

MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). For purposes of a

Rule 12(b)(1) motion, the Court "may consider materials outside the pleadings."

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). "To

survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain

sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"

---

[4] Press Release, MSPB, *Member Raymond A. Limon Retiring* (Feb. 28, 2025) https://perma.cc/YPP8-QJXA.

[5] *See Members,* MSPB, https://perma.cc/LUE5-KHHV (last visited Aug. 11, 2025).

[6] *See About OSC*, U.S. Office of Special Counsel, https://perma.cc/9JWV-KYWW (last visited Aug. 7, 2025).

[7] *See* Josh Gerstein, *Federal Workforce Watchdog Who Was Fired by Trump Drops Legal Fight to Get His Job Back*, Politico (Mar. 4, 2025), https://www.politico.com/news/2025/03/06/federal-workforce-watchdog-who-was-fired-by-trump-drops-legal-fight-to-get-his-job-back-00215891.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### I.    <u>This Court Has Jurisdiction Because Alternate Administrative Channels Are No Longer Available and the *Thunder Basin* Factors Weigh Against Channeling.</u>

While this Court previously found that it likely lacked jurisdiction to consider the Unions' request for emergency relief, PI Order at 10–16, the legal and factual landscape have materially changed since that ruling.

The Administration has deliberately been destroying the very channels that it argues are the only route for the Unions to obtain any relief. The Administration has even repeatedly argued in court that the administrative channels are invalid. Recent court decisions have concluded that for these and other reasons, proper application of the *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), factors weigh against channeling.

In addition, the broad constitutional and statutory claims here are starkly different from the ones at issue in *AFGE v. Trump*, 929 F.3d 748, 760 (D.C. Cir. 2019) (*AFGE v. Trump (2019)*), which involved limitations on how federal sector unions could bargain. As three Justices concluded in rejecting the government's channeling argument in a case involving mass RIFs (without any disagreement from their colleagues), the Unions "are not challenging individual employment decisions" but rather a broader "dismantling" of executive agencies—in this case, through three executive actions aimed at slashing one-quarter of the federal workforce collectively. *See McMahon v. New York*, No. 24A1203, 2025 U.S. LEXIS

2670, at *19 (July 14, 2025) (Sotomayor, Kagan, and Jackson, JJ., dissenting to grant of stay pending appeal).[8]

A.  <u>Congress could not have intended claims to be administratively channeled when the Administration has deliberately abolished those channels.</u>

The core of the *Thunder Basin* channeling analysis is gauging what Congress intended. *See Thunder Basin*, 510 U.S. at 212–13 (evaluating whether particular claims "are of the type Congress intended to be reviewed within this statutory structure"); *AFGE v. Trump (2019)*, 929 F.3d at 754 (evaluating whether "Congress intended that a litigant proceed exclusively through a statutory scheme").

As applied here, Congress could not have intended federal union claims to be shunted off to administrative channels when those channels are no longer functional. The Administration has destroyed those administrative routes through several actions. The President issued an Executive Order which stripped unions of the option to proceed through administrative channels *at all* for tens of thousands of employees at multiple agencies. The President has also fired the heads of key independent agencies that are supposed to resolve federal sector employees' and unions' disputes. He has declared that independent agencies are no longer independent and are unconstitutional. In such unprecedented circumstances, Congress could not have intended the Unions' claims to be relegated to channels that the Administration has intentionally and methodically destroyed.

---

[8] To the extent this Court was concerned at the preliminary injunction stage about the Unions' claim that agencies were implementing RIFs contrary to RIF regulations, the Unions have dropped that count.

1.    Exclusions Executive Order.

On March 27, 2025, President Trump issued an Executive Order that de-unionized over thirty agencies and subdivisions. Exec. Order No. 14,251, Exclusions from Federal Labor-Management Relations Programs, 90 Fed. Reg. 14,553 (Mar. 27, 2025) (Exclusions Order). The Exclusions Order covers many of the Defendants in this action, including all of the IRS and much of the Departments of Health and Human Services, Defense, Veterans Affairs, and Interior. *Id.* § 2. The Administration has explained that agencies covered by the Exclusions Order "are no longer subject to the collective-bargaining requirements of chapter 71" and those agencies "are no longer required to collectively bargain with Federal unions." Charles Ezell, Acting Director, OPM, "Guidance on Executive Order *Exclusions from Federal Labor-Management Programs*" (Mar. 27, 2025), (OPM Exclusions Memo) https://perma.cc/Z2ZJ-Y8U7.

Union claims related to agencies covered by the Exclusions Order, therefore, cannot be channeled to the FLRA because—as the Administration itself asserts—that channel no longer exists. A union representing IRS employees, for example, such as NTEU, can no longer file claims related to that agency with the FLRA. "The administrative review scheme . . . is not available . . .  for the simple reason that those agencies and subdivisions have been excluded from the [Statute's] coverage by" the Exclusions Order. *See NTEU v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268, at *13 (D.D.C. Apr. 28, 2025) (rejecting government's channeling arguments

11

and enjoining implementation of EO 14,251).[9] *See also* OPM Exclusions Memo at 5

(collective bargaining obligations regarding RIFs no longer apply for agencies in the

Exclusions Order and "agencies should cease participating in grievance procedures

after terminating their CBAs.").

The FLRA has held that it lacks jurisdiction to hear claims involving

agencies excluded from the Statute by an Executive Order. *See U.S. Dep't of Air*

*Force, Air Force Materiel Command Robins Air Logistics Ctr. Robins Air Force Base,*

*Ga.*, 66 F.L.R.A. 589, 598 (2012) (dismissing claim against Air Force Office of

Special Investigations for lack of jurisdiction because that office was exempted from

the Statute by Executive Order); *U.S. Att'ys Off. S.D. Tex.*, 57 F.L.R.A. 750 (2002)

("[S]ince [an] Executive Order exempts United States Attorneys' Offices from

coverage of the Statute, the Authority lacks jurisdiction to decide the cases[.]"). Any

request that the FLRA General Counsel issue an unfair labor complaint against one

of the agencies excluded by the Exclusions Order would be dismissed for lack of

jurisdiction—and that dismissal would not be subject to judicial review. *See*

*Turgeon v. FLRA*, 677 F.2d 937, 938–39 (D.C. Cir. 1982) (holding that decision by

FLRA General Counsel not to act on ULP charge is not reviewable).

---

[9] This ruling was stayed, 2–1, by a motions panel of the D.C. Circuit but only on
equitable factors and not based on any finding that the government was likely to
succeed on the merits. *See NTEU v. Trump*, No. 25-5157, 2025 U.S. App. LEXIS
11952 (D.C. Cir. May 16, 2025*), petition for reconsideration en banc denied*,
2025 U.S. App. LEXIS 17653 (D.C. Cir. July 16, 2025).

This Court's prior finding that the Unions' claims could go to the FLRA and subsequently to court, PI Order at 11, is no longer the case for the long list of agencies in the Exclusions Order, including all of NTEU's members at the IRS.

        2.    <u>Weakening of independent agencies.</u>

In addition to the Exclusions Order, the Administration has taken other steps to render the administrative channels unworkable. The President has fired the heads of, and thus weakened, the very agencies which would normally hear federal employee or union claims.

The MSPB, FLRA and OSC are supposed to carry out "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests" of federal employees with "the needs of sound and efficient administration." *United States v. Fausto,* 484 U.S. 439, 445 (1988). Congress created the agencies as wholly "independent of any control or direction by the President," S. Rep. No. 95-969, at 24 (July 10, 1978), and thereby insulated them from any appearance of bias that would attend the executive adjudicating its own employment disputes. *Id.* at 6–7 (emphasizing need for "a strong and independent [MSPB] and Special Counsel"); *see also id.* at 7–8 (stating that FLRA structure "will assure impartial adjudication of labor-management cases"). Congress therefore made the MSPB and FLRA members as well as the Special Counsel removable only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. §§ 1202(d), 1211(b), 7104(b); *see also* H. Rep. No. 95-1403 (July 31, 1978) (noting that Congress rejected President's proposal that FLRA members "serve at the pleasure of the President").

But these administrative bodies are no longer working as Congress intended. The President has fired the Special Counsel and members of the FLRA and MSPB. *See supra* at pp. 7–8. The Fourth Circuit held that channeling may not be warranted in just such circumstances. In *National Association of Immigration Judges v. Owen (NAIJ)*, the Court held that a lower court erred when it channeled a federal employee association's constitutional and other challenges to a government policy. 139 F.4th 293, 313 (4th Cir. 2025). The government argued that the district court lacked jurisdiction because plaintiffs could bring claims against the policy through the statutory scheme. Employees removed for violating the policy, for example, could file a claim with the MSPB. *See NAIJ v. Neal*, 693 F. Supp. 3d 549, 568–69 (E.D. Va. 2023) (explaining potential administrative routes), *rev'd sub nom. NAIJ v. Owen*, 139 F.4th 293 (4th Cir. 2025). Or employees could allege that the government had committed a prohibited personnel practice and bring such a claim to the OSC. *Id.*

The Fourth Circuit concluded, however, that such administrative channels were not functioning as Congress intended. The Court explained that channeling may be warranted "[w]hen the Civil Service Reform Act functions as designed[.]" *NAIJ,* 139 F.4th at 299. But "[i]f . . . the Senate-confirmed roles in the MSPB and Special Counsel go unfilled, or if the agencies fail to perform their duties such that covered employees' claims are not adequately processed, then the framework of the CSRA would be thwarted." *Id.* at 305. When those channels are rendered nonfunctional, proceeding through such channels "would be futile." *Id.*

14

As the Fourth Circuit recognized, the administrative channels that might normally allow for review of some of the Unions' claims here are not currently functional. A non-probationary employee could file a removal claim with the MPSB—but the MSPB lacks a quorum. *See supra* p. 7. Or an employee might be able to fashion a claim that a removal or RIF action constitutes a prohibited personnel practice and request investigation by the OSC—but there is no Special Counsel to act on such a request. *See supra* p. 8. A union could ask the FLRA General Counsel to issue an unfair labor complaint—but there is no General Counsel. *See supra* p. 7. The FLRA does have a bare two-person quorum, but the President fired the last Chair without cause—which shows that the supposedly independent agency is no longer independent and protected from political whims.[10]

Indeed, the Administration itself has conceded that the administrative scheme is unworkable, albeit for different reasons than the Unions contend here. The Administration has argued that the very administrative scheme that it would force the Unions through is unconstitutional. *See* Application to Vacate the Order Issued by the U.S. District Court for D.C. and Request for an Immediate Administrative Stay at 12–21, *Bessent v. Dellinger*, No. 24A790 (Feb. 16, 2025) (arguing that the CSRA provision that insulates the Special Counsel from removal

---

[10] The Unions recognize that the legal issue of whether the President can fire some or all heads of agencies has been teed up in various lawsuits. *See, e.g., Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (staying lower courts that had ordered MSPB Chair Harris reinstated). The Unions are not suggesting that this Court needs to weigh in on the legality of the FLRA Chair's or MSPB Chair's firing. The Unions are only pointing out that, as it stands, members of the FLRA or MSPB have been fired without cause and are not at their full complement.

is unconstitutional); Defendants' Opposition to Plaintiff's Motion for a Temporary Restraining Order at 6–10, *Harris v. Bessent*, No. 25-412 (D.D.C. Feb. 13, 2025) (arguing that the CSRA provision that insulates the MSPB chair from removal is unconstitutional).

The President has also stated in an Executive Order that independent agencies are no longer independent. *See* Exec. Order 14,215, Ensuring Accountability for All Agencies, 90 Fed. Reg. 10447 (Feb. 24, 2025) (asserting "Presidential supervision and control of the entire executive branch" including over "so-called 'independent regulatory agencies'").[11] The Administration should not be allowed to have it both ways—to cut off access to the relevant administrative agencies and argue that they are invalid, but nonetheless argue that the Unions' claims must be forced exclusively to those very agencies.

B.    *Thunder Basin* factors weigh against channeling.

Even if this Court were to conclude that the civil service channels were functioning, the type of claims that the Unions present do not warrant channeling under *Thunder Basin*. *See Thunder Basin*, 510 U.S. at 212–13 (under the second prong, courts consider (1) whether precluding district court jurisdiction could "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is

_____

[11] On April 24, 2025, President Trump issued Executive Order 14,284, Strengthening Probationary Periods in the Federal Service. This Executive Order purports to remove the limited regulatory MSPB appeal rights for probationary employees.

"outside the agency's expertise.") Courts have recognized in recent decisions that the *Thunder Basin* factors weigh against channeling claims similar to those that the Unions raise here.

**a. No meaningful judicial review**. As explained above, there is no meaningful review because the administrative channels are unavailable or broken. Unions cannot bring any claims to the FLRA in connection with agencies excluded by the Exclusions Order, such as the IRS. For agencies that remain covered by the Statute, removal claims by non-probationary employees would face a Board without a quorum. There is no Special Counsel to act on prohibited personnel practice claims. There is no FLRA General Counsel to issue an unfair labor complaint.

In addition, this Circuit's precedent holds that channeling is not warranted when adjudication requires the assessment of several executive actions collectively—a task that is not feasible in piecemeal administrative adjudication. Plaintiffs in *National Mining Association v. Department of Labor* challenged "many" regulations promulgated under the Black Lung Benefits Act as impermissibly retroactive. 292 F.3d 849, 855 (D.C. Cir. 2002). In its channeling analysis, the D.C. Circuit concluded that assessing this legal claim required an analysis of "all of the regulations [at issue] together as well as the entire rulemaking process." *Id.* at 858. This type of analysis, it explained, "would not be feasible in individual adjudications dealing with particular regulatory provisions." *Id.* Thus, meaningful review of the claim could not be had through the administrative scheme and, consequently, federal district court jurisdiction was not precluded. *Id.* at 858–9.

The Unions here lodge claims that, like the underlying claim in *National Mining*, require assessment of several executive actions—the Workforce Order, the mass firing of probationary employees, and the DRP—together as collectively being contrary to separation of powers and the IRA. The cumulative effect of multiple, broad Administration actions is what is at issue—not individual employment decisions that might otherwise be appropriately channeled.[12]

**b. Wholly collateral.** In a similar vein, the Unions' claims are wholly collateral to the administrative scheme because they are challenging the collective effect of three broad executive actions and not a particular employee's termination. *See AFGE v. OPM*, 771 F. Supp. 3d 1127, 1132 (N.D. Cal. 2025) (challenge to OPM directive on firing probationary employees is collateral to the types of claims properly brought to the FLRA or MSPB); *New York v. Kennedy*, No. 25-cv-196-MRD-PAS, 2025 U.S. Dist. LEXIS 124822, at *33 (D.R.I. July 1, 2025) (holding plaintiffs' APA and constitutional challenges to HHS RIFs are collateral because they do not pertain to employment relationships or ULPs).

Relatedly, Congress did not even allow for RIF-removals claims to the MSPB. Such appeals are not provided for in the Statute but instead are only allowed by later-enacted regulations. *Compare* 5 C.F.R.§ 351.901 *with* 5 U.S.C. § 7512(B) (excluding RIF removals from definition of adverse action). It is even less likely,

---

[12] For this reason, cases such as *AFGE v. Trump*, No. 25-cv-03698-SI, 2025 U.S. Dist. LEXIS 89344 (N.D. Cal. May 9, 2025), *stayed, Trump v. AFGE*, No. 24A1174, 2025 U.S. LEXIS 2667 (July 8, 2025)(*see* Def. Mot. at 24), are distinguishable. That case involved only a challenge to the Workforce Order, not multiple Administration directives.

therefore, that Congress contemplated that the MSPB could or should resolve the legality of an Executive Order directing widespread RIFs.

**c. Outside of agency expertise**. The claims that the Unions raise—constitutional, ultra vires, and APA—are not within the FLRA's or the MSPB's expertise. The MSPB and FLRA may know about employment and labor policy, but they know "nothing special about the separation of powers." *See Axon Enter. v. FTC*, 598 U.S. 175, 194 (2023). And the Unions' ultra vires and APA claims are not "intertwined with any factual and policy questions that would benefit from the MSPB's or the FLRA's expertise." *See AFGE v. OPM*, 771 F. Supp. 3d at 1132 (finding plaintiff union's constitutional, ultra vires, and APA claims outside MSPB's and FLRA's expertise); *New York v. Kennedy*, 2025 U.S. Dist. LEXIS 124822 at *33–34 (plaintiffs' APA and constitutional claims regarding HHS RIFs are outside MSPB's and FLRA's expertise). This Court would not need to parse through some employment-specific question to resolve the Unions' claims. *Cf. Elgin v. Dep't of Treasury*, 567 U.S. 1, 22–23 (2012) (ruling that employee's claims should proceed first to the MSPB, which can apply its expertise to issues such as whether an employee's "resignation amounted to a constructive discharge" before reaching statutory or constitutional claims about a directive to terminate the employee).

The facts present here are starkly different from *AFGE v. Trump (2019)*, which challenged executive orders that expressly constrained how agencies bargained. 929 F.3d at 753–54. Claims about the parameters of federal sector bargaining fall within the FLRA's expertise. Not so for constitutional challenges to

executive branch overreach or the mass firing of probationary employees who have no recourse at the MSPB.[13] In addition, no argument was raised in *AFGE v. Trump (2019)* that the channels were not functional. Nor did that Court consider that cumulative challenges should not be channeled under its own precedent, *National Mining*. For all these reasons, this Court has subject matter jurisdiction over the Unions' claims.

## II.    The Unions Have Suffered Concrete Loss of Dues and Bargaining Power and Thus Have Standing.

Defendants argue that the Unions lack standing because they have not been directly injured and allege only "broad fears about employment outcomes or loss of bargaining power." Def. Mot. at 31. This is inaccurate. The Unions do not claim standing because of "fears" of potential future action. They have been harmed. Mass firings of both probationary and non-probationary employees have occurred at every single agency where NTEU represents employees. 2d. Am. Compl. ¶¶ 52, 66. NTEU members have taken the DRP. *Id.* ¶ 89. This has led to a loss of dues-paying members, which is a textbook harm for purposes of standing.[14]

---

[13] In an earlier proceeding, this Court indicated that, as compared to the claims raised in *AFGE v. Trump (2019)*, it was "less certain" that the Unions' claims are at the "core" of the FLRA's expertise. PI Order at 15. The Court went on to indicate that in contrast "whether the firing of probationary employees qualifies as a RIF" might fit within the FLRA's expertise. *Id.* But none of the Unions' claims turns on whether probationary firings qualify as RIFs, and the Unions no longer challenge any violation of the RIF statute or regulations.

[14] In a tacit admission that the challenged actions have happened, Defendants initially argued that the Unions' claims were not ripe because it was "far from clear that any of the alleged violations will ever come to pass." Defs.' Resp.to Pl. Mot. for a TRO at 17 (Feb. 17, 2025) (Dkt. #14). Defendants are no longer making this ripeness argument.

A.    Loss of dues.

The Unions' loss of dues from the firing of dues-paying members is more than enough to establish standing. Indeed, such a straightforward monetary loss is always sufficient for standing. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("a loss of even a small amount of money is ordinarily an 'injury'"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("monetary harms" are among the "most obvious" types of harms that create standing).

Defendants even concede that the Unions have suffered a "pocketbook injury." Def. Mot. at 31. That concession ends the standing question. *See Collins v. Yellen*, 594 U.S. 220, 243 (2021) (A "pocketbook injury is a prototypical form of injury in fact.").

B.    Loss of bargaining power.

Although the Unions need not plead more than one injury to establish standing,[15] they have also separately and additionally been injured by the loss of bargaining power caused by the loss of members. The strength and influence of any union correlate directly with the size of its membership. That status is weakened by a loss of members. The D.C. Circuit has held that "harm to [the Unions'] bargaining position" was "certainly a real injury" for purposes of standing. *NTEU v. Chertoff*, 452 F.3d 839, 854 (D.C. Cir. 2006). *See also Rivera-Vega v. ConAgra, Inc.,* 70 F.3d

---

[15] *See Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 512 F.3d 252, 259 (6th Cir. 2008) (it was sufficient that the plaintiff established one harm caused by defendants and the Court "need not address whether Plaintiff school districts' other alleged injuries are sufficient to establish standing").

153, 164 (1st Cir. 1995) (affirming finding of irreparable harm to union where "the potential effect of [a] large scale employee lockout" could diminish union support and bargaining power); *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").

Defendants seem to argue *Chertoff* is not on point because "[h]ere, by Plaintiffs' admission, the only alleged harm is an expectation of reduced dues, which Plaintiffs in turn allege will lead to a loss of bargaining power."[16] Def. Mot. at 32. This is categorically untrue. The Unions did not allege only an "expectation" of reduced dues. The Unions pled that NTEU and NFFE "have lost dues-paying members" from mass firings and dues paying members have "signed up" for the DRP. 2d Am. Compl. ¶¶ 66, 89. They pled that such losses have occurred. The Unions also did not allege "only" a loss of dues (although that would be sufficient for standing) which "will lead" to a loss of bargaining powers. They allege a separate harm of loss of bargaining power caused by diminished membership. *Id.* ¶¶ 107–112. At this stage, these allegations must be accepted as true, and the Court "must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975).

---

[16] Defendants state that "Plaintiffs' reliance on [*Chertoff*] does help their standing here." Def. Mot. at 32. The Unions are not sure whether Defendants are conceding that *Chertoff* "does help" the Unions' case, or whether this is a typo and Defendants meant to assert that *Chertoff* "does *not* help" their standing.

Defendants make a scattershot of other arguments to counter the Unions'
evident injuries. Defendants argue, for example, that an organization alleging only
a "diversion of resources" to address anticipated harms cannot establish standing.
Def. Mot. at 30 (citing cases such as *FDA v. Alliance for Hippocratic Med.*, 602 U.S.
367 (2024)). But the Unions did not allege that their injury is diverting resources to
address a possible future harm. They pled an existing loss of dues and bargaining
power.

Defendants also argue, after their concession that the Unions have suffered
"pocketbook" injuries from loss of dues, that the requested injunction would not
"redress" such injury. Def. Mot. at 32. Defendants cite no caselaw in support of this
redressability argument. And, in fact, there is a straight line between an injunction
that would stop the widespread removal of dues-paying union members and
redressing the Unions' harm from diminished dues. *See Friends of the Earth, Inc. v.
Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 185–86 (2000) ("It can scarcely be
doubted that, for a plaintiff who is injured or faces the threat of future injury due to
illegal conduct ongoing at the time of suit, a sanction that effectively abates that
conduct and prevents its recurrence provides a form of redress.").

Defendants also argue that the Unions cannot show harm stemming from the
DRP because those losses are "attributable to those members' free choices." Def.
Mot. at 33. But Defendants caused the Unions' injury by offering the DRP, and that
harm exists even if employees' choice to take the offer was an "intervening" step in
the chain of causation. The Supreme Court has explained that "the very last step in

the chain of causation" does not negate causation attributable to another actor's "determinative or coercive" action earlier in the chain. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

Or put another way, traceability requires only that a plaintiff "make a reasonable showing that 'but for' defendant's action the alleged injury would not have occurred." *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1247 (D.C. Cir. 1983) (citing *Duke Power Co. v. Carolina Env't. Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978)), *rev'd on other grounds*, 467 U.S. 340 (1984). Defendants cannot dispute that "but for" their offering of the DRP, the Unions would not have lost members from that very offering. *See id.*; *see also CREW v. DHS*, 507 F. Supp. 3d 228, 239–40 (D.D.C. 2020) ("It does not matter if there was more than one source of the plaintiff's injuries": plaintiffs have standing to challenge an agency-wide policy even if errors by individual agency employees contributed to the harm).[17]

In sum, a plaintiff, on a motion to dismiss, "need only state a plausible claim that each element of standing is satisfied." *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016) (cleaned up) (quoting *Iqbal*, 556 U.S. at 678–79). The Unions have easily met that standard here.

_____

[17] The Fourth Circuit decision relied on by Defendants, Def. Mot. at 33 (citing *City of New York v. DoD*, 913 F.3d 423, 431 (4th Cir. 2019)), is inapposite because that Court affirmed dismissal on APA grounds and did not address whether plaintiffs had standing. In addition, the Unions here pled organizational standing, that is, the unions themselves have been injured. Defendants separately argue that the Unions have not established "representational" or "associational" standing to sue on behalf of their members when their members would otherwise have standing to sue in their own right, *see* Def. Mot. at 33, but the Unions did not plead associational standing.

### III. <u>Congress Establishes and Funds Agencies to Carry Out Their Missions, and the Administration's Evisceration of Those Agencies Violates Separation of Powers (Count I).</u>

Defendants argue that the Unions' Count I, which alleges that the Administration has violated the Constitution's separation of powers doctrine, should be dismissed. Def. Mot. at 46–48. Defendants conflate the Unions' first two counts and argue they "allege[] only a statutory violation," which the Unions arguably try to equate to a constitutional violation. Def. Mot. at 46. This is not what the Unions have pled. Count I alleges that the Administration's wholesale hobbling of numerous agencies intrudes on Congress' role in creating and funding agencies and thus violates the separation of powers.

### A. <u>Congress has the constitutional authority to create and fund agencies.</u>

Separation of powers in the federal government is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020). The Constitution bestowed on Congress the power to create laws: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const., Art. I, sec. 1. Congress's constitutional power entitles it to create or destroy executive agencies and dictate their missions. "To Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). *Accord Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (discussing Congress's ability to create or remove federal agencies through the Necessary &

Proper Clause). Congress thus "control[s]" the very "existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010).

Congress, moreover, has the power to fund or defund executive branch agencies—and, in exercising that power, to determine whether and how agencies may function. It exercises this power regularly through the annual budget and appropriations processes. It also enacts specific laws affecting how the executive branch may expend appropriated funds. The Antideficiency Act, 31 U.S.C. § 1341, for example, generally prohibits the executive branch from incurring obligations that Congress has not authorized. As another example, the Impoundment Control Act, 2 U.S.C. §§ 681–688, prevents the Executive from refusing to postpone or withhold the use of appropriated funds.

The President's power, in turn, is to "faithfully execute" the laws that Congress creates. U.S. Const. Art. II, sec. 3; *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("The President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.") Consistent with these roles, "settled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d at 259.

No one disputes that Presidents have some reorganization authority over the executive branch, but they must act with Congressional buy-in. Historically, Presidential reorganizations have always done so pursuant to congressional delegations of authority in Reorganization Acts. *See, e.g.,* 5 U.S.C. §§ 901–912.

"Between 1932 and 1984, Presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." S. Rep. No. 115-381, at 5 (Nov. 26, 2018). The most recent statutory authorization for a President to reorganize the executive branch expired December 31, 1984. Henry B. Hogue, Cong. Rsch. Serv., R44909, Exec. Branch Reorganization 6–7 & n.23 (2017). Congress denied approval for reorganizations to Presidents George W. Bush and Barack Obama. *Id*. at 7.

Indeed, Congress also denied President Trump authorization to conduct a large-scale reorganization in his first term. In 2017, he issued Executive Order 13,781, entitled, "Comprehensive Plan for Reorganizing the Executive Branch," 82 Fed. Reg. 13,959 (Mar. 13, 2017). This Order directed agencies to submit plans within 180 days "to reorganize the agency, if appropriate, in order to improve the efficiency, effectiveness, and accountability of that agency." *Id*. § 2. But the plan failed because Congress did not pass accompanying legislation. *See* H.R. 6787, 115th Congress (2017–2018); S. 3137, 115th Congress (2017–2018). These examples—including from Defendant Trump's own first term—show that Presidents do not have the power unilaterally to conduct the large-scale restructuring of federal agencies challenged here.

B.     The President's actions intrude on Congress's powers.

The Administration's mass firings and its pressure campaign on federal workers to resign their positions—collectively, a project to fatally weaken agencies that Congress created and funded—violate two bedrock principles of the separation of powers.

First, the President cannot act unless authorized by Congress or the Constitution. As the Supreme Court held in *Youngstown*, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." 343 U.S. at 585. If the President could not seize steel mills when he believed national defense was at stake, *id.* at 583 (citing President Truman's Executive Order which cited national defense considerations), there is even less justification for a President to decimate entire agencies because of alleged "bloat" in the federal government. *See* Workforce Order, § 1. Defendants cite no statute that expressly authorizes the President to slash the federal workforce or render agencies unable to fulfill their missions. "Nor is there any act of Congress . . . from which such a power can be fairly implied." *Youngstown,* 343 U.S. at 585.

Second, the Executive must act when Congress directs it to do so. The D.C. Circuit relied on this principle when granting a petition for a writ of mandamus ordering the Nuclear Regulatory Commission to approve or disapprove the Department of Energy's license application to store nuclear waste at Yucca Mountain. *In re Aiken Cnty.*, 725 F.3d at 267. The Nuclear Waste Policy Act required the Commission to issue its decision within a certain time. *Id.* at 257 (citing 42 U.S.C. § 10134(d)). But the statutory deadline passed, and the Commission admitted that it did not intend to comply with the law. *Id.* at 258.

In an opinion by then-Judge Kavanaugh, the Court explained that "[u]nder Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available

and the President has no constitutional objection to the statute." *Id.* at 259 (emphasis omitted). The President "may not," the Court continued, "decline to follow a statutory mandate . . . simply because of policy objections." *Id.* Although the President has prosecutorial discretion, that discretion "does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to . . . implement or administer statutory projects or programs." *Id.* at 266.

Furthermore, the Antideficiency Act shows how the mass firing of "nonessential" employees under the Workforce Order contravenes Congress's will. Agencies determine which employees are essential under criteria derived from the Antideficiency Act, 31 U.S.C. § 1341 *et seq. See* Mem. for the Dir. of OMB, Gov't Operations in the Event of a Lapse in Appropriations, O.L.C. Opinion (Aug. 16, 1995). The statute makes clear that one category of essential employees who are permitted to work during a lapse in appropriations are employees dealing with "emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342. Emergency activities do "not include ongoing, regular functions of government[.]" *Id.*

In other words, employees engaging in the "ongoing, regular functions of Government," *id.,* are considered nonessential, are not permitted to work during shutdowns, and will be prioritized in a RIF under the Workforce Order. Without these employees, the "ongoing, regular functions of government" will stop. As long as Congress appropriates funds for executive agencies' work, however, Congress has

expressed its will for the "ongoing, regular functions of government" to continue. And if Congress wants to give the Executive Branch discretion to withhold authorized funds or to only partially disburse funds, it must say so. *See, e.g., Train v. New York*, 420 U.S. 35, 46–47 (1974) (noting that if Congress did not authorize the Executive to withhold funds under the Federal Water Pollution Control Act from being allotted, or to only disburse certain funds, then the Executive did not have such discretion).

In sum, usurping a power reserved to Congress, President Trump violated one of the central tenets of our Constitutional system, that "the branches of government should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires." *Myers v. U.S.*, 272 U.S. at 116 (citing Madison, 1 Annals of Congress 497).

C.    Defendants mistakenly argue that Count I pleads only a statutory violation.

In their motion to dismiss, Defendants rely heavily on *Dalton v. Specter,* 511 U.S. 462 (1994), to argue that a statutory claim does not necessarily equate to a separation of powers claim. Def. Mot. at 46–47. That reliance is misplaced.

In *Dalton*, plaintiffs sued administration officials for violating the APA because they had allegedly not followed statutory base closure procedures. The Court held there had not yet been any "final" agency action under the APA because administration officials had only issued reports and it was the President who would actually take final action. 511 U.S. at 476. The Court also held that the President

30

himself could not be sued for those actions under the APA because the President was not an "agency" under the APA. *Id*. Lastly, the Court held that when a statute grants wide discretion to the President, his decision pursuant to that statute is not judicially reviewable. *Id*.

None of *Dalton*'s holdings applies here because Counts I and II are not APA claims. And there is no statute here granting the President wide discretion to act (as in *Dalton*) or granting any discretion at all.

Nevertheless, Defendants rely on language in *Dalton* that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." Def. Mot at 46 (citing *Dalton*, 511 U.S. at 471). But the Unions are not arguing that the President has some statutory authority here and is acting "in excess of" it; they allege that he is acting contrary to his and Congress's roles under the Constitution. Count I alleges that the Administration's mass firings and pressure campaign on federal employees to resign, collectively, intrude on Congress's sphere and thus violate the Constitution's separation of powers. The government cannot reasonably dispute that the President's actions and those of his agencies "may still be reviewed for constitutionality." *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

## IV. The Administration Has Acted Ultra Vires by Slashing the IRS in Contravention of the Inflation Reduction Act (Count II).

The Unions' second count alleges that the broad executive actions challenged here, collectively, are contrary to the IRA which provided billions of dollars for increased taxpayer services and enforcement at the IRS. Defendants do not engage

at all with the Unions' argument that the President acted in violation of that act. Defendants' only basis for moving to dismiss this claim is to acknowledge on one hand that Count II alleges "a statutory violation," Def. Mot. at 46, but then also claim that Count II improperly pleads a constitutional violation (which it does not).

Congress passed the IRA, Pub. L. No. 117-169, in 2022 after the IRS workforce had shrunk to its smallest size since the 1970s.[18] In the IRA, Congress appropriated billions of dollars for designated purposes, namely improving tax law enforcement, operations support, business systems modernization, and taxpayer services. IRA § 10301. Congress has rescinded some of this amount, 2d Am. Compl. ¶ 31, as it is empowered to do. IRS used its IRA funding to hire thousands of new employees. 2d Am. Compl. ¶ 32.[19] For example, IRS has rapidly hired thousands of new employees to enact Congress's mandate to improve taxpayer service. *Id.* ¶ 33.[20]

Because so many of these employees have been hired only recently after the IRA's enactment, many are in probationary status. IRS has an estimated 15,000 probationary employees today, many hired through IRA funds. *Id.* ¶ 32. The

---

[18] *See* National Taxpayer Advocate, Annual Report to Congress 2022 at 27, https://www.taxpayeradvocate.irs.gov/reports/2022-annual-report-to-congress/full-report/.

[19] *See* U.S. Department of Treasury, Continuing Improvements to IRS Customer Service in Filing Season 2024 (June 7, 2024) https://home.treasury.gov (IRA funding has made thousands of new hires possible).

[20] *See* Congressional Research Service, The Internal Revenue Service's Strategic Operating Plan (June 2, 2023), https://crsreports.congress.gov/product/pdf/IF/IF12394  (agency responded to more taxpayer calls "thanks to the hiring of 5,000 customer service representatives using IRA funds").

Administration's mass firing of probationary employees thwarts Congress's legislated goal in the IRA of improving tax enforcement and taxpayer services.

The President cannot act contrary to a statute. Defendants do not contend otherwise, nor could they. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–39 (D.C. Cir. 1996) (executive order was ultra vires because it conflicted with the National Labor Relations Act); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *Youngstown*, 343 U.S. at 637–638 (Jackson, J., concurring) (the President's power is at its "lowest ebb" when he contravenes the express or implied will of Congress).

Perhaps the government does not dispute that slashing IRS employees necessarily undercuts the IRA because this ground was already covered at the emergency relief hearing. The Court recognized that "there's a point at which the termination of enough employees would necessarily violate Congress's mandate to in this case hire enough IRS folks to ensure compliance . . . there was a congressional finding that the IRS needs more resources in order to enforce the tax laws." Transcript of Motion Hearing at 41 (Feb. 18, 2025). Government counsel responded "yes" to the Court's statement. *Id.* The Court continued "at some point a certain number of firings would be tantamount to not using appropriated funds for a purpose that Congress mandated." *Id.* at 41–42.

Because Defendants fail to make any argument that the Administration's actions, cumulatively, conflict with the IRA, their motion to dismiss Count II must be denied.

**V.    Defendant OMB, OPM and Other Agencies' Implementation of the Workforce Order and Other Actions Violate the APA (Claims III-V).**

Counts III and IV allege that OPM and OMB violated the APA by implementing the Workforce Order and approving ARRPs in excess of their statutory authority and in a manner that is arbitrary and capricious. Count V is against the other Defendant-Agencies and alleges that their implementation of their ARRPs is arbitrary and capricious. Defendants argue that these claims should be dismissed for a laundry list of reasons, but, in each instance, they misconstrue applicable law or mischaracterize what the Unions have pled or both. Counts III, IV and V allege straightforward, cognizable APA claims.

**A.    Claims III-V challenge agency, not Presidential, action reviewable under the APA.**

Defendants acknowledge that APA review is available for agency action. Def. Mot. at 35. They argue, however, that the Unions' APA claims are actually against the President and the Workforce Executive Order, while simultaneously admitting that "Plaintiffs do not directly claim the EO violates the APA[.]" Def. Mot. at 35 & n.7. Counts III-V in fact plainly plead claims against only OPM, OMB, and the other Defendant-Agencies, which are all "agencies" within the meaning of the APA. *See* 5 U.S.C. § 701(b)(1).

This Circuit held in *Chamber of Commerce v. Reich* that "it is now well established that 'review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" 74 F.3d at 1328 (citing *Franklin v. Massachusetts,* 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment)). Numerous other courts have similarly held that under the APA, "where the President delegates the implementation of an executive order to an agency, that agency's actions are not derivatively shielded from APA review." *Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 U.S. Dist. LEXIS 105237, at *29 (D.D.C. June 3, 2025); *see also Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021) (holding that an "attempt to bootstrap the nonreviewability of presidential actions to discretionary authority delegated to" an agency did "not have support in precedent"); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020) ("To the extent Defendants contend that the court is foreclosed from reviewing agency actions taken to implement [Presidential] Proclamations, they are wrong.") (emphasis omitted); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019). Under this well-established law, OPM, OMB, and the other Defendant-Agencies' actions implementing the Workforce Order are clearly reviewable under the APA.

> B.  The OMB/OPM Memo and ARRPs are discrete agency actions reviewable under the APA.

Defendants' next argument that the Unions do "not challenge a discrete agency action" and instead seek only "wholesale improvements" to federal employment policies is similarly wrong. *See* Def. Mot. at 36–37. Counts III and IV

quite specifically challenge the OMB/OPM Memo and OMB's and OPM's approval of ARRPs. 2d Am. Compl. ¶¶ 118–122. Count V challenges the other Defendant-Agencies' ARRPs and their execution of those ARRPs. *Id.* ¶¶ 123–26. These actions are discrete, and not at all similar to the broad and undefined programs deemed unreviewable in the cases that Defendants cite.

For example, in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 (1990), the plaintiff challenged a constellation of "continuing (and thus constantly changing) operations" of the Bureau of Land Management (BLM). Although the plaintiff characterized these operations as BLM's "land withdrawal review program," that term was "not derived from any authoritative text" and did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders or regulations." *Id.* By contrast, the OMB/OPM Memo and ARRPs challenged here are specific, formal issuances defined in written documents.

*Village of Bald Head Island v. U.S. Army Corps. of Engineers*, 714 F.3d 186, 193 (4th Cir. 2013), does not help Defendants either. *See* Def. Mot. at 36. There, the court held that the Corps' approval of a dredging project "was a 'determination' that surely amounted to 'agency action.'" *Village of Bald Head Island*, 714 F.3d at 193. In contrast, the performance of the project, and especially the Corps' failure to adequately protect local beaches, "was not a determination—i.e., a 'rule, order, license, sanction, relief, or the equivalent'—that is 'action' as used in the APA." *Id.*

Like the Corps' approval of the dredging project in *Village of Bald Head Island*, OPM and OMB's approval of agencies' ARRPs "was a 'determination' that

surely amounted to 'agency action.'" *Id.* Unlike the Corps' performance of the project, however, agencies' execution of their ARRPs within established criteria set by OMB and OPM involve a contained set of actions that affect rights and obligations: identifying employees to terminate in their RIFs, issuing RIF notices, placing employees on administrative leave, and terminating them. *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 804 (D.C. Cir. 2023) ("An 'agency action' is an agency's determination of rights and obligations."). Reviewing these actions, unlike reviewing whether the performance of dredging work adequately protects local beaches, would not place the court in a "day-to-day managerial role over agency operations." *Village of Bald Head Island*, 714 F.3d at 194.

For similar reasons, agencies' execution of their ARRPs can be distinguished from BLM's failure to protect public lands from damage caused by off-road vehicle use in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61–65 (2004) (*SUWA*); BLM's "years' worth of policy choices and site-specific decisions" involved in determining the timber volume for sale each year in *Am. Forest Research Council*, 77 F.4th at 805; or BLM's strategy for managing the population of wild horses and burros in *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 21 (D.C. Cir. 2006). *See* Def. Mot. at 36. These were all generalized programs carried out over periods of years. In contrast, the ARRPs were not generalized programs but instead were done in response to specific direction by OMB and OPM under specific (and short) timelines. Judicial review here, therefore, would not create the problem of "injecting the judge into day-to-day agency management." *SUWA*, 542 U.S. at 67.

37

Defendants' argument that the OMB/OPM Memo does not fall into any of the categories of agency actions listed in 5 U.S.C. § 551(13) is also off base. *See* Def. Mot. at 37.[21] That provision allows challenges to "rules," which § 551(4) defines in part as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." The OMB/OPM Memo is an agency statement "designed to implement . . . policy"—in particular, the "workforce optimization initiative." OMB/OPM Memo at 1. The Memo's "future effect" is to require agencies to submit Phase 1 and Phase 2 ARRPs by certain dates, containing certain elements, and planned for implementation by certain dates. *See* OMB/OPM Memo at 3–6. In line with the APA's "expansive" and "comprehensive[]" meaning of agency action, the Memo certainly qualifies. *See Fund for Animals*, 460 F.3d at 19.

C.    The OMB/OPM Memo and implementation of the ARRPs are "final" actions reviewable under the APA.

To constitute final agency action under the APA, "the action must mark the consummation of the agency's decisionmaking process," and it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (cleaned up). As shown below, the Unions have challenged only final, not tentative or interlocutory, agency actions.

---

[21] Defendants focus on the OMB/OPM Memo, and do not argue that approving and executing the ARRPs are outside of section 551(13)'s definitions.

1.    The OMB/OPM Memo.

The OMB/OPM Memo marks the consummation of those agencies' decision-making process under the first prong of the finality test. Issued by those agencies' top brass, it is the "'definitive' statement[] of [OPM and OMB's] position" on the steps federal agencies must take to comply with the Workforce Order. *See Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1139 (D.C. Cir. 2010) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980)). The Memo is not "informal," "tentative," or "only the ruling of a subordinate official." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)).

The OMB/OPM Memo also satisfies the second prong of the finality test. It imposes obligations on federal agencies, including to submit and implement ARRPs on short deadlines, with which "compliance was expected." *Abbott Labs.*, 387 U.S. at 151.

Defendants wrongly insist that to be final and reviewable under the APA, the OMB/OPM Memo must have an "effect on *Plaintiffs*." *See* Def. Mot. 39–40 (emphasis added). *Scenic America, Inc. v. U.S. Department of Transportation*, 836 F.3d 42 (D.C. Cir. 2016), shows why this is not what the law requires. There, a nonprofit organization challenged a Federal Highway Administration (FHWA) guidance document. *Id.* at 45. The court found that the guidance had "a clear legal effect on the regulated entities," which were the FHWA "Division Offices and the states," not the plaintiff organization. *Id.* at 56. In particular, the guidance altered

the legal regime by "withdraw[ing] some of the discretion" that those entities previously held. *Id.* (citing *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011)).

The OMB/OPM Memo here similarly withdraws some of the discretion that other Defendant-Agencies previously held in conducting RIFs. For example, the OMB/OPM Memo dictates that agencies "should focus on the maximum elimination of functions that are not statutorily mandated" and "should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations." OMB/OPM Memo at 2. This binding and regime-altering effect on the agencies renders the OMB/OPM Memo final.

### 2.    OMB's and OPM's Approvals of ARRPs.

OMB's and OPM's approvals of specific agencies' ARRPs (Count IV) are also independently final agency actions, because they are neither "tentative [n]or interlocutory." *Bennett*, 520 U.S. at 178. Rather, OMB's and OPM's approval of an agency's ARRP is a "judgment allowing the [ARRP] to go into operation," and thus "ha[s] fixed legal consequences." *Bhd. of Locomotive Eng'rs & Trainmen v. FRA*, 972 F.3d 83, 99 (D.C. Cir. 2020) (holding that "the [Federal] Railroad Administration's approval of Kansas City Railway's revised engineer certification program is a final agency action").

Although Defendants argue that the OMB/OPM Memo's provision for OMB and OPM "review and approval" of ARRPs "cannot possibly bear the weight that Plaintiffs seem to assign to it" (Def. Mot. at 39), the information on the review and approval process that has become available suggests that legal consequences flow from it. In another case similar to this one,

40

> The evidence plaintiffs presented on how the ARRP approval process has actually played out shows that at least three defendant agencies initially submitted an ARRP that "did not include plans for large-scale RIFs" and that OMB, OPM, and DOGE rejected this plan "and directed the agency to implement large-scale RIFs instead."

*AFGE v. Trump*, No. 25-cv-03698-SI, 2025 U.S. Dist. LEXIS 98195, at *82–83

(N.D. Cal. May 22, 2025) *stayed*, *Trump v. AFGE*, No. 24A1174, 2025 U.S. LEXIS

2667 (July 8, 2025).[22]

So, despite Defendants' insistence that "agencies are responsible for developing and implementing RIFs" (Def. Mot. at 39–40), OPM and OMB have the last word. If there is any doubt on this issue, then dismissal is not warranted at this early stage and discovery must be allowed to prove whether it is OMB and OPM, or other agencies, who have the final say.

3.    Agencies' ARRPs and Their Execution.

Once approved, the agencies' ARRPs (Count V) constitute final agency action as well. The very case setting forth the finality standard shows why. In that case, the Supreme Court concluded that a Biological Opinion from the Fish and Wildlife Service constituted final agency action because it "alter[ed] the legal regime" by setting forth "prescribed conditions" for the Bureau of Reclamation to comply with in operating a water project. *Bennett*, 520 U.S. at 178. The Defendant-Agencies' ARRPs similarly "alter the legal regime" because they are not merely "tentative recommendation[s]." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. at 798).

---

[22] The Unions recognize that this case has been stayed but cite it to show how, as a factual matter, agency submissions of—and OMB and OPM rejection of—ARRPs are playing out.

Rather, they set forth "prescribed conditions" with which agencies intend to comply in conducting RIFs. *Id.*

The actions that agencies take in implementing their ARRPs also qualify as final agency action. In identifying employees to fire pursuant to a RIF and sending out RIF notices, for example, agencies consummate their decision-making process as to which employees are nonessential and which agency functions are not statutorily mandated. In placing employees on administrative leave and terminating them, the agency is causing certain duties and functions to cease, thus altering the agency's size, scope, and character. These actions "alter the legal regime," affect "rights or obligations," and inflict "legal consequences." *Id.*

    D.    <u>The Unions have no alternate, adequate remedy to the APA.</u>

APA review is permitted when there is "no other adequate remedy." 5 U.S.C. § 704. In interpreting the statute's "no other adequate remedy in court" language, "[t]he Supreme Court has long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such that 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.'" *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quoting *Abbott Labs.*, 387 U.S. at 141). The D.C. Circuit has held that APA review is precluded "where a statute affords an opportunity for *de novo* district-court review." *Id.* The "uncertainty of the availability of a remedy" can lead the court to consider that remedy inadequate. *Id.* at 1273–74; *see also Bowen v. Massachusetts*, 487 U.S.

879, 901 (1988) (rejecting argument that an adequate alternative remedy was available because the remedy proposed was "doubtful and limited").

Defendants claim that alternate remedies exist by simply recycling their channeling argument. Def. Mot. at 41–42. The Unions have explained why administrative review followed by the theoretical possibility of appellate court review is an insufficient "alternate" remedy here. *See* Argument, section I, *supra*. The available channels are unavailable or, at best, fatally weakened. The remedy that Defendants argue is available—review by the FLRA, MSPB, or Office of Special Counsel (Def. Mot. at 19–28, 41–42)—is, at the very least, "doubtful" and "uncertain[]." *See El Rio Santa Cruz Neighborhood*, 396 F.3d at 1270, 1274–75.

E.    Claims III-V allege plausible APA violations on the merits.

Defendants' position that the challenged agency actions satisfy the APA boils down to two arguments. First, Defendants note that the Supreme Court stayed a preliminary injunction in a similar case on the ground that the government was likely to succeed on the merits. Def. Mot. at 42. Second, Defendants argue that the Workforce Order's boilerplate instruction that its implementation should be "consistent with applicable law" shuts down any challenge to its lawfulness. Def. Mot. at 42–46. These arguments do not establish that the Unions failed to state an APA claim on which relief can be granted. Def. Mot. at 42–46.

**1.** The Supreme Court's terse emergency-docket order staying a preliminary injunction did only that: it stayed a preliminary injunction. *See generally Trump v. AFGE*, 2025 U.S. LEXIS 2667. It did not dispose of the *AFGE* case, which remains live in the district court. So, it certainly is not cause to dismiss this case. Whether a

case is likely to succeed on the merits is a different inquiry from whether a complaint alleges a plausible claim at the motion to dismiss stage. *Cf. 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 100 (D.D.C. 2012) ("[T]he federal rules do not permit a district court to dismiss a complaint that is sufficiently pled with detailed and plausible factual allegations based upon the court's own assessment of the weight of disputed evidence or its finding that the claim is not likely to succeed on the merits."). In addition, the Supreme Court opined only on the likelihood that the Workforce Order and the OMB/OPM Memo were lawful. *See Trump v. AFGE*, 2025 U.S. LEXIS 2667, at *1–2. It "express[ed] no view on the legality of any [ARRP] produced or approved pursuant to the Executive Order and Memorandum," which the Unions challenged in Count V here. *Id.* at *1–2.

**2.** Defendants' second argument that the Workforce Order's "consistent with applicable law" clause renders its implementation lawful is not grounds to dismiss this case either. Despite Defendants' heavy reliance on it (Def. Mot. at 42–45), Justice Sotomayor's lone view in her five-sentence *AFGE* concurrence is not a solid foundation to support dismissing the Unions' well-pleaded APA claims. *AFGE*, 2025 U.S. LEXIS 2667, at *2.

**a.** As Justice Sotomayor recognized, the ARRPs and their execution were not even before the Court. *Id.* The Unions allege here, however, that agencies have planned and executed RIFs that are not, in fact, "consistent with applicable law." For example, the Unions allege that agencies' plans to terminate tens of thousands of employees, such as IRS's plan to cut 40% of its workforce, demonstrate that

44

agencies are following the Executive Order's command to terminate employees "not typically designated as essential during a lapse in appropriations." 2d Am. Compl. ¶¶ 64–65 (quoting EO § 3(c)). And cutting non-essential employees conflicts with the Antideficiency Act, 31 U.S.C. § 1341 *et seq.* The Antideficiency Act shows Congress's intent that the "ongoing, regular functions of government" continue so long as Congress has funded the federal agencies that it created. 31 U.S.C. § 1342. While employees performing these functions—that is, non-essential employees— may not work during a lapse in appropriations, the opposite is true when Congress has provided funding: they are to work—and to do so in furtherance of the statutory missions that Congress has prescribed to their agencies. Outside of the lapse scenario, Congress surely intended that agencies would perform more functions than those considered essential, which only include ensuring "the safety of human life or the protection of property." *Id.*

The Unions also plausibly allege that agencies' ARRPs and their execution of those ARRPs are arbitrary and capricious. Most egregiously, HHS planned "from the beginning" that it was "going to do 80% cuts, but 20% of those are going to have to be reinstalled" because of anticipated "mistakes." 2d Am. Compl. ¶ 61 (quoting Rob Stein et al., *"Your RIF Notice Is Not Cancelled." Inside a Chaotic Week of Massive Layoffs at HHS*, NPR (Apr. 5, 2025, 5:00 AM), https://www.npr.org/sections/shots-health-news/2025/04/05/g-s1-58312/hhs-layoffs-rif-cdc-fda-nih) (last accessed Aug. 13, 2025)). And indeed, HHS's RIF notices have been riddled with errors. 2d Am. Compl. ¶ 60.

**b.** To be sure, the OMB/OPM Memo includes the "consistent with applicable law" language from the Workforce Order. OMB/OPM Memo at 1. But merely quoting the "savings clause does not and cannot override" the Memo's clear import. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) (*San Francisco*). Like the Executive Order in *San Francisco*, the Workforce Order and OMB/OPM Memo here "unambiguously command[] action." 897 F.3d at 1240. For instance, the OMB/OPM Memo incorporates the Workforce Order's command that agencies prioritize in the RIFs employees "not typically designated as essential" and "refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019." OMB/OPM Memo at 2. As noted above, this instruction conflicts with the Antideficiency Act.

**3.** As the Unions plausibly allege in their complaint, OPM and OMB's actions violate the APA in two additional ways.

**a.** Count III alleges that OPM's and OMB's implementation of the Workforce Order in the Memo and their approval of ARRPs pursuant to the Memo are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," under 5 U.S.C. § 706(2)(C). 2d Am. Compl. ¶¶ 118–120. OPM and OMB possess no authority to direct agencies to reorganize or engage in "large-scale" RIFs. The authority to reorganize the government, like the authority to create or destroy agencies, lies with Congress. *See id.* ¶¶ 23–29.

By statute, OMB's functions include budgeting, regulatory review, financial management, the promulgation of Executive Orders, and general management. *See*

31 U.S.C. §§ 501–507; *cf.* 5 U.S.C. § 3502 (RIF regulations identifying no role for OMB). OMB's authority with respect to financial and other management is generally limited to proposing policies, giving "advice" and making "recommendations" to agencies, along with long-range management planning. *Id.* § 503. To the extent that OMB assumes a role that goes beyond advising, making recommendations, or gathering reports from agencies, but instead purports to direct and approve (or reject) agency action, OMB crosses the line from clearinghouse or advisor to decision-maker—which Congress did not authorize. *See, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 126–127 (D.D.C. 2025) (rejecting argument that OMB management role set forth in § 503 authorizes action implementing Executive Order freezing government spending).

And section 503 does not give OMB the authority to make significant decisions for agencies in the realm of agency organization, agency functions or programs, or the size and scope of programs or staffing, particularly in light of the many statutes delegating those functions to the agencies themselves. The OMB/OPM Memo unambiguously and improperly provides "instruction" to submit the ARRPs for "approval." OMB/OPM Memo at 1–6.

OPM similarly has no statutory authority to approve agency plans to reorganize between or within agencies. 5 U.S.C. §§ 1101–1105. Nor does it have authority to require agencies to terminate workers. *Id.* OPM's statutory authority with respect to RIFs consists of setting government-wide order of retention rules for the release of employees in a RIF, not making the decision whether or how many

employees to RIF. 5 U.S.C. § 3502. OPM's own RIF regulations state that "[e]*ach agency* is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated." 5 C.F.R. § 351.201(a)(1) (emphasis added). OPM cannot order federal agencies to downsize or reorganize.

**b.** OPM and OMB's actions are also arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). The APA requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), which means that agency action must be both "reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). It is arbitrary and capricious for an agency to "entirely fail[] to consider [an] important aspect of the problem." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (citation omitted). "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Id.* at 20 (cleaned up).

The OMB/OPM Memo is arbitrary and capricious for several reasons.

- The Memo's time period to submit plans for massive layoffs and restructuring (a mere two weeks for the initial plan that must identify agency-wide cuts) is absurdly short. It necessarily means that agencies

could not engage in rational decision-making, as opposed to simply following the desires of the President and his agents.

- The OMB/OPM Memo's mandate that all agencies engage in "large-scale RIFs" to achieve a "significant reduction" in personnel and the "maximum elimination of functions" (in the name of eliminating "bloat" and "waste"), is per se unreasonable. *See* OMB/OPM Memo at 1–2. It necessarily disregards important aspects of the decision at issue, including the impacts on the agencies' ability to effectively perform their statutory functions and requirements and the resulting consequences to the public, the economy, the workforce, or anything else.

- Requiring agencies to abolish all offices, programs, and operations identified by the President (or via his agents) necessarily requires agencies to ignore their complex array of statutory authority and obligations and effectively permits the President to wield power that he does not have. Lapse Plan levels are an arbitrary starting point. By definition, they do not reflect staff levels for fully functioning agencies. And using 2019 levels (the last year of the prior Trump Administration) is even more arbitrary. Those levels have nothing to do with agencies' current needs and obligations. These actions by OMB and OPM are neither "reasonable [nor] reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

49

Individually and cumulatively, these factors predetermine how agencies can act, which is arbitrary and capricious.

Even if the OMB/OPM Memo's stated goal was within OMB/OPM's authority (which it is not), OMB and OPM have provided no explanation, let alone a rational one, for their choice to accomplish that goal through a whirlwind, clandestine process that replaces considered agency decision-making with unqualified mandates. OMB's and OPM's rushed process ignores countervailing considerations, including the repercussions that will necessarily result from abruptly abolishing vast swaths of government service and functions. *See League of Cal. Cities v. FCC*, 118 F.4th 995, 1014 (9th Cir. 2024) (agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (cleaned up); *cf. Prometheus Radio Project*, 592 U.S. at 423–27 (FCC's actions reasonable where FCC thoroughly examined the record and considered impact of rule change on minority and female ownership). OMB and OPM's categorical requirements necessarily preclude the federal agencies that are carrying out RIFs from engaging in reasoned decision-making that considers all important aspects of the decision as the APA requires.

## **CONCLUSION**

For these reasons, the defendants' motion to dismiss should be denied.

Respectfully submitted,

/s/ Julie M. Wilson
JULIE M. WILSON
General Counsel
D.C. Bar No. 482946

/s/ Paras N. Shah
PARAS N. SHAH
Deputy General Counsel
D.C. Bar No. 983881

/s/ Allison C. Giles
ALLISON C. GILES
Assistant Counsel
D.C. Bar No. 439705

/s/ Jessica Horne
JESSICA HORNE
Assistant Counsel
D.C. Bar No. 1029732

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street, N.W., Suite 1000
Washington, D.C. 20001
Tel: (202) 572-5500
Fax: (202) 572-5645
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

Attorneys for Plaintiff NTEU

/s/ Yvette M. Piacsek
YVETTE M. PIACSEK
General Counsel
D.C. Bar No. 980302

NATIONAL FEDERATION OF FEDERAL
EMPLOYEES, IAM, AFL-CIO
1225 New York Avenue N.W., Suite 450
Washington, D.C. 20005
Tel: 202-216-4428
ypiacsek@nffe.org

Attorney for Plaintiff NFFE


/s/ Carla M. Siegel
CARLA M. SIEGEL
General Counsel
D.C. Bar No. 449953

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772
Tel: 301-967-4510
csiegel@iamaw.org

Attorney for Plaintiff IAM

/s/ Teresa Ellis

TERESA ELLIS
General Counsel
D.C. Bar No. 495855

INTERNATIONAL FEDERATION OF
PROFESSIONAL & TECHNICAL
ENGINEERS, AFL-CIO
513 C Street N.E.
Washington, D.C. 20002
Tel: (202) 239-4880
tellis@ifpte.org

August 15, 2025                    Attorney for Plaintiff IFPTE